IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 2:23-cr-00069-Z-BR-5 |
| Government, | ) | |
| VS. | ) | Tuesday, April 16, 2024<br>10:11 a.m. - 12:45 p.m. |
| RACHEL LYNN WADDELL, | ) | |
| Defendant. | ) | PRETRIAL CONFERENCE |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MATTHEW J. KACSMARYK

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
BY: ANNA MARIE BELL, AUSA
BY: JOSHUA FRAUSTO, AUSA
500 South Taylor Street, Suite 300
Amarillo, Texas 79101

FOR THE DEFENDANT: BARFIELD LAW FIRM, P.C.
BY: B. BROOKS BARFIELD, ESQ.
P.O. Box 308
Amarillo, Texas 79105

COURT REPORTER: SHAYNA MONTGOMERY, CSR, RMR, CRR
United States Court Reporter
205 SE 5th Ave, Room 133
Amarillo, Texas 79101

Proceedings reported by mechanical stenography and transcript produced by computer.

P R O C E E D I N G S

THE COURT: The Court calls Criminal Case Number 2:23-cr-069-Z-BR-1, United States vs. Rachel Lynn Waddell, for pretrial conference.

Are the parties ready to proceed?

MS. BELL: The United States is ready, Your Honor.

MR. BARFIELD: Defense is ready, Your Honor.

THE COURT: And at this point I'll ask the defendant to state your full name for the record --

THE DEFENDANT: Rachel --

THE COURT: -- to note your presence in court today.

THE DEFENDANT: Rachel Lynn Waddell.

THE COURT: And, Ms. Waddell, you may participate in this hearing seated or standing, whatever is most comfortable and consistent with the advice of counsel.

And because this was originally charged as a multi-defendant case, the Court will make clear that this is 2:23-cr-69-Z-BR-5.

So just some preliminary housekeeping on the Court's expectations for trial which is set for next week. Trial start time will be ten o'clock a.m. Counsel may speak from the lectern. They must seek leave of Court to move about the courtroom. Water is allowed but nothing else. I think everybody on both the government's side and defense side has been in this courtroom before. All counsel and assistants may

use laptops.

This Court revised the prior local rule regarding use of courtroom technology. I just ask that you refer to that.

We'll begin at 10:00 a.m. with voir dire and the Court will conduct the majority of the voir dire questions and then I'll reserve 15 minutes per side for your questioning. As is typical in this courtroom, the venire panel will be assembled left to right, identified by number in the gallery behind you. So I'll instruct counsel for the government and defendant to reorient their tables so that you may conduct voir dire towards the gallery. We'll then change that configuration once opening arguments begin.

As a reminder to both the government and defense counsel, I don't tolerate gamesmanship during voir dire. You may not pre-try your case to the jury. The purpose of voir dire is to identify jurors who are qualified to serve. I also will not allow bolstering of any of your witnesses or your case-in-chief. For the benefit of the court reporter and the record on appeal, I'll ask that you provide a list of all of the attorneys who will be appearing at counsel table, any titles that apply, and that is due to the CRD by Friday close of business of this week.

Now, because we don't have a standing jury pool in the Amarillo Division, I just remind you that we have to issue subpoenas -- or I'm sorry, have to issue summons in advance of

voir dire. The Court anticipates 40 to 50 venire persons within your venire panel. We will use a cordless microphone for all questioning from the Court and from counsel. I'll ask that attorneys be careful to use the assigned numbers for individual venire persons for record purposes and also purposes of anonymity.

So here, under Criminal Rule of Procedure 24(b), the Court anticipates a 32-count strike range, ten plus one for the defendant, six plus one for the government, and those extra counts are for two alternates. You'll also notice that our jury box is configured to accommodate that configuration.

I know that counsel for the defendant and the government have tried many cases in this room, but as a reminder I'll go through the following questions from the bench. You may delete these questions from your own voir dire outlines because the Court will address the following.

We'll confirm that the jurors are qualified to serve. I'll go through the counties in the Amarillo Division. We'll go through standard excuses from service. I'll provide a basic case overview and also some basic criminal law concepts discussing burdens of proof and how a criminal case differs from a civil case. I'll also introduce counsel, parties and witnesses and determine if there are any relationships or prior knowledge that would prejudice their ability to serve as jurors.

The Court will ask its questions, followed by the government, then the defendant, and again, I'm affording each side 15 minutes for those questions. As part of the standard criminal trial scheduling order, both parties are afforded an opportunity to submit questions that you would prefer from the bench for the Court to ask, and these may be case-specific questions or criminal case law questions.

Did either party submit for the Court voir dire questions that they would prefer to read from the bench?

MS. BELL: The government did, Your Honor.

THE COURT: Okay. And did the defendant submit?

MR. BARFIELD: Yes, Your Honor.

THE COURT: Okay.

MR. BARFIELD: I think -- pursuant to the scheduling order, I believe we presented that via e-mail to the Court.

THE COURT: Okay. So I have a copy of that document from the government and from the defendant and I will review those ahead of trial and I will integrate those into the Court's questioning of the venire panel. So I thank the parties for complying with that order and providing advance notice of those questions. So those will be integrated into the Court's outline for voir dire.

Just so you understand the vast geography of this case, I do intend to ask questions about hardships. Sometimes we have jurors that are traveling multiple hours to attend voir

dire. If we need to take up individual hardships one by one, we'll excuse the venire panel, bring in the individual venire person, and we'll do a colloquy at that point. So I'll ask that both the government and defense counsel keep a running list of potential hardship questions. I'll explain the nature of a qualifying hardship and then we can identify individual venire persons to whom that might apply.

In this division, it's often geography and the logistics of covering child care and things like that. So we'll go through any venire persons that are subject to hardship or excuse. We'll do any rehabilitation of those venire persons. I'll allow counsel for the government and defendant to ask those rehabilitation questions, if necessary, and then we will go into our strike range and I will start with any strikes for cause. Of course this'll be done outside of the presence of the venire panel.

And I will take up those cause arguments from counsel first and then we'll exchange our list for peremptory strikes. So the way we do peremptory strikes here, parties will have ten minutes to delineate strikes on their respective list, and at the end of that ten-minute period, parties will simultaneously return those strike lists to the courtroom deputy, and we'll also have personnel from the clerk's office. They will reconcile those two lists and then provide the Court with a copy and then we'll go into any motions or objections, any

Batson challenges or anything like that. We'll take care of that outside the presence of the jury. And at this point, the venire persons will return to this first-floor courtroom and we will seat the jury.

And again, it's my hope that we will have two alternates. It's my practice not to identify the venire persons as alternates. I find that they are better invested in the trial if they don't think of themselves as alternates. So those alternates will not be identified until the close of evidence and their dismissal.

Now let's go through any pretrial motions that need to be resolved prior to trial.

Here, the Court has several motions in limine that are pending. Let me summarize those and then invite argument as necessary.

So here, we have government's motion in limine in ECF Document Number 309 requesting that the Court exclude references to alleged prior physical or emotional abuse between the defendants, the arrest of codefendant T Blue Bloomer on December 21st, 2022, and excluding reference to any prior protective orders. This motion in limine also seeks exclusion of statements regarding potential punishment, potential punishment of coconspirators and any argument that this defendant previously worked as an informant for law enforcement.

So, Ms. Bell, have I properly summarized your points expressed in the motion in limine?

MR. FRAUSTO: Your Honor, Josh Frausto on behalf of the United States. Yes, Your Honor, you did, and it's my understanding defense is in agreement and unopposed as to all four requests.

THE COURT: Okay. And Mr. -- and I'll enter a final ruling here shortly just for record purposes and for any record on appeal.

And for the defense, I have ECF Document Number 312, a motion in limine requiring the government to provide reasonable notice before introducing 404(b) evidence. It's my understanding that the government complied with this Court's scheduling order requiring prior notice of any 404(b) evidence. I believe that was filed in ECF Number 308.

Is that correct, Mr. Frausto?

MR. FRAUSTO: Yes, Your Honor.

THE COURT: Okay. And, Mr. Barfield, you are simply requesting, at least in that motion, that the parties approach the bench before we introduce any 404(b) evidence, is that correct?

MR. BARFIELD: That is correct.

THE COURT: You also had filed defendant's motion for full disclosure of the witness list in ECF Document 295. We can address that issue now, but I believe just by operation of

the scheduling order that witness list has now been filed of record. Do you continue to urge your motion for disclosure of witness list?

MR. BARFIELD: The list has been complied with, Your Honor.

THE COURT: Okay. So I've prepared an order dismissing that motion as moot and it just recounts the procedural history of that motion's practice, and then the Court finds that in accord with the scheduling order the government timely complied with its obligation to disclose its witness list to the defendant. Accordingly, the motion is dismissed as moot.

Any objections to that order, Ms. Bell?

MS. BELL: No. Thank you, Your Honor.

THE COURT: Any objections -- it is your motion, Mr. Barfield. Any objections?

MR. BARFIELD: No. Since the government's complied, it would be a moot motion at this point.

THE COURT: Just to keep the docket sheet clean, we'll enter that order today, and the Court does find that the government complied with the scheduling order and those witness lists were properly disclosed to defendant.

Now -- so I will take up each of these limine items in the sequence they were briefed to the Court. I'll make necessary findings, and then if there's anything that needs to

be further adjudicated, I'll hear those arguments next. I believe I heard from Mr. Frausto that most of these limine items can be done by agreement, but I just want to make sure that we have proper findings because I know this case was severed rather late in the process and I want to make sure that the record on appeal is clean on all those points.

First is the government's motion to exclude reference to alleged prior physical or emotional abuse, and this relates to the arrest of codefendant T Blue Bloomer on December 21st, 2022 and prior protective orders. The Court has tentatively determined that it should grant government's motion as identified by the government. No evidence is admissible at trial unless it tends to make a factual issue more or less probable. Here, the government has cited Federal Rule of Evidence 401.

The Court further finds that introducing evidence of that alleged abuse would likely contradict a binding Fifth Circuit pattern instruction, specifically 1.04, which states that the jury should render its verdict solely on evidence without prejudice or sympathy. And the Court is also guided by United States vs. Penn, 969 F.3d 450. The Court discerns that that Fifth Circuit counsels against evidence that might encourage nullification because such evidence is, by definition, irrelevant, inadmissible and should not be introduced at trial.

So, Mr. Frausto, are you arguing the government's motion in limine?

MR. FRAUSTO: Yes, Your Honor.

THE COURT: Okay. So any additional analysis or anything that you would like to preserve for further appellate review?

MR. FRAUSTO: No, Your Honor.

THE COURT: And, Mr. Barfield, am I correct that you do not oppose this motion in limine?

MR. BARFIELD: That's correct, Your Honor. And I think a lot of that motion in limine had to do with the -- prior to the cases being severed.

THE COURT: Okay. And that was the Court's assumption as well, that a lot of these issues are now resolved by virtue of the order granting severance, but the Court does grant this first motion in limine and does find that evidence of that prior abuse and prior protective orders is inadmissible for the reasons stated. This'll be finalized in the Court's written order in limine.

So next, government's motion to exclude statements regarding potential punishment. The Court has tentatively determined that it should grant government's motion. The Court is also guided by Fifth Circuit precedent Rogers vs. United States, 422 U.S. 35, quote, "The jury has no sentencing function and should reach its verdict without regard to what

sentence may be imposed." So that is just one case in that line of unbroken Supreme Court and Fifth Circuit precedent.

Anything further from the government on this motion?

MR. FRAUSTO: No, Your Honor.

THE COURT: Mr. Barfield, anything from the defendant?

MR. BARFIELD: No, Your Honor. I don't believe punishment is an issue for the jury at all.

THE COURT: Okay. So that motion in limine is granted. It'll be reflected in the Court's written order in limine.

And let's move next to the motion to exclude statements of the coconspirators' potential punishment. In a similar vein, the Court is guided by Rogers vs. United States and cases applying same, and the Court has tentatively determined it should grant that motion and memorialize it in the order.

Anything further from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Anything further from defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: So the Court does grant that motion in limine. It'll be reflected in the written order.

So finally, we have, at least on the government's motion in limine, a reference to defendant's prior work as an

informant. Here, the Court does not ascertain that defendant has asserted a public authority offense. The Court only -- the fact the defendant previously provided information to law enforcement is irrelevant to the legal issues before the Court.

Are there any other findings or analysis from the government -- or that you would request?

MR. FRAUSTO: No, Your Honor.

THE COURT: Anything further from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. So here, the Court does grant that motion in limine and does hereby exclude references to defendant's prior work as an informant for law enforcement, and that'll be memorialized in the final written order in limine.

So let's turn next to the pending motion in limine filed by the defendant.

So here, in the first instance, the defendant asks that government counsel approach the bench before introducing any evidence of past crimes, wrongs or other acts. I believe we've reached agreement on Rule 404(b). The Court is guided by the language of that rule which states that there is a narrow exception to the inadmissibility of character evidence where such evidence is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or lack of accident.

But that rule and this Court's own criminal

scheduling order requires prior notice of intent to present such evidence. The Court finds that the government has complied with that notice requirement in ECF Document Number 308 and the Court has tentatively determined that it should grant defendant's motion as to the need to approach.

Anything further, Mr. Barfield? It is your motion.

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. And are you satisfied that the government has complied with its obligation to provide notice under Rule 404(b)?

MR. BARFIELD: I have -- I am, Your Honor.

THE COURT: Okay. Anything further from the government?

MS. BELL: Thank you, Your Honor.

With regard to this evidence in Exhibit 5, Your Honor, on page 2 there are -- there's questioning, Your Honor, from Officer Mincher to Ms. Waddell.

Can you show that?

Your Honor, on that page Officer Mincher asks what other kinds of drugs Ms. Waddell uses and she admits that she smokes weed, that she uses methamphetamine and that she has not used cocaine, Your Honor. The defendant did not object to this exhibit and we will be asking the Court to preadmit it, Your Honor.

And so with regard to the need to approach, Your

Honor, given that it's already in an exhibit we won't be harping on those points. We certainly think they're important to the government's case and that, should Ms. Waddell argue that she thought she was dealing with cocaine powder, this is highly relevant, this line of questioning, as to what substance she thought she had, Your Honor. And so given that, we believe that, since defendant has not objected to this exhibit, it would be admitted without objection by the defendant and would not need to approach prior to using this exhibit if the Court would allow.

THE COURT: And you -- at least at this date and as part of your trial preparation, you intend to present Government's Exhibit 5 through the direct examination of Officer Mincher?

MS. BELL: Yes, Your Honor.

THE COURT: Okay. So I'll instruct court staff to pull the television screen forward so that defense counsel can review that exhibit.

MR. BARFIELD: I have it on my screen, Your Honor.

THE COURT: Okay. Mr. Barfield, this is just the -- I'm construing Ms. -- okay. All right.

I know that that's small-type font for anybody in the gallery, but this is Government's Exhibit 8 -- I'm sorry, Government's Exhibit 5, page 1.

MS. BELL: Yes, Your Honor.

THE COURT: And, Ms. Bell, I'm just construing your motion as a request for further clarification on the 404(b) order in limine that you need not approach before introducing this portion of Exhibit 5, is that correct?

MS. BELL: That is our request, Your Honor.

THE COURT: And any objection, Mr. Barfield?

MR. BARFIELD: Nope -- no, sir. I don't have any objection -- on this particular exhibit I don't have any objection to that.

THE COURT: Okay. Thank you to both parties for diligently previewing that issue.

We don't have to take this up outside the presence of the jury or add further delay. I'll also note that Government's Exhibit 5 was stipulated by both parties. So the Court grants the government's request and you need not approach in order to present this portion of Exhibit 5, which has been stipulated.

MS. BELL: Thank you, Your Honor.

And similarly, many of the other exhibits, Ms. Waddell discusses her use of fentanyl powder and fentanyl pills, Your Honor. Those exhibits are numerous. They also have been stipulated to. The defendant has no objection to those exhibits. They will be in this similar format in the form of a transcript. It will be played. And so we would ask, Your Honor, similarly, that we need not approach for each and

every exhibit that references Ms. Waddell's fentanyl powder and pill use, Your Honor. In fact, she says at one point that -- and admits that she was using fentanyl and selling fentanyl to support her habit.

And so that's highly relevant, Your Honor, and we would ask not to have to approach for each exhibit.

THE COURT: And Mr. Barfield?

MR. BARFIELD: That's fine, Judge.

THE COURT: We can take these up one by one or I can make it part of the written order in limine that as long as it is an exhibit that is stipulated or preadmitted into evidence, the government need not approach for that portion of the exhibit.

MR. BARFIELD: Yeah, Your Honor. And I think what we're talking about is conversations in transcripts, and that's fine, Judge.

THE COURT: Okay. So I'm granting the government's request. I will draft language in the written order in limine specifying that as long as it is an exhibit admitted by stipulation or ruling of the Court, that the government need not approach to the extent that transcript reflects some of that 404(b) content.

And next, the Court has now signed the order dismissing as moot defendant's motion for disclosure of the witness list. That'll be made part of the ECF docket sheet and

record on appeal.

Are there any other pretrial motions that can be addressed and resolved at this time, Ms. Bell?

MS. BELL: I don't believe so, Your Honor.

THE COURT: And any from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. So the parties can anticipate the order in limine being on file before close of business Friday of this week. I anticipate it'll actually probably be filed earlier than that.

And as I've explained to both the AUSA and defense counsel in other settings, this is a request-permission culture in this courtroom, not a beg-for-forgiveness. So if you think that you're approaching any of the limine issues that were addressed in that order, out of an abundance of caution, let's approach. We'll activate the sound machine, we can take up that issue outside the presence of the jury.

So I know judges have different takes on limine, but it's my preference to strictly enforce the order in limine. If you have any doubts about whether you're approaching a red line, I just ask that you approach this bench. We'll have the court reporter relocate the microphones so that we make whatever appellate record is necessary and we can take those up at trial.

Now -- so let's turn to the jury charge, and I know

that there will be a final charge conference during the trial proceedings, but to the extent we can pre-litigate any jury charge language at this conference, I prefer to do so.

So here, ECF Document Number 320 is styled as an agreed proposed jury charge.

Ms. Bell, is it correct that the government consents to the jury charge appearing in that document?

MS. BELL: Yes, Your Honor.

THE COURT: And, Mr. Barfield, I believe that your signature block is on the cover page for that agreed proposed jury charge. Is the defendant agreed to that jury charge language?

MR. BARFIELD: Yes, Your Honor.

THE COURT: Okay. There was one pattern that I wanted to address. I know some of these exhibits involve Spanish translations. I see here that the parties have agreed to the Fifth Circuit Jury Pattern Instruction 1.49 regarding transcripts of foreign language.

Am I correct that this is directly from the Fifth Circuit pattern, Ms. Bell?

MS. BELL: I believe so, Your Honor. Mr. Frausto prepared these, but I believe it is.

THE COURT: Okay. All right.

So -- I'm sorry. Mr. Frausto, it's a little bit like whack-a-mole.

MR. FRAUSTO: Sorry, Your Honor.

THE COURT: Sometimes I don't know which attorney I'm referring to.

Mr. Frausto, is this directly from the Fifth Circuit pattern?

MR. FRAUSTO: That's correct, Your Honor.

THE COURT: Okay. Any objection to 1.49 as appearing in the agreed charge?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. So that's the only wrinkle that I discerned in the jury charge. I know sometimes in cases involving translation of non-English languages parties will request a more particularized instruction, but if both sides are agreed to the pattern we'll just use Pattern 1.49.

Are there any other portions of this jury charge that remain in dispute and have the attorneys flagged those for the Court's attention? I don't --

MR. FRAUSTO: Your Honor, just briefly if I may, regarding 1.49, the only thing that was modified, which is depicted on page 9 of the agreed jury charge, is it was modified to include text messages because it's just tape-recorded conversations. But it was modified to include text messages which Mr. Barfield agreed to.

THE COURT: Okay. And so that's what I was going to ask. Where I see a bolded italicized parenthetical, that's to

clarify to the Court any modifications to the pattern.

MR. FRAUSTO: That's correct, Your Honor.

THE COURT: Okay.

MR. FRAUSTO: That's the only thing that was modified outside of the Fifth Circuit pattern jury charge.

THE COURT: Okay. And I was flipping through the charge this morning to see if there were any other inserts reflecting modification that needed to be addressed today. I didn't see any but this foreign language instruction.

Are there any others that we can take up at this time?

MR. FRAUSTO: No, Your Honor.

THE COURT: I think the rest of the italicized font is trial dependent, just the parties notifying the Court that, if necessary, some of this language may be used, but in any event, it'll track with the Fifth Circuit pattern. Is that correct?

MR. FRAUSTO: That's correct, Your Honor.

THE COURT: Okay. Mr. Barfield, any of this italicized language appearing in parentheticals that you would wish to address now at the pretrial conference?

MR. BARFIELD: Not at this time, Your Honor.

THE COURT: Okay. So this Court will start with the agreed proposed jury charge and then I will present both parties with the Court's draft. We'll have the charge

conference, and then this is without prejudice to either party arguing any additional charge language. I know some of this proposed language is conditioned on what is testified to and what evidence is adduced at trial, but I think we're in pretty good shape. This is not a case where the charge conference is going to consume half a day or a full day of appellate argument. So the Court thanks the parties for being diligent in reaching agreement on pattern language.

Okay. So now that we have addressed pending pretrial motions, what I believe is a substantially complete jury charge, let's turn to just scheduling.

So the Court anticipates that the government -- government's case and defendant's case will take no longer than two days. So I've instructed the clerk's office, the marshals, the court security officers to anticipate a two-day trial.

Does other -- does either the government or defendant think that we need to add a third day to that schedule?

MS. BELL: I think it would be wise to add it just in case, Your Honor. It depends on how long voir dire takes. Certainly, that has taken, on some trials, into the evening hours and sometimes early. We've prepared an opening and we'll have a short witness prepared for Tuesday. Officer Mincher will be second, and I anticipate his testimony to be five to six hours; hoping to start him on Wednesday. And then our remaining witnesses would be short, but that would give us very

little time for charge conference and everything --

THE COURT: Okay.

MS. BELL: -- and close. So I think it will go into Thursday.

THE COURT: Okay. Mr. Barfield, any objection to the Court anticipating a three-day trial?

MR. BARFIELD: I think that's probably prudent, Your Honor, to anticipate a three-day trial.

THE COURT: And, of course, you know, as defense counsel, it's your prerogative to reserve certain case strategies. But do you think a third day would be adequate for any defense case?

MR. BARFIELD: I do, Your Honor.

THE COURT: Okay. So I'll modify that instruction to the clerk's office and court staff. We will plan for a three-day trial. As you know, this division has just one court reporter, so I have to coordinate with the magistrate judge and all of the initial appearances and arraignments that she has upstairs. So I'll just advise Magistrate Judge Reno that we are planning on a three-day trial interval. So we will make certain to have the court reporter available for that and then also court security in place.

And how much time -- let's talk about opening statements. How much time do you anticipate for opening statements, Ms. Bell?

MS. BELL: Your Honor, we're requesting 30 minutes, although I may move for 15.

THE COURT: Okay. And are you requesting a warning?

MS. BELL: Yes, Your Honor, a ten-minute warning.

THE COURT: Okay. And, Mr. Barfield, how much time would you like for your opening statement, understanding that you may present at the beginning of trial or during your case-in-chief?

MR. BARFIELD: No, Your Honor, those time constraints would be perfectly fine with defense, already mentioned by the Court and counsel.

THE COURT: Okay. So 30 minutes with a ten-minute warning from the Court.

MR. BARFIELD: Yes, Judge.

THE COURT: So let's talk about the anticipated witness order. Again, I know because some of the logistics of the division require both parties to make witnesses available from different offices, sometimes in the Dallas Division, sometimes in the Fort Worth Division. So I have the pre-submitted list of witnesses. I just want to make certain that that list matches counsel's expectation.

So during the government's case-in-chief, I have the following fact witnesses: Officer Randy Mincher, Amarillo Police Department; Officer Randall Chance Harlan, Amarillo Police Department; Sergeant Jeremy Hoffman, Randall County

Sheriff's Office and DEA task force officer or TFO. And we have Corporal Christopher Cruz, Amarillo Police Department; Officer Ricky Lee Matthews, Amarillo Police Department; Corporal Royce Matthew Bushey, Amarillo Police Department. And then the final fact witness and custodial witness, Captain Matt Stockstill, Randall County Sheriff's Office. I have -- oh, I'm sorry, and then another fact witness, Analyst Dorthy Sparks of the DEA.

As far as expert designations, the government has noticed as an expert and fact witness, Task Force Officer Vernon J. Wilson of the DEA task force; Jay R. Hopenwasser, and that is spelled H-O-P-E-N-W-A-S-S-E-R, a senior forensic chemist with the DEA; and expert witness Paul Galat, identified as a forensic chemist.

Have I correctly identified the witnesses you intend to call, Ms. Bell?

MS. BELL: Yes, Your Honor, although depending on the preadmittance of our evidence today, we will certainly be shortening that. In fact, if the majority of these or all of these are preadmitted, Your Honor, we intend on calling five witnesses in this order: Vernon Wilson, Randy Mincher, Christopher Cruz, Jay Hopenwasser and Paul Galat.

THE COURT: Okay. Thank you for that order. We'll instruct the court security officers and the marshals to anticipate those witnesses in and out of the building.

And I do have a secondary list of possible witnesses. I know this may be trial contingent, but Corporal Anthony Kennedy of the Amarillo Police Department; Officer Douglas Richardson of the Amarillo Police Department; Special Agent Christopher Brown of the DEA; Special Agent Fernando Burga of the DEA; Sergeant Richard Anderson of the Amarillo Police Department; Officer Erick Quirk of the Amarillo Police Department; Officer Eric Skaggs of the Amarillo Police Department, and Sergeant Randy Rice of the Randall County Sheriff's Office.

And then listed as a potential custodial witness, Officer Kristopher Koval, the DEA task force officer. And one final potential fact witness, Sergeant Kerry Blackerby of the Randall County sheriff's office. Those were duly designated and noticed.

Ms. Bell, is it my understanding that you were just holding those as possible witnesses and to comply with the Court's scheduling order?

MS. BELL: Yes, Your Honor.

THE COURT: Okay. So we will keep that on a separate inventory. If at any time the government anticipates calling those witnesses, please notify the clerk's office and the courtroom deputy will make allowances for their participation.

Are any of these witnesses assigned to the Dallas Division or will require a special setting because of

logistics?

MS. BELL: Your Honor, Jay Hopenwasser and Paul Galat, both being senior chemists with the DEA lab, have very busy schedules. We've asked them to fly in on Wednesday morning and stay through Thursday evening, and so they'll be available for testimony Wednesday afternoon or early Thursday, depending on how fast we go.

THE COURT: Okay. So we'll do our best to stay on schedule. If it looks like we are disrupting that anticipated schedule, we'll work with counsel during a break to reorder witnesses if necessary.

MS. BELL: Thank you, Your Honor.

THE COURT: Okay. And, Mr. Barfield, any witnesses that you would identify to the Court and any logistics that we should know about to ensure their presence at trial?

MR. BARFIELD: No, I believe the witnesses involved in this case have already been mentioned to the Court, except for the exception of potentially my client, obviously, subject to her Fifth Amendment rights. I don't anticipate necessarily that she would testify, but if she at some point chooses to testify, that would be a witness not mentioned previously.

THE COURT: Okay. If we're approaching your case-in-chief or a point in your case-in-chief where you do anticipate that the defendant will testify, we will excuse the jury. We'll do the necessary Fifth Amendment colloquy.

That'll be done outside the presence of the jury, so I'll just ask that you give us some advance notice. We'll have to do a bit of jury shuffle and we'll have to preserve the appellate record on that. But if defendant exercises her right to testify in her own trial, we'll do the Fifth Amendment work outside the presence of the jury. I want to make sure that we make a clean record on that, but we may need to time that with scheduled breaks and lunch breaks and things like that. If you think that there is a time where we can make that necessary record, just notify the Court and we'll try to anticipate that and get ahead of the schedule.

MR. BARFIELD: Yes, Your Honor. If my anticipation changes, then we will immediately notify the Court and opposing counsel.

THE COURT: Okay. And I'll allow you to do whatever Fifth Amendment work is necessary to make a clean record for the Fifth Circuit.

Okay. So I listed a series of expert witnesses that were designated by the government.

Does defense counsel have any untimely Daubert motions stating good cause to challenge any of the proposed expert testimony, that of Vernon Wilson, Jay Hopenwasser or Paul Galat?

MR. BARFIELD: After reviewing the case law and being involved in this for quite some time, I do not, Your Honor.

THE COURT: Okay. So the Court finds that Vernon Wilson, Jay Hopenwasser and Paul Galat are qualified and may testify as experts in this trial limited to the topics of expertise identified in government's designation of experts in ECF Number 294. Rule 702 states that an expert may be qualified by knowledge, skill, experience, training or education and may testify in the form of an opinion if it will help the trier of fact to understand the evidence, the testimony as a product of reliable principles and methods, the testimony as a result of those methods, and the expert has reliably applied those methods to the facts of this case.

The Court finds that those standards are satisfied here for the aforementioned witnesses and that all of these witnesses may testify in their expert capacity consistent with Rule 702 and also the Daubert opinion and cases applying same. Additionally, the Court separately finds that these witnesses also have training, education and experience in their respective fields and may testify in that capacity as well.

Now, I know there was at least one expert who was cross-designated as a potential fact witness, and I think -- I believe that was Task Force Officer Vernon Wilson. Is that correct, Ms. Bell?

MS. BELL: We intend at this point to use him as an expert only, Your Honor.

THE COURT: Okay. So I know I have seasoned criminal

practitioners on this case. You understand the tension. If at any point either party is requesting fact testimony for an expert that is admitted and designated an expert, I'll just ask that you keep those two lines of testimony distinct. I can instruct the jury on the differences between expert and fact testimony. So if you have someone in the witness stand who is testifying both as a fact witness and an expert witness on the same trip, let's just take a break. If you can bifurcate your testimony, I'll explain to the jury the differences so that when they go to deliberate, they understand the differences between expert and fact testimony. This is consistent with the Fifth Circuit admonishment that we keep these things separate for the jury.

So if at any point you think that an expert is bleeding into fact testimony, let's take a pause. I believe it's United States vs. Haines is the Fifth Circuit case. I'll give them a brief instruction explaining that this witness is now putting on a different hat and testifying in a factual capacity. If you think that we're approaching that point, just signal to the Court and we can make that instruction and make that clear to the jury. And we'll just clarify to the jury that here, the witness is relying on his expertise or relying on his personal knowledge of the case.

So now we are to the proof chart and the exhibits, and we will preadmit as much evidence as possible for purposes

of trial efficiency and benefit of the jury.

So here, I have as stipulated evidence the following exhibits: Government's Exhibits 1 through 29, 35 and 36, 38, 44 through 62, 64 through 79.

Ms. Bell, does that listing of stipulated evidence match your notes and expectation? I can repeat that. It's Government's Exhibits 1 through 29, 35 and 36, 38, 44 through 62 and 64 through 79.

MS. BELL: Your Honor, on our joint exhibit list, which is Document 318, the defendant did not stipulate to the two drug exhibits, which are 77 and 78. It is my understanding that defense is not contesting authenticity, they're not contesting the chain of custody, they just want to wait to admit those until the lab analyst testified.

Do I have that correct?

MR. BARFIELD: I believe that's correct, Your Honor. I find it a bit difficult in any type of case where physical evidence, narcotic testimony is involved to pre-stipulate to any admission of the actual drugs until we've actually heard the testimony in court. So I think that's a fair statement by the -- by the government of my position is I'm not necessarily objecting to. I just think a predicate and the law under expert testimony has to be satisfied before we preadmit those exhibits.

THE COURT: So those exhibits may be -- "preadmitted"

might be the wrong terminology. Those exhibits are not contested in the form of a timely objection but that they are subject instead to authentication, foundation and the rest.

MS. BELL: I ask that the Court conditionally admit them so we can refer to them and show them to the jury through witnesses. We have them here for defense counsel to inspect, Your Honor. We don't anticipate calling Agent Hoffman at trial given that the defense counsel is not contesting the chain of custody, Your Honor. We would just simply have Officer Mincher identify these exhibits as the ones that he seized and then have the analyst identify the substance and the exhibit as well and ask that they be admitted at that time.

THE COURT: And is this the DEA chemist, Hopenwasser?

MS. BELL: And Galat, Your Honor.

THE COURT: Okay.

MS. BELL: They each have one of the exhibits.

THE COURT: Do you -- Ms. Bell, do you intend to publish to the jury the actual physical narcotics --

MS. BELL: Yes, Your Honor.

THE COURT: -- in Exhibits 77 and 78 during your opening statement?

MS. BELL: Not during opening, Your Honor.

THE COURT: Okay.

MS. BELL: And we'll refer to them through Officer Mincher's testimony as suspected fentanyl until we confirm with

the lab analyst, and that is our stipulation with defense counsel that we'll endeavor to infer to them as suspected until confirmed.

THE COURT: Yeah, when I started as a baby assistant United States Attorney in the Dallas Division, some of the former DAs had the bad habit of stacking the drugs like a ziggurat of narcotics and just leaving it on the table for the duration of trial. So you know that I won't allow that, but I do want to understand how those are going to be presented. You're not going to show those during your opening statement. They're not going to be physically present until the witness authenticates. Okay.

MS. BELL: Yes, Your Honor.

THE COURT: So any objection to conditional admission subject to that authentication predicate and foundation?

MR. BARFIELD: Yeah, I think -- yes, no objection there in that regard. And I think that also covers some of my objections on some of these other exhibits that any narcotics substance be referred to as "suspected," and I'm just trying to speed maybe the pretrial up a little bit. One of my objections is referring to the substance as -- we're talking about fentanyl here -- as fentanyl. So I would object to any until we have said testimony as to the -- what actually the lab results were, that any reference to fentanyl other than stating the case, stuff like that from a witness, yeah.

MS. BELL: Okay.

MR. BARFIELD: No, not -- does that make sense, Judge? That was a horribly put together sentence, but I hope the Court understands what I'm kind of objecting to there. And I think --

MS. BELL: I think -- he'll let me say it in opening but not in -- not with the witness.

THE COURT: Well, it's stated in the indictment as a count.

MR. BARFIELD: Yeah, just from a witness. For instance, a police officer is saying we found the fentanyl when it's -- because I suspect there's going to be evidence and -- well, we'll just deal with it on other objections. I'm getting ahead of myself, Judge.

THE COURT: Okay. So but on 77 and 78, Mr. Barfield, any objection to conditionally admitting those exhibits in physical form for publication to the jury, subject to authentication, foundation and laying the predicate with the witness?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. So I'll make that part of the order in limine specific to Government's Exhibit 77 and 78. And then I'll just admonish the government to abide the terms of that order in limine when they are filed later this week.

So other than Government's Exhibits 77 and 78, has

the Court properly identified those exhibits which may be preadmitted by stipulation of the parties?

MS. BELL: Let me --

THE COURT: And again, that would be 1 through 29 -- and here, I'm only listing the government's exhibits by designation because they perfectly match the defense --

MR. BARFIELD: Exactly.

THE COURT: -- listing.

MR. BARFIELD: Yes, sir.

THE COURT: This is a case where defense counsel is designating the same exhibits. So that's the only reason I'm using that nomenclature. 1 through 29, 35 through 36, 38, 44 through 62, 64 through 79 with the exception of Government's Exhibits 77 and 78 which are conditionally admitted subject to authentication, foundation and laying the predicate with the sponsoring witness.

May we preadmit by stipulation that range of exhibits?

MS. BELL: It's correct, although I wasn't sure about defendant's objections. He objected to Number 37, which is photographs of pills that were found on Ms. Waddell's -- or Mr. Bloomer's phone. I think he forgot to object to 38, which is the close-up of those pills, and so I wasn't sure if he was stipulating to one version of it and not the other. But it seems like he wanted to object to both, so I listed that as not

stipulated to.

MR. BARFIELD: Your Honor, I appreciate the government for that. Yeah, 37 and 38 are essentially the same exhibit; 38 is just a close-up. So my objections on 37 and 38 would be the same, that is correct. And the main objection on those would be -- that's where I got ahead of myself, Judge -- that those exhibits -- my objection is that those exhibits be testified to as fentanyl as -- from anyone that is not -- for obvious reasons if it has not been already testified to what that particular substance would be.

(Pause in proceedings.)

THE COURT: We can do this by the affirmative or negative route. So how about we take up the objected exhibits and then hopefully we can have a final listing of those exhibits that are preadmitted by stipulation?

So here, the Court discerns that the objected-to exhibits are 30, 31, 32, 33 and 34, 39 through 43, Government's Exhibits 63. I need to add to that list now Exhibits 37 and 38. Is that correct, Mr --

MS. BELL: It is, Your Honor.

THE COURT: -- Mr. Barfield?

MR. BARFIELD: Yes, Your Honor.

MS. BELL: I'm sorry.

THE COURT: Okay. And, Ms. Bell, is that your inventory of objections?

MS. BELL: It is, Your Honor. Thank you. Apologize.

THE COURT: Okay. Yep.

So let's turn to those objections, and then by the time we complete the Court's review and ruling on those objections, we should have a complete list.

So first as to Government's Exhibit 30, here, the Court will announce its tentative determination and the basis for the anticipated ruling and then I'll invite any follow-up argument from counsel as necessary.

So Government's Exhibit 30 is bodycam video footage. The Court discerns that this evidence may be relevant to intent and knowledge, also any agreement to distribute. And here, the parties -- well, here, defendant has objected to this evidence as hearsay under Rule 801, specifically that is an out-of-court statement made for the truth of the matter asserted and that because the case is now severed this is no longer a statement by party opponent and therefore doesn't qualify under that hearsay exception.

I believe the government has not yet filed a response, but here, if the government could explain to the Court how severance affects any exceptions that might apply, and I'll give the parties the final ruling after they argue the point.

So first, from Mr. Barfield, the basis of your objection and then I'll hear response from Ms. Bell.

MR. BARFIELD: Your Honor, the Court basically stated my objection. Basically, this trial has been severed. This is a conversation occurring between two individuals out of court to prove that my client is involved in a -- to prove the facts of the matter asserted in this case, and I don't believe there's -- because this is not an admission by a party opponent now. Therefore, I believe it is plain hearsay just by the definition of the rule, Your Honor.

THE COURT: Okay. Ms. Bell, you may respond or Mr. Frausto if you're arguing this exhibit.

MS. BELL: Your Honor, in Document 318, which was our joint exhibit list, we listed in there and made clear that the government would not use Exhibits 30 through 33 inclusive and they would be withdrawn if the case was severed and will not be used at trial. And, in fact, we filed an amended witness list which is Document 324 removing those exhibits. So we had a clear record that we are withdrawing those exhibits now that the case is severed. And so with regard to 30 through 33, we would withdraw those exhibits and ask that they not be used or referred to.

THE COURT: Okay. Thank you, counselor.

The Court is inclined to agree with defense counsel, specifically because of the case severance and also additional Fifth Circuit guidance in United States vs. Johnson, 85 F.4th 316, which explains that codefendants' statements minimizing

criminal exposure do not meet the statement against interest standard. This Court would have found that these exhibits were inadmissible for reasons of those rules and that jurisprudence, but thankfully, here, the parties worked together post-severance to clarify to the Court that Exhibits 30 -- 30, 31, 32 and 33 will not be presented at trial.

So I will update for the court reporter, the CRD and this bench my list of exhibits to exclude 30, 31 and 32. Those exhibits are out and they will not be presented at trial.

MS. BELL: And 33, Your Honor.

THE COURT: And 33.

MS. BELL: Thank you, Your Honor.

THE COURT: So that the appellate record is clean here, the government has noticed to the Court its intent to withdraw Exhibits 30, 31, 32 and 33. They are not admitted for that reason and also for the additional reasons stated by the Court specifically finding Fifth Circuit precedent, explaining when codefendant statements are or are not against interest pursuant to the exceptions that apply under the rules of evidence. So they would have been out by operation of withdrawal or out because of binding Fifth Circuit precedent.

So the Court finds that Exhibits 30, 31, 32 and 33 are not in evidence.

Okay. So that leaves Government's Exhibit 34. Here, I believe this is a series of photos of defendant's cell phone.

At least the first page, Bates Number 0001, is a snapshot of a cell phone and it purports -- or at least has the name Rachel on that screenshot and a reference to PillEye. So this is spelt P-I-L-L, capital E-Y-E. It resembles a cellular phone application or app. And then there is a series of photographs within that app or application that follow. I believe it is Bates range 0001 through 0046.

Here, defendant has objected under Rule 401 and 403 specifically that these photographs are overly prejudicial and without sufficient evidentiary basis, and I will allow defense counsel to make any additional argument in support of that objection.

MR. BARFIELD: Thank you, Your Honor. And also, Your Honor, this -- now my horse has caught up to my cart here and basically I'm objecting because of the speculative nature of what's depicted in these exhibit and the cumulative nature as what's depicted in these exhibits as being prejudicial based on the probative value is I don't believe any of these substances were ever tested by any expert as to what these photographs actually depict. Therefore, any reference to anything in these photographs I believe based on the volume will be highly prejudicial based on its probative value as -- for those reasons and because there's no evidence at all as to what is actually depicted in these as being illegal or contraband. And it's my anticipation that the position of the government would

try to show these as showing a massive volume of narcotics.

So that's my position, Your Honor.

(Pause in proceedings.)

THE COURT: And because I'm going to invite additional argument on potential redaction, I'm going to ask that the government display Government's Exhibit 34. I understand that there are some 46 pages, but if you can just begin with that first one. I may ask counsel for their argument on redactions and I want to make certain that everybody is oriented around the relevant photographs and the numerals that are depicted in the pages that follow.

But at this time, I'll invite argument from the government.

MS. BELL: Thank you, Your Honor.

Your Honor, there will be evidence in this case that the conspiracy -- that Ms. Waddell joined the conspiracy in May of 2023. And if you look at the very last page, Number 46, page 46 of the exhibit, you can see that the PillEye app started use under this Rachel -- under her actual -- in her cell phone and under her name started at the time the conspiracy started, Your Honor. And so we were going -- are going to present evidence at trial that she joined the conspiracy in May and she began taking these pictures in May of 2023, Your Honor.

With regard to what the pills are, I would ask the

Court to look at Exhibit 5, if we can show that to the Court. In her interview, Officer Mincher was very, very clear in his words about what type of pills they were talking about. In that exhibit, Mincher says, "What do people use" -- "what code words do people use when talking about these blue pills, the fentanyl pills?" She says, "Blues." She also says, "Beans." And later, she also -- they talk later on that page about powdered fentanyl. She says they call it "pow."

And so they define what they're talking about early on in their conversation. There's no doubt that the two were talking about fentanyl pills, Your Honor. And so throughout the conversation and in many of the other exhibits, Ms. Waddell admits to using fentanyl pills, at times she says 10 to 20 pills. During her last interview in October she said she used two pills that day. And so she's a user of fentanyl pills. She knows what they are. And so she identified what they were talking about from her own words, these are fentanyl pills. And so we have defined what they are.

If we'll turn now to Exhibit Number 14, Your Honor. This is the conversation where Officer Mincher has received permission to look in her phone. He finds the PillEye app, and they have a discussion about this application, how many pills are on it. In fact, on the first page of this exhibit, that is unobjected to, Officer Mincher says there's 35,500 pills, and they have a discussion about the pills.

If we'll turn to the very last page of that exhibit, the very last paragraph there, Ms. Waddell very concisely says what she uses this PillEye app for. She uses it when she buys the pills to count them. She uses it when she gets home to make sure she didn't get ripped off. She uses it when she packages them for sale. And when she goes and meets with people, she'll count them again with this PillEye app. And so she says a lot of those pictures are duplicates. And defense is certainly able to argue that it wasn't 35,000 pills but it was simply a lot of duplicates.

And so, Your Honor, these conversations go on all the way up to her arrest, these pill pictures I mean. And so up until August 26th, the day before the traffic stop, she was taking pictures of the pills. And so all of those pictures are within the conspiracy. She never at any time tells Officer Mincher they're anything but fentanyl pills. This goes to weight, not admissibility, Your Honor. Whether or not we are going to argue that we believe these are fentanyl pills, defense is certainly capable and will argue that they are something other than fentanyl. But that goes to weight, not admissibility. It is relevant. The conversation is here. These pictures give context to the conversation that defense counsel has already agreed to admit so that the jury can see what the PillEye app is and how it works and how it was used by Ms. Waddell.

So we'd ask that the Court overrule any objection to this exhibit. We'd ask that it be preadmitted.

THE COURT: And, Ms. Bell, you referenced Officer Mincher in reviewing Government's Exhibit 5 and 14 which are preadmitted by stipulation, is that the witness who would sponsor this evidence?

MS. BELL: Yes, Your Honor, and he took the photographs himself.

THE COURT: Okay. So regarding authentication, laying a foundation and the predicate for this evidence, he will testify that this cell phone as depicted in Government's Exhibit 34 was seized during a arrest or during a custodial interrogation, is that correct?

MS. BELL: Yes, Your Honor. It was seized during the arrest and searched pursuant to consent. And as my understanding and my discussions with Mr. Barfield that he's not objecting to any of the foundation to any of these witnesses that we're going to discuss, he's just simply asking that the Court exclude it under 401, 403 or under hearsay 801, 802.

THE COURT: Okay. So the concern is United States vs. Jackson, 636 F.3d 687. That is a case that I argued as an Appellate Division AUSA and there the Fifth Circuit took issue with drug ledgers and potential authentication issues. That case went into a published opinion. There was a motion for

reconsideration. They repealed and replaced their opinion, and by the time that litigation is complete in a final published opinion, the holding of the Court turns on authentication. And the Court's concern there -- and I know these are not -- I know Government's Exhibit 34 isn't exactly like a drug ledger, but it does involve pills, pill counts, things of that sort. The concern in Jackson, as expressed by those Fifth Circuit judges, is that it was presented during a proffer session, so there are concerns that there may be fabricated amounts and numbers and things of that sort. And in that case the Court found that it was inadmissible; that it was unduly prejudicial.

Could you distinguish as different from the drug ledger line of cases in that Jackson holding, could you distinguish Government's Exhibit 34 from that -- from that case law?

MS. BELL: Absolutely, Your Honor, because she's explaining to Officer Mincher how she uses this app to run her drug business. You'll see through a lot of her text messages that she refers to it as a business. And she is certainly running it in that fashion and she's checking to make sure she doesn't get ripped off. A drug ledger usually is counting amounts, it's detailing who the items are sold to, how much they still owe and those types of things. This is simply just her aiding herself in her distribution and counting the pills that she receives and then recounting them when she sells.

We're not going to argue that she sold 35,000 pills because you can see on the application that she recounts them. It actually counts the number of pictures and on certain lines you can see where there's additional numbers and it counts those over and over again.

THE COURT: And is Officer Mincher able to testify in -- you know, through his education, training and experience as to the PillEye application itself, is this something that is more akin to a drug trafficking tool of the trade? So you know because you've briefed these issues and, Mr. Barfield, you know you've briefed these issues to the Court. There are certain designated trafficking tools of the trade, so scales and things of that sort. Are we now to the point in that jurisprudence where PillEye has been designated any sort of drug trafficking tool of the trade?

MS. BELL: I don't think -- it's so new that I don't think it's been used -- and I didn't see it in any case law, Your Honor, but it's equivalent to a scale. And the Court routinely admits scales as tools of the trade, Your Honor. This is a tool of the trade. We're -- we don't weigh out pills. Nobody buys, you know, four grams of pills. They want, you know, 500 pills, they want 50 pills, they want 10 pills. And so this is simply the way of determining the number of pills without having to count it. We leave that to our pharmacist to count by fives, Your Honor.

And so, you know, especially when you're dealing in bulk and thousands of pills, this application is simply the scale in which to measure those pills. And so it's really a tool of the trade and it's not a drug ledger because it just simply doesn't list the people that these are going to, what it sold for and how much money she's receiving or what she's owed. And so it's just different than a drug ledger.

THE COURT: Let's -- so in that Jackson opinion, the Supreme Court was still wrestling with Crawford, Melendez-Diaz and cases applying sixth amendment concerns and how that intersects with rules of evidence, business records and of that sort. So at the time, and I believe this is 2011 or 2012, many Courts had merged the rules of evidence, the business records exception with the testimoniality analysis under Crawford and Sixth Amendment cases, and that was really the crux of the confusion. Which set of rules do we use to determine admissibility? Is it the rules of evidence where business record exceptions and things obtained or where the objection sounds in the Sixth Amendment, do we look to Melendez-Diaz and cases like that? I think that's now settled. If there's a confrontation objection, testimoniality and that line of inquiry predominates.

Here, we now have another layer of objection, which would be the 403 point. We've already approached this subject earlier in the hearing.

MS. BELL: Could I --

THE COURT: Repeated photographs of large drug quantities where there -- where they are not tied to the actual seizure or physical exhibits could have a potential prejudicial effect on the defendant.

MS. BELL: If I could distinguish further the Jackson case, this was not obtained during a proffer. It was an interrogation interview, Your Honor. And if you look here -- and if we could actually slow that down, just this countertop.

This is going to be highly relevant in this case because the countertop and which is used in the photographs is going to be identified by Officer Mincher as the countertop in Ms. Waddell's residence, Your Honor. And so the fact that she's taking these pills -- pictures of the pills in her home is going to be highly relevant. Also, Your Honor, the Court will see when we talk about Exhibits 37 and 38, those exhibits are of pills that were taken on May 15th by Mr. Bloomer's phone. And in this case, those pills --

And if we'll go to 38. Sorry. And if we could highlight the colorful pills right in the very middle. There we go.

These colorful pills are very distinct. They call them Skittles. They're fentanyl pills. Just like the blues, they have the same chemical structure when we've seized them in the past. But they have a very specific color. They call them

Skittles and that's what Ms. Waddell refers them to.

And what you'll see is that in the Exhibit 34, we're going to be able to point out some of those very colorful pills in some of the pictures taken on May 18th, which is two days after that traffic stop. And so -- not traffic stop. The pictures -- three days after the pictures were taken on Mr. Bloomer's phone. And so we're going to connect these pictures to other evidence. We're not using it to show that she trafficked 35,000 pills. Obviously, we're using it to show that she was involved in the May 15th incident and the -- connect her to those pills, and we're going to use it to connect it to her specifically through the pills taken at her residence, Your Honor. Because her countertop is distinct and it's shown in really the majority of those photographs.

THE COURT: Okay. So as to the 403 analysis, in United States vs. Winters, 530 Fed. Appx. F390, this is a Fifth Circuit case from 2013. I believe this is Judge Smith for the Fifth Circuit. He expresses concern that substantial amounts of cocaine packaged for distribution are highly prejudicial and the government's presentation of picture after picture after picture of packaged cocaine at some point tipped the scales of prejudice under Rule 403.

If the Court were to admit Government's Exhibit 43 with redaction of the photos, would that satisfy any 403 concerns that you have, Mr. Barfield?

MR. BARFIELD: Just so I'm clarified what the Court's -- if -- if --

THE COURT: Just so you understand --

MR. BARFIELD: Yeah, yeah.

THE COURT: -- the mind of the Court --

MR. BARFIELD: Please restate that just so I can -- yeah.

THE COURT: So I am persuaded that the government has made a persuasive, if not dispositive, argument that this case is distinguishable from Jackson because of the circumstances of the collection. In Jackson there was concern that there are self-interested reasons to fabricate ledgers, present those in a proffer session, you're currying favor of the government, maybe you're trying to pursue a 5K for a substantial assistance.

Here, at least as presented by the government, this is the defendant's phone. We don't have the same authentication concerns. We don't have the same proffer session dynamic with perverse incentive structures. What we have instead is an interrogation of the defendant using her phone and taking picture by picture. So we don't have the same authentication proffer session dynamic as Jackson.

So the Court is persuaded that the government is correct that those standards are different in this case. This is unlike the Jackson case because of case-specific facts

involving the collection of the evidence, the interrogation of the witness, how it was presented and photographed and documented in Government's Exhibit 34. But what of the 403 problem of recurring photographs of packaged narcotics? Are you persuaded that the government has linked those photographs to Exhibits 5 and 14, or do you continue to urge your 403 objection that these repeated depictions of blue pills, without additional authentication or connection to evidence already admitted, renders this more prejudicial than probative?

MR. BARFIELD: Well, I do think that it is more prejudicial than probative because, one, we don't know what the substances are; two, there's multiple duplicates; three, it's obviously going to prejudice the jury. I would actually state that this is -- if we're going to argue that this is a tool of the trade, I think we can conversely argue that this is a drug ledger as well. It's either a tool of the trade or it's not.

Now, I don't think this PillEye app -- I don't think that we have any idea who produces this, how accurate it is, what it is. I think that's a whole other issue as to the authenticity and how it works, and I don't think anybody in this case has the expertise to testify as to the dynamics of this app.

So I would urge the 403. Now, the Court advised -- so I think showing the volume of duplicates to the jury would be extremely prejudicial in this case, Your Honor. The Court

made a statement of redaction and if the Court does not -- would indulge me, maybe clarifying the Court's statement in regards to redaction as to what I --

THE COURT: So, Mr. Barfield, my proposal --

MR. BARFIELD: Yes.

THE COURT: -- and this is not a ruling of the Court but just --

MR. BARFIELD: Sure.

THE COURT: -- trying to -- trying to discern if the parties can reach agreement on redaction.

MR. BARFIELD: Yes, sir.

THE COURT: So if we were to omit by blackout or whiteout of the photographs and instead just had the various pill totals, so you have in the left column of each page a photograph, it has a date and time stamp, it has the name Rachel. And then in the right column you have the totals as approximated by the PillEye app. Were the Court to order the photographs of those pills redacted, leaving only the information as to date and person and quantity, would you still have a 403 objection?

MR. BARFIELD: I think I have to have a 403 objection, Your Honor. Now, with that being said, if this is admitted in any way, shape or form, I would certainly -- I would certainly be on board with the Court's suggestion. Does that -- does that make sense, Your Honor? So I urge my 403

objection because, quite frankly, one, we -- and if I may to just address -- I understand the statements made in the transcript, but there's not necessarily any connection between the exact photographs here and what the substance is that's being talked about in these transcripts.

So we have a lot of speculation that would go on in regards to these. So that's another issue here, is -- is --

THE COURT: But isn't it an issue of weight and not admissibility?

MR. BARFIELD: Well, I think that that -- I think -- I think, honestly, Judge, it would -- if it's admitted, it would go to weight, obviously. I mean, that's -- I'm not going to -- you know, I'm not going to run head first into a brick wall on that argument. So my concern would be, obviously, the 403. If it is admitted, I do think the redaction would be necessary because again, it's just -- it's kind of like what the Court alluded to earlier, stacking the drugs in front of jury and just letting them stare at it the whole trial. That's just obviously prejudicial.

I don't think at this point for the purposes of appellate records I could necessarily stipulate to that. I hope the Court can appreciate my position.

THE COURT: Okay. I understand your argument. I have the argument of the government. Let me...

MS. BELL: Your Honor, may I say one more --

THE COURT: So a surreply.

MS. BELL: A surreply about proposed redactions.

THE COURT: Okay. You know, sometimes you have to move the Court for a surreply, but...

MS. BELL: Thank you.

THE COURT: Yeah, I'll grant it in this instance. One final argument from the government.

MS. BELL: Your Honor, I think that redacting all the photographs would really tie the hands of the government and here's why. We need to connect the use of this to Ms. Waddell, and the fact that her countertop is used is highly relevant, Your Honor. In Exhibits 59 and 60, which are stipulated to, we're showing the countertops in Ms. Waddell's home. And the purpose of those exhibits is to connect them to the -- here's 59, and if we can go to 60.

That shows a close-up of the countertop and it connects her to the use of this PillEye app -- that it's found on her phone. It says "Rachel" and it's her countertop. That's our argument. And so if you take away all of our pictures from the PillEye app, it doesn't explain to the jury really how it's being used. It doesn't show how it's being used and it doesn't make that connection with the countertop. On page -- if we could go to page 43 of this exhibit.

THE COURT: And this would be?

MS. BELL: Exhibit Number 34.

THE COURT: Exhibit 34, Bates Number 043.

MS. BELL: 043, Your Honor. If you look down to the very bottom, the second one up from the bottom, the date is 5/18/2023. There were 35 pills. If we can go just on to the picture of those pills.

Your Honor, this is highly relevant. There we see those colorful pills that were bought on the 15th and transported by Ms. Waddell and Mr. Bloomer from Albuquerque, New Mexico to Amarillo, and that she was taking pictures of, counting and distributing. It makes the connection, Your Honor.

And so if the Court's going to redact anything, we'd ask that we be allowed to keep some of these colorful pill pictures, to keep at least the front page pictures where we can see her countertop. We can see it in this picture as well. We'd just like to be able to make those arguments to the jury and show, first of all, that they were pills being taken and what did it look like. That should be relevant, Your Honor, that what did the pills -- the pictures look like, what kind of pills, what color were they, that's very relevant, Your Honor. And we would ask the Court to allow us at least some of the pictures.

And if the Court wants to take out the other pictures -- you know, certainly we weren't intending on showing every page of this exhibit because the jury would fall asleep.

But just -- we were intending on using just some of the ones that show the high counts during the relevant times. For example, Mr. Carlisle was caught on August 9th in Amarillo. He was arrested on that day and the text messages will show that on August 6th and August 7th Ms. Waddell met with Mr. Carlisle, that she obtained fentanyl pills and that she was requesting more fentanyl pills from Mr. Carlisle. And so we're asking the Court to perhaps leave in the ones around those dates for August 6th so that we can show what she purchased from Mr. Carlisle and make those arguments effectively to the jury.

And so those would be on August 6th and 7th, would be -- let me get the Bates pages -- Bates 11, 12 -- 11 and 12 would be probably the most -- maybe 10 through 12, Your Honor, would be the most important to show, you know, what she received from Mr. Carlisle on those dates.

THE COURT: And so it's the government's proposal to present and correlate the countertop, the colored form of the pills to preadmitted testimony, connecting dates and quantities to those photographs as they appear in Government's Exhibit 34, Bates range 0010 through 0012?

MS. BELL: I would propose to the Court that the Court allow us to use the cover page, Numbers 10 through 12 and page 43. I think that would be sufficient, Your Honor. It wouldn't be overly done then, Your Honor. It would alleviate the Court's concern about showing too many pictures and photos

of pills, but it would allow us to make the arguments that we want to make regarding the times that are important to the government, the 15th of May and August 6th and 7th, Your Honor, and it would allow us to show the countertop. So we would ask the Court to allow us perhaps to just use those pages and show those to the jury and that would be sufficient for the government's presentation.

THE COURT: Okay. Any objection to that proposal, Mr. Barfield? More precisely, does that proposed redaction satisfy your 403 concerns?

MR. BARFIELD: Your Honor, I mean, certainly, that is --

THE COURT: I know it's preferable to having all 43 -- or I'm sorry, it's actually 46 --

MR. BARFIELD: Yeah.

THE COURT: -- pages presented and published to the jury with that redaction. I know it's preferable, but does that cause you to withdraw your objection if the Court orders those redactions?

MR. BARFIELD: I've tried to figure out how to phrase this, Judge --

THE COURT: I understand.

MR. BARFIELD: -- outweighing any appellate record.

THE COURT: I understand. I find that you have capably and effectively represented your client, that you've

preserved for further appellate review your objections to Government's Exhibit 34. But as we are working to ready this case for trial, do you have -- do those proposed objections suffice to withdraw your 403 objection to Exhibit 34 as redacted?

MR. BARFIELD: With the Court's recitation of preserving my appellate rights, that would satisfy the concerns initially, yes, Your Honor.

THE COURT: Okay.

MR. BARFIELD: Your Honor was a former appellate attorney, so he understands where I'm going with this.

THE COURT: Okay.

MR. BARFIELD: With your statement on the record, I think I'm protected and my client's protected. Therefore, that would certainly be a compromise that could be lived with.

THE COURT: Okay. So here, the Court sustains in part defendant's objection to Government's Exhibit 34. The Court will make this part of the order in limine and evidentiary order that follows in written form. Here, the Court agrees with defense counsel that the repetitious display of photo after photo after photo of undifferentiated pill counts would be inadmissible. In United States vs. Winters, 530 Fed. Appx. 390, the Fifth Circuit Court explained that the repeated depiction of substantial amounts of cocaine packaged for distribution are highly prejudicial and cannot necessarily

be offset by the probative value of those pictures themselves.

Additionally, the Court agrees with defense counsel that there is a potential authentication problem. But now that I have heard the government's anticipated testimony and the sponsoring witness who will support, authenticate and lay the foundation for this exhibit, I'm less concerned that we have the authentication issues that plagued the government in United States vs. Jackson and I do find that the quantities reflected in the right column of each photograph in Exhibit 34 are analogous to drug ledgers. And the Fifth Circuit has made clear that in a drug trafficking conspiracy case a drug ledger makes it more likely that defendant was communicating with conspiracy members for the purpose of distributing narcotics. That is also from United States vs. Winters, 530 Fed. Appx. 390.

Also, the numbers recorded in the app are admissible subject to proper authentication. Here, the Court tasked the government with first authenticating Exhibit 34 through witness testimony or expert testimony, and I'll remind both the government and defendant of that standard. Here, a proponent may authenticate a document with circumstantial evidence including the document's own distinctive characteristics and the circumstances surrounding discovery. That authentication will be essential to the Court's admission of Exhibit 34 so that this case remains distinguishable from the Jackson case.

So here, counsel may use In re McLain, 516 F.3d 301, a Fifth Circuit case from 2008, and of course United States vs. Jackson, 636 F.3d 687, a Fifth Circuit case from 2011. The intersection point of those two cases should be the guideposts for admitting Government's Exhibit 34 for authenticating its accuracy and rendering the quantities expressed therein admissible at trial.

Also, the Court does agree with the government that the numbers recorded do reflect statements made and offered against a party. Under Rule 801(2)(d)(A) and that here, as proposed at the pretrial conference, that evidence may be presented through testimony of a witness who has personal knowledge and observation of the exhibit. Counsel should be guided by United States vs. Potwin, P-O-T-W-I-N, 136 Fed. Appx. 609, and the Trevino Chavez case, 830 Fed.Appx.425. And using those Fifth Circuit guideposts and this Court having balanced the risk of prejudice and the probative value of this evidence, the Court will conditionally admit Government's Exhibit 34 with the following redactions: It may only be presented to the witness and when properly authenticated published to the jury in the following form: Government's Exhibit 34, Bates label 0001 that has been variously referred to as the cover page and Exhibits -- Exhibit 34, Bates range 0010 through 0012 and 0043.

Because the government here has conclusively explained the linkage and connective tissue between the pills,

the countertop and anticipated testimony, if that predicate and that authentication is established at trial, I will permit Government's Exhibit 34 with those redactions and I'll make that part of the Court's evidentiary order and order in limine that follows this hearing.

So let's move to the next range of objections. I believe we are down -- we've already addressed government's objection -- I'm sorry, defendant's Objection 37, 38 and you have the Court's ruling on that. It'll be reduced to writing in the order to follow.

Let's turn now to Exhibits 39 through 43 and 63.

MS. BELL: Your Honor, I apologize. I didn't get the ruling on 37 and 38. I don't know if we received that yet from the Court.

THE COURT: Oh, okay. So I know that we've -- we've addressed it. A lot of the concerns are similar to defendant's other objections, but I'll allow -- I'm hoping your horse has caught up to the cart as to Exhibit 37 and 38 as well. I'm using your metaphor there. Any additional argument on Exhibits 37 and 38?

MR. BARFIELD: It would be the same exact argument, Your Honor. As far as -- yeah, same objection, same argument. These are purported pictures -- photographs taken by a -- T Blue Bloomer's cell phone of items in what, my understanding is, would be a Jeep operated by my client. So same objections.

THE COURT: Thank you, Mr. Barfield. I have your argument.

Ms. Bell, any additional argument on the admission or exclusion of Government's Exhibits 37 and 38?

MS. BELL: Your Honor, just to point to the Court to Exhibit 19 on page 4, Ms. Waddell admits -- was shown these photographs by Officer Mincher and she admitted that it was her Jeep and she claimed, Your Honor, that Michael Winbigler, who -- we will show evidence to the Court during trial that he is a coconspirator in the case. In fact, in Exhibit 22, it's a transcript of her October 2nd interview with Officer Mincher, and on page 1 of that exhibit she told Officer Mincher that she let Michael Winbigler -- she at some point in the interview says that he borrowed her Jeep to go to Albuquerque. And then in this exhibit she says that Michael introduced her to Mr. Carlisle because she was buying pills from Mr. Winbigler and then she wanted to get a better price, so he introduced her to Mr. Carlisle. And so they are coconspirators in the case, Your Honor.

And on page 3 of Exhibit 22, she tells Officer Mincher that she had this photograph on her phone and she believed that Mr. Bloomer got it because he took a picture of her phone, that he would go through her phone and take pictures. She claimed that the photo was taken by her coconspirator Michael Winbigler and that he used her Jeep to go

buy pills from Mr. Carlisle.

And so either way, Your Honor, she's admitting that the photograph is her Jeep. She's authenticating that that is her Jeep. She just believed that -- or told Officer Mincher that she believed a different person took the picture other than Mr. Bloomer. There will be evidence that it was actually native to Mr. Bloomer's phone and, in fact, won't be admissible at this trial, but Mr. Bloomer admitted to taking those pictures during a trip with Ms. Waddell to Albuquerque.

And so, Your Honor --

THE COURT: And, Ms. Bell, just briefly on Government's Exhibit 37 and 38, there is a reference to Santa Rosa --

MS. BELL: Yes.

THE COURT: -- and May 15. What is the significance of those time stamps, date stamps and name?

MS. BELL: Your Honor, of course that correlates with her PillEye app and those colorful pills appearing in the PillEye app. And, Your Honor, there were conversations between Mr. Bloomer and Ms. Waddell in his cell phone that showed that they did take a trip to Albuquerque during that time, that Ms. Waddell actually went and met with Mr. Carlisle. And she actually tells Mr. Bloomer that -- during her time in a motel room with Mr. Carlisle that Mr. Bloomer should wait outside and that they were getting thousands of pills. And so it

correlates with those times.

And then Santa Rosa is on the drive back from Albuquerque, New Mexico to Amarillo, Your Honor. It's one of the towns that someone would stop at. There's a Love's truck stop there and we believe that this was taken at that truck stop.

THE COURT: So Government's Exhibits -- here, the Court is overruling defendant's objection. Government's Exhibits 37 and 38 are conditionally admitted subject to authentication, foundation and predicate. The Court finds here that the probative value of Government Exhibits 37 and 38 is significantly heavier than the previously-litigated Exhibit 34. Given the facts and circumstances and the connective tissue linking those photographs, those -- those depictions of pills to -- unobjected-to exhibits, testimony and also the photograph itself which identifies dates, places and approximate pill counts that correlate to evidence already admitted by stipulation.

So unlike Exhibit 34 requiring redaction, Government's Exhibit 37 and 38 has increased probative value for the reasons stated by the government and in this Court's ruling.

So with that, I believe we are up to Exhibits 39 through 40, and I believe these are the exhibits of Mr. Carlisle's phone photos. The objection from defendant is

that these are pure hearsay and that they are offered for the truth of the matter asserted.

It's your motion, Mr. Barfield. I'll allow you any additional argument and then a response from the government, and then you'll have my ruling on --

MR. BARFIELD: Yes, Your Honor.

THE COURT: -- from the bench.

MR. BARFIELD: Thank you, sir.

What we have here -- and primarily the objection is we have text conversations that appear on this phone from what appears to be Mr. Bloomer and Mr. Carlisle, again, plain hearsay objection on those exhibits there. The conversation that my client was not involved -- I mean, out-of-court statements, Judge. Again, I'm sticking to the rule of hearsay.

THE COURT: Okay. Understand. I have your objection. I have your argument.

A response from the government.

MS. BELL: Your Honor, just to clarify the defendant's objection, is he objecting then only to Bates Stamps 14 through 16 and stipulating to the rest of the exhibit? I just want to make sure what I'm answering.

THE COURT: Okay, Mr. Barfield. This is similar to Exhibit 34. There's a Bates range here on Government's Exhibit 39; it is Bates range 0001 through 0016. Does your argument apply to that entire Bate range?

MR. BARFIELD: It applies to, I believe, 0013 through 0016, Your Honor.

THE COURT: Okay.

MR. BARFIELD: Because I believe -- if I'm not mistaken and just for clarity, I believe the previous exhibits from 003 up to 0012 involved a conversation involving my client.

THE COURT: Okay. So I hate to beg additional clarification, but by my count, 0001 through 0013 fall into the categories you described. It involves conversations with defendant herself. It is outside the hearsay argument for reasons of party opponent exceptions so that your objection really starts with 0014 running through the end of that Bates range, which I believe is 0016.

MR. BARFIELD: Yeah, I believe --

THE COURT: So your objection does not apply to 001 through 0013, is that correct?

MR. BARFIELD: I believe that's correct.

THE COURT: And are you now stipulating to Government's Exhibit 39, Bates range 001 through 0013?

MR. BARFIELD: Actually -- yes, that's correct, Judge.

THE COURT: Okay. I just want to make sure.

MR. BARFIELD: No, you're right. You're right.

THE COURT: I know this case was severed very late in

the game and so we didn't have extensive motions practice over some of these exhibits until now. I just want to make sure that I have your argument and that you agree that I've correctly restated it.

MR. BARFIELD: I agree. And to further clarify, I'm specifically objecting to 0014 through 0016.

THE COURT: Okay. So the Court finds that Government's Exhibit 34, 001 through 0013 are preadmitted into evidence by stipulation of the parties.

And we are now continuing argument on the latter half of that same exhibit, 0014, 15 and 116.

Ms. Bell, you may proceed.

MS. BELL: Thank you, Your Honor.

Your Honor, these statements fall outside of the hearsay rule. They are admissible as statements of a coconspirator under Rule 801(d)(2)(E). Your Honor, the government has to prove that a conspiracy existed, that the declarant was a member of the conspiracy, that the statement was made during the course of the conspiracy and made in furtherance of the conspiracy. And of course we are alleging, Your Honor, in this case, that the conspiracy began with regard to Ms. Waddell in May of 2023 and up to the date of her arrest on October 2nd of 2023.

And so these text message dates fall within that range. There's a date in the middle of page 14, Monday, May

31st, and so they fall within the range. If you look at the very -- near the top, you can see on the right-hand side it is Mr. Carlisle's statements. This is his phone. And on the left-hand side, the ones with the B are Blue Bloomer, Your Honor.

And, Your Honor, the previous page, Number 13, of course shows Blue, Rachel's boyfriend, as the person who's making this statement. And so he's identified as Blue Bloomer. We'll have testimony that that was, in fact, his phone number, and it identifies him additionally as Rachel's boyfriend. So we know who the two people are talking; it's Mr. Carlisle on his phone and Mr. Blue Bloomer.

Your Honor, there will be testimony -- if we can go back to 14 and re-highlight that top sentence there. Blue tells Mr. Carlisle, "If anything, let me get with Rachel" -- identifying the defendant -- "about it. I don't want to make any decisions without her when it comes to you. Coo" -- which is cool. And he replies -- Mr. Carlisle replies, "Cool" or "Coo."

So they're talking about Rachel and the fentanyl distribution business and that will be clear from the context of the other conversations.

If we go lower, starting on May -- Monday, July 31st, 2023, Mr. Bloomer is talking about helping Rachel with her business, with her drug distribution business. And you'll see

in some of the other exhibits that have been stipulated to, which are conversations between Rachel and Blue, Rachel refers to her fentanyl distribution as a business. And so to give context to this conversation, that's what they're talking about, the fentanyl distribution business. Ms. Waddell and Mr. Bloomer argue frequently that Mr. Bloomer is trying to take her business and he says no, he's trying to help her with the business. And he's actually talking here about trying to take the risk and he's doing deliveries, Your Honor, for Ms. Waddell, delivering drugs to her customers -- what she refers to as her customers in her business. She even says in one text message that she was working on really growing this business, this fentanyl distribution business.

So they're talking about clearly the fentanyl distribution. And so this is a conversation between two coconspirators, both Ms. Waddell, supplier Mr. Carlisle and her boyfriend who acts as a person in her business as a delivery person; he collects money. There were text message conversations where Mr. Bloomer even jokes about being her collection person. And so all of these conversations -- and if you go to page 15 of the exhibit, Bates stamp 0015, in the middle he's also talking about, "I need to let her run her business the way she wants to." And so again, they're continuing a conversation about that business.

Then, if we go to page 16, you can see that this is

Sunday, August 6th, and this is when Mr. Carlisle was at the hotel in Amarillo. He was distributing fentanyl pills from the hotel and they talk about meeting. "I'm about to head your way. Oh, cancel that, not yet." And then on August 7th, which is lower in the conversation -- if we could go down to the very -- just the bottom. Thank you. On August 7th, he says, "Here we come. You up?" And Mr. Carlisle replies that he's barely -- he's tired. And then Mr. Bloomer says, "We're here now."

And that's going to correspond with that PillEye app, again where there's a lot of pictures taken on this day and the day before on the 6th when Ms. Waddell met alone with Mr. Carlisle and they received pills. And so these are conversations during the conspiracy. The conspiracy existed. The declarants are both members of the conspiracy and it's made in the course and in furtherance of the conspiracy. And they're discussing the conspiracy. In fact, "in furtherance of" is supposed to be broadly and liberally construed, Your Honor, and that is United States --

THE COURT: Yeah, I think it's supposed to be -- Fifth Circuit has defined "furtherance" as a statement advancing the ultimate objects of the conspiracy.

MS. BELL: Thank you, Your Honor. And this is. And they're discussing also the roles of the parties. It's identifying coconspirators. It's talking about the role. And

so Blue is talking about his role in the conspiracy here. He's saying, "Hey, I'm trying to take a lot more responsibility to take some of the potential consequences of the conspiracy off Rachel." And so they're discussing really their roles and then they're furthering their goals by meeting so that pills can be purchased. And so we believe it falls clearly within the coconspirators' statement under this rule and it is not hearsay, Your Honor.

THE COURT: Okay. And so that I'm citing the correct Rule of Evidence and exception, so here, we are looking at 801(2)(d)(E), and that's a statement made by the parties' coconspirator during and in furtherance of the conspiracy. And I now have your argument on furtherance. Is that correct?

MS. BELL: Yes, thank you, Your Honor.

THE COURT: So here, the Court is overruling defendant's objection to Government's Exhibit 39, Bates range 0014 through 0016. The Court agrees with the government's application of Federal Rule of Evidence 801(2)(d) -- I'm sorry, 801(d)(2)(E) and Fifth Circuit case law applying same. Here, Government's Exhibit 39, 0014 through 16 is admissible as a coconspirator statement made in furtherance of the conspiracy. The Court is guided by United States vs. Trevino vs. Chavez, 830 Fed. Appx. 425, a Fifth Circuit case from 2020 explaining that testimony comprised of statements made by coconspirators pertaining to the ongoing distribution and supply of narcotics

may be admitted as evidence of drug trafficking.

Additionally, in United States vs. Ebron, 683 F.3d 105, the Court there defines what furtherance requires, quote, "To be in furtherance of the conspiracy, the statement must advance the ultimate objects of the conspiracy." So here, the Court agrees with the government and is guided by that Fifth Circuit precedent and finds that the government has established that this Bates range reflects statements of a coconspirator consistent with Rule 801(2) -- 801(d)(2)(E) and Fifth Circuit cases defining furtherance.

This will be conditioned -- these exhibits are conditionally admitted on the basis of the government presenting a sponsoring witness, laying the necessarily -- laying the necessary predicate, foundation and authentication. This Court is further guided by Cornett, another Fifth Circuit case, 195 F.3d 783, a Fifth Circuit case from 1999. There, the Court distinguishes idle chatter from statements that are actually in furtherance of the conspiracy and therefore advancing the ultimate objects of that conspiracy, and also Fifth Circuit precedent explaining that the in-furtherance requirement of 801(d)(2)(E) is not to be construed too strictly less the purpose of the exception be defeated. That is United States vs. Broussard, B-R-O-U-S-S-A-R-D, a case found at 80 F.3d 1025, and also the Trevino case that this Court has previously cited in this hearing, 830 F. Appx.

Here, the statements are not mere idle chatter but instead reflect the furtherance requirements of Rule 801(d)(2)(E) and Fifth Circuit cases applying same.

That order will be reduced to writing in the order in limine and evidentiary rulings. Again, that'll be on file later this week and the counsel in this case are instructed to follow that.

So now I believe we are down to Exhibit 40, 43 and 63. Is that correct, Mr. Barfield?

MR. BARFIELD: Your Honor, I think --

THE COURT: And I'm sorry, Mr. --

MR. BARFIELD: 41, Judge.

THE COURT: 41. Okay. So 40 is stipulated by the parties. Is that correct, Mr. Barfield?

MR. BARFIELD: Based upon what we've just been talking about, correct, Judge.

THE COURT: Okay. So let's move to --

MR. BARFIELD: 41 --

THE COURT: -- Exhibit 41.

MR. BARFIELD: -- which, Your Honor, same objections on the original. This is -- my understanding, this is just -- this is all -- this is just more photographs of the PillEye app from Blue Bloomer's phone who took the pictures -- allegedly took -- supposedly took -- well, there's pictures -- took the pictures from my client's phone so that -- to me, this is just

a duplicate bolstering exhibit under 403 and we've already kind of had arguments as to -- I don't want to have to reargue what we already just kind of argued before.

THE COURT: Okay. So I'll incorporate by reference your arguments to Government Exhibit 34 and then I'll add that you are arguing under 403 that there's substantial prejudice in the duplication of similar photographs. Is that have -- have I properly framed your argument, Mr. Barfield?

MR. BARFIELD: You have. And if you'll notice in these photographs, there's no countertop, there's no connection. In fact, the countertops I believe reference -- for reference to the Court actually appear in Blue Bloomer's trailer is where these took place. So I'm just going to object to this as under 403 because there's no connection other -- there's no connection to any residence, any search, anything in this particular exhibit and it's -- and it's prejudicial.

THE COURT: So the character of the evidence is duplicative of your objection that the repetition of picture after picture of narcotics is prejudicial, but Exhibit 41 itself is not duplicative. It's actually a series of different photographs, is that correct?

MR. BARFIELD: Yes, sir.

THE COURT: Okay. I have your argument.

Ms. Bell, you may respond.

MS. BELL: Thank you, Your Honor.

So these pictures were taken by Officer Randy Mincher pursuant to consent and they were taken on October 4th of 2023. And on that date Mr. Bloomer was arrested at the courthouse when he came to view Ms. Waddell's initial appearance. Your Honor, Mr. Barfield is incorrect. Her countertop is actually shown in these pictures. And so if you go to the very last page, which is Bates Stamp 0007, you can see that these pictures here, they go up to 8/26 which was the date before her traffic stop. That 8/26 in the middle there of 2023, the 28 pills, that was taken on the day before the traffic stop. And so it just goes to show that there was nothing really taken after that date until, above it, 9/19/2023, the app started being used again with large numbers of pills.

If we'll go to page 6, please. And near the top of the app -- if we can go -- just one of those pictures, like the full pictures right there. Yep. So you can see there's the same countertop again. There's that countertop, a connection again to Ms. Waddell. Now, after that time there's a couple of other pictures with that countertop, but then we believe that she moved her operation and the pills to Mr. Bloomer's. If you look at the very front picture of the very -- page 1 and we zoom in on those pictures on page 1, we can see that this is different countertops. And in the very corner of the picture on the right, that's Mr. Bloomer's bovine testicle key chain that's discussed during his interview. And so he admits later

that that's his countertop and that's his house and that he had these pills.

And so --

THE COURT: I'm sorry, I didn't immediately recognize --

MS. BELL: I just couldn't resist talking about the bovine parts.

THE COURT: -- the bovine testicle key chain. Where is that?

MS. BELL: So may I approach?

THE COURT: Sure, as long as you don't have that.

MS. BELL: Right. And so during the traffic stop on August 28th and we -- they dared me, I was dared to say that now. We actually got Mr. Bloomer stopped and he had this key chain on his --

THE COURT: Okay. So it's a distinctive key chain that identi -- okay.

MS. BELL: It's a distinctive key chain. He claims they sell it at every truck stop in town. I've never seen that before. But right here in the picture, Agent Mincher confronts Mr. Bloomer that this is his countertop because he's got that key chain there and finally he admits that. And so --

THE COURT: So unlike Exhibit 34, here, the necessary connective tissue and authentication comes through elements of the photograph and distinctive qualities that connect those

photos to Mr. Bloomer, not --

MS. BELL: Yes.

THE COURT: -- the defendant.

MS. BELL: Not his admissions. But they actually did a search warrant on the trailer as well and that was the countertop in the trailer, Your Honor. And so -- so here, we have a coconspirator who's been working with Ms. Waddell to distribute large amounts of pills and he's now really operating her stash house. On October 2nd when she's arrested, she's coming back to Amarillo from Lubbock and she says she got the pills in Lubbock, although she won't reveal where she got them. But we know where she got them because he's got the bulk of the pills. And on page 2 of the exhibits you can see that on October 3rd, after her arrest, he's actually still taking pictures of these pills and counting them.

And so he was definitely still part of the conspiracy. To alleviate the concerns about multiple pills, I would ask the Court to do the following: to allow us to present page 1 of the exhibit and then only page 6 of the exhibit, which is the page that shows that pills -- pictures were being taken in September of 2023 and it's Ms. Waddell's countertop again. That's in those pictures. And so we're asking the Court only to allow us to do those two pages and maybe that will alleviate the concerns of defense.

THE COURT: Okay. So, Mr. Barfield, let's preserve

for further appellate review your objections to the entirety of Government's Exhibit 41. The Court finds that defense counsel has capably and effectively objected and preserved for review his aforementioned objections to the entirety of Government Exhibit 41.

With that now preserved, do you -- does the proposed redaction of Exhibit 41 as explained by the government allay your concerns under 403 and the same line of objections we discussed vis-à-vis Government's Exhibit 34?

MR. BARFIELD: As I believe the Court's preserved my objection for appellate purposes, I believe that would be a compromise that would be acceptable at this point.

THE COURT: Okay. So the Court does find that defense counsel has capably and effectively preserved those arguments for Fifth Circuit review, and the Court conditionally admits, subject to authentication, foundation and predicate through testimony or otherwise, Government's Exhibit 34 Bates range 001 and 006. And the government is ordered to redact those exhibits consistent with the Court's prior ruling on Government's Exhibit 34.

MR. BARFIELD: Your Honor, I believe the Court said Exhibit -- which it's getting -- Exhibit 41 --

THE COURT: I'm sorry. It's -- yeah, I'm flipping back and forth between photos of phones.

MR. BARFIELD: Yes, sir. I understand.

THE COURT: Okay. My mistake. Thank you for the correction. Strike that.

With all of the appellate arguments now preserved, the Court does conditionally admit Government's Exhibit 41, Bates 001 and Bates 0006, subject to the requirements of authentication, foundation and predicate.

And at this point of the hearing I'll instruct the parties to exchange the redacted form and to begin that process. I know that there is a written order to follow, but let's make certain that those are in the form consistent with the Court's ruling and that the parties don't have any objection before we start displaying things on the screen at trial.

So I think we're now down to Government's Exhibit 43.

MR. BARFIELD: I believe it would be 42 and 43, Judge. I believe 42 is photographs in Spanish of texts, and I believe 43 would be the transcript thereof.

THE COURT: Okay. So these are the Spanish -- screenshots of text messages in Spanish. These are followed by Government's Exhibit 43 that has purported English translations thereof. I understand defendant to object to both Government's 42 and 43 citing Rule 403 and hearsay. Is that correct?

MR. BARFIELD: That is correct, Your Honor. Essentially, again just briefly, this is a conversation between

this individual and another unknown individual that is absolute hearsay. I don't know that -- I don't see where there's a connection to my client at all.

THE COURT: Okay. So, Ms. Bell, a response from the government, and if you could explain which witness will sponsor this evidence and if you could explain the government's reason for relevance and any connective tissue to the conspiracy underlying the counts of indictment.

MS. BELL: Thank you, Your Honor.

Again, these statements are admissible as coconspirator statements under Rule 801(d)(2)(E), Your Honor. And, Your Honor, first I want to address the issues of, you know, who's talking. It's Katherine Valencia-Morales's phone. These photographs were taken by Officer Harlan. It's my understanding that defense counsel doesn't have any objection to the authenticity of them. Officer Mincher reviewed these photographs as well and the phone and he will sponsor these exhibits, Your Honor.

Your Honor, I will first refer the Court to Exhibit 68. If we can bring that one up. So it is a text message exchange. It was found on Ms. Waddell's phone. This is a stipulated exhibit and has been preadmitted. Your Honor, on this phone you can see that the contact -- the phone number says, "Hey, it's Katherine trying to call you from Britt's phone."

Now, in the vehicle on August 27th, 2023, there were four people. There was Ms. Waddell as the driver, Mr. Landon Prather, who was in the front seat; and the two ladies in the backseat are Britt, who is Britania Velarde, and Katherine Valencia-Morales. The pictures in the Exhibit 42 are of Katherine Valencia-Morales's cell phone, and Exhibit 43 is a translation of the Spanish of those text messages and embedded in that is the photographs.

And so in this conversation in Exhibit 69 -- and we'll go down to the next text message -- we can see that it's also Britt, who's Britania Velarde, she's not charged in this conspiracy but she is a coconspirator. If we'll go to -- just the bottom message. 68. She says, "It's Britt. Please call me. Kat said she wanted me to tell you. It's a big deal for $40 that you can just do 30. Okay." And so what they're doing here is they're actually setting up the trip to Oklahoma. You see on August 26th Ms. Waddell traveled with these three other people to Oklahoma, and during her statements to law enforcement Ms. Waddell admitted that the purpose of the trip was to go to score powdered fentanyl or to buy powdered fentanyl.

That admission can be found in Government's Exhibit 3, page 4. And so in Exhibit -- and we don't have to go to those ones. And Government's Exhibit 4, page 5, Ms. Waddell tells Officer Mincher that it was Kat, Katherine

Valencia-Morales, who had the connection in Oklahoma City. She was the one arranging the purchase of the powdered fentanyl and Ms. Waddell was going to be the driver and she was also going to buy fentanyl. And so through many of her admissions, Ms. Waddell admits the purpose to go to Oklahoma is to get powdered fentanyl and that she was supposed to get 5 grams of powdered fentanyl.

So throughout Government's Exhibit 68, you can see that they're talking about fentanyl. They're going to go, and Ms. Velarde or Ms. Valencia-Morales asked -- we're doing page 3 now of Exhibit 68. They ask Ms. Waddell to "bring beans please." So that was defined by Ms. Waddell. She stated to law enforcement when she says "beans" in text message conversations she means fentanyl pills. And so they're talking about bringing fentanyl for the trip. Ms. Waddell on page 4 of the exhibit says, "I'm coming. I'm grabbing beans. I'll be right there. Had to gas up."

And then we continue through the exhibit where Ms. Velarde says that -- in the very last page of the exhibit, page 7, she says, "Please hurry because they literally close at 8:00 p.m., no exceptions." So what they're talking about here is the drug dealer in Oklahoma has told Ms. Valencia-Morales that they stop selling at eight o'clock. They close up their fentanyl distribution business and no sales after eight o'clock. And you can see in our objected Exhibit Number

42 -- I'll just reference that for a moment. You can see that they get there later than 8:00 and the guy tells them, "We're closed and you'll have to come back tomorrow." That's why they actually stay an extra day into the 27th because they can't buy their fentanyl until the next morning.

If you'll turn now to Exhibit Number 69, please, you can see that we're talking here to the same person and she's listed at the bottom one as Kat, who's Katherine Valencia-Morales. And again, Exhibit 43 and 42 are the text messages of Katherine Valencia-Morales.

Let's turn to the very next page, page 2. If we go to the very top portion, Ms. Waddell tells them that her portion, her stuff -- she uses a cuss word -- is 5 grams short and she's mad about it. And so we know that they went there, they got drugs and Ms. Waddell's portion was short and she was mad about it.

And so if we go back to the Exhibit Number 42, throughout -- and 43 I think is easier for all of us to look at because it's translated. We look at 43 and here it is, Katherine Valencia-Morales, the defendant's coconspirator, is setting up the deal, and when they set up this deal, the deal is to buy fentanyl powder that Ms. Waddell is purchasing as well. Ms. Waddell tells Officer Mincher that she put in $700 for the deal to purchase 5 grams of fentanyl.

And so this setting up of the deal is absolutely

within the conspiracy. A conspiracy existed, they're going to buy fentanyl powder. This was after Mr. Carlisle was arrested and so they had to go to a different source and that's why they find the source in Oklahoma. The declarants are all members of the conspiracy because the gentleman in Oklahoma, who is only defined by his Gmail address, we don't know his real name, it was never discovered, but he's a coconspirator. He's selling the fentanyl and it's made in course and in furtherance of the conspiracy.

Now, Ms. Waddell says, "I'm going to get 5 grams of fentanyl powder." And that may not sound like a lot to the Court, but she admits in statements that she could make a gram last three weeks with her personal use. That means if she was to get 5 grams, that she's got 15 weeks of fentanyl powder there. We also have other text messages that specifically are -- Exhibit Number 79, I think it's page -- I want to say 11 of that, she actually talks about selling fentanyl powder with a -- who she refers to as a customer known as TT or Tina. She talks about -- it's page 14, excuse me.

If we go to page 14. Yep, there we go. That. Page 14. Right there. It's the green one near the bottom. There we go.

We can see there where she says, "I don't have any Kung pow chicken." And remember "pow" is the code word for fentanyl powder for sale right now. "I have to wait until I

get back. Only beans," only fentanyl pills. So right there you can see just in that one text message alone -- and we have many others where she's selling powder, but just in that one alone you can say she's selling fentanyl powder. So this is not a conspiracy to go over and get some powder for use. Remember she said that she was 5 grams short. So she was getting more than 5 grams. So it's not for her personal use, it's for sale and she was selling fentanyl. And again, those messages are right before the trip. They're actually August 23rd. And so they're right during the conspiracy, Your Honor.

So we submit to the Court that all of these messages are in furtherance of the conspiracy, during the conspiracy and the declarants are members of the conspiracy. Thank you.

THE COURT: So, Ms. Bell, I have your argument. Specific to Exhibit 43, who did the translation?

MS. BELL: It is Officer Cruz and he will testify at trial, Your Honor.

THE COURT: Okay. So I have handled cases with Arabic translations and a lot of expert testimony about the meaning of certain words. So this is not a translation where you're translating the documents through a 702 expert and there's going to be much litigation of the meaning of certain translations. What is Officer Cruz's background and basis for translating Spanish to English?

MS. BELL: He was raised in a home -- his parents are

from Mexico and -- but he was born in the United States. His parents spoke Spanish fluently, they spoke it in the home and he learned it as a first language, although he's bilingual. He learned English in the home and was taught alongside of it Spanish. He still speaks Spanish to this day and is fluent in Spanish.

THE COURT: So he's been listed as a fact witness with the Amarillo Police Department. Does he have any task force assignment to serve as an -- as an interpreter or a translator for Spanish-speaking witnesses or persons in custody?

MS. BELL: Not in court, Your Honor, but he is used as an interpreter frequently through the Amarillo Police Department. And so that's one of the roles that he serves as a police officer and he gives frequently translations for the department.

THE COURT: Okay. And because Exhibit 43 lacks a certification or any sort of interpreter, signature block or things like that, you intend to lay -- do you intend to lay the necessary predicate for his expertise just based on his experience and his own education in translating Spanish to English?

MS. BELL: As a native Spanish speaker, we believe that he is qualified to translate these and we intend to lay the foundation at trial, Your Honor.

THE COURT: Okay.

MS. BELL: But he's available today if the Court needs to hear from him.

THE COURT: Understood.

So the Court here overrules defendant's objections to Government's Exhibits 42 and 43. The Court agrees with the government that Government's Exhibit 42 is admissible under the aforementioned Rules of Evidence, specifically 801(2) -- I'm sorry, I somehow always get that wrong -- it's Federal Rule of Evidence 801(d)(2)(E). Here, the testimony consists of statements made by coconspirators pertaining to the ongoing distribution and supply of narcotics. That brings this evidence within the ambit of United States vs. Trevino Chavez, a case already cited by the Court, 830 Fed. Appx. 425.

The government, by explaining anticipated testimony and also already preadmitted exhibits, has proven to the Court's satisfaction that the text messages are in furtherance of the conspiracy. And again, using United States vs. Ebron as a guidepost to be in furtherance of the conspiracy, the statements must advance the ultimate objects of that conspiracy. Again, as stated in this Court's rulings on other hearsay objections, the Court is guided by that Trevino case, the Ebron case and then also the Broussard case previously cited, 80 F.3d 1025. And this ruling is made conditional to the government laying the necessary foundation, predicate and

authentication through officer testimony or otherwise.

Regarding Government's Exhibit 43, the Court overrules defendant's objection. The Court finds that this is an acceptable translation based on Officer Cruz's background, his proficiency in Spanish and also his practice as an interpreter for the Amarillo Police Department. But again, it's conditional on the government laying that foundation and establishing his personal knowledge of the Spanish language. This is not a case where contested translations require a Daubert hearing to establish expertise, but instead this is more like a fact witness who is testifying as to personal knowledge and based on training, education and experience.

So 42 is admitted on those conditions. That'll be reflected in the Court's order that follows. 43, the translation is admitted for the reasons stated. That too will be reflected in the written order to follow.

And I believe we are finally down to the last objected-to exhibit, which is Exhibit 63.

MR. BARFIELD: And, Judge, in regards to that exhibit, I think you're going to find that this is also text message conversations which essentially we make the same argument, hearsay objection argument because it's not involving my client, so --

THE COURT: Okay. Understand.

So I have the hearsay argument. I'll deem your prior

arguments under the rules of hearsay incorporated by reference.

Is there any additional to or particular to Exhibit 63?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. Anything further from the government? I know we've relitigated coconspirator statements, Rule 801(d)(2)(E) and the cases interpreting same. Is there anything particular to Exhibit 63?

MS. BELL: Your Honor, I would just say that, again, they're admissible as the Court ruled on Exhibit 39 under the Rule 801(d)(2)(E). And I would point out to the Court that -- that Exhibit 63 and page 5 and follows is just actually the mirror of what was found on Carlisle's phone. This was found in Mr. Bloomer's phone. Defense is not objecting to the phone download, that these are authentic messages.

And so you can actually see that those are just the mirror images. And the purpose of that is to show we found them on both phones and that way the jury can know they're authentic. The first four pages are -- Carlisle's phone didn't go as far back as Mr. Bloomer's phone. And so if look at page 1 of 63, again, they're talking about meetings, they're talking about when they're meeting up, and we believe that fentanyl pills were sold and bought during these meetings.

And so the first four pages are just discussing meeting times when they met, and we believe that to be in

furtherance of the conspiracy because Mr. Carlisle was selling pills and Mr. Bloomer and Ms. Waddell were together and they were buying pills.

THE COURT: So counterintuitively, though, as colored in this exhibit --

MS. BELL: Yes.

THE COURT: -- the green text fields relate to somebody identified as Blue.

MS. BELL: Blue.

THE COURT: And the blue --

MS. BELL: Yes.

THE COURT: -- text fields correspond to somebody identified as somebody other than Blue.

MS. BELL: That's right.

THE COURT: Okay.

MS. BELL: Plug, and that is Mr. Carlisle's phone number.

THE COURT: And that is just the way that the particular computer program produces the exhibit. Okay.

MS. BELL: Unfortunately, yes.

THE COURT: Okay. So I'm assuming at any point if there's a confusion about the color blue and the person Blue, you can always make reference to the phone number as the identifier.

Okay. So the Court overrules defendant's objection

to Government's Exhibit Number 63. Similar to prior rulings on text messages, the Court finds that these texts comprise statements made by coconspirators pertaining to the ongoing distribution and supply of narcotics, including a source of funding for drug trafficking. This is lifted from the Trevino Chavez case previously referenced.

The Court is also satisfied that the government has satisfied its burden of proof that the statements were in furtherance of the conspiracy and made to advance the ultimate objects of the conspiracy, guided again by the Ebron case, E-B-R-O-N, 683 F.3d 105. And also, the Court is satisfied that these conversations do not represent mere idle chatter as described in Fifth Circuit cases cited previously in the hearing.

Also, the Court uses United States vs. Broussard, 80 F.3d 1025, as a guidepost for determining the difference between idle chatter and statements made in furtherance of the conspiracy. And this, too, is conditional on the government laying the necessary authentication, foundation and predicate. And the Court understands that the government intends to do so through the testimony of a properly designated fact witness.

For all those reasons, Government's Exhibit 63 is in evidence and is preadmitted.

I will now ask the parties to compile your list of government's exhibits which corresponds to the defendant's list

of exhibits. They're identical here, so hopefully we don't have any mismatches. And for purposes of accuracy, the appellate record and also the Court's subsequent written order, I want to make sure we have all the same numbers.

So the following evidence -- I'm sorry, the following exhibits are admitted by stipulation of the parties: Government's Exhibits 1 through 29, 35, 44 through 62, 64 through 76 and 79.

Mr. Barfield, do you agree with that list of stipulated exhibits?

MR. BARFIELD: Yes, Your Honor.

THE COURT: And does the government agree with that list of stipulated exhibits?

MS. BELL: Yes, Your Honor.

THE COURT: The next listing of exhibits include those that were withdrawn by the government and otherwise deemed inadmissible by the Court. This is mostly a function of motions practice and the severance in this case. Government's Exhibits 30, 31, 32 and 33 are withdrawn and otherwise ruled inadmissible by the Court.

Is that consistent with your notes, Mr. Barfield?

MR. BARFIELD: It is, Your Honor.

MS. BELL: Yes, Your Honor.

THE COURT: And is that -- okay. Ms. Bell, thank you.

MS. BELL: Sorry.

THE COURT: So Government's Exhibit 34 is admitted subject to further redaction, and again, the Court has ordered the parties to exchange redacted copies consistent with the Court's order. Government's Exhibits 36, 37 and 38 are admitted. Government's Exhibits 39 through 40 are admitted. Government's Exhibits 41, 42 and 43 are admitted. And I believe in that range, this Court specified conditional admission upon laying the predicate, proper foundation authentication and only 34 and 40 --

MS. BELL: 41.

THE COURT: -- 1 are subject to specific redaction.

Does the government -- I'm sorry. Does the defendant agree with the Court's recitation of which exhibits are admitted subject to those conditions and redactions?

MR. BARFIELD: Yes, Your Honor.

THE COURT: And does the government agree?

MS. BELL: Yes, Your Honor.

THE COURT: So that we're on the same page, 34 and 41 are the ones requiring further redaction and further work by counsel to reach a form that's acceptable to both. Is that your understanding, Mr. Barfield?

MR. BARFIELD: Yes, sir.

THE COURT: And is that your understanding, Ms. Bell?

MS. BELL: Yes, Your Honor.

THE COURT: And finally, Government's Exhibit 63 is admitted subject to the same conditions for predicate, foundation and authentication.

With that, does defense counsel agree that we have preadmitted or reached ruling on all the exhibits at issue in this trial?

MR. BARFIELD: Yes, Your Honor.

THE COURT: And does the government agree?

MS. BELL: Yes, Your Honor.

THE COURT: Okay. So because there were extensive rulings on redaction and admission, the written order that follows will include the Court's order in limine and evidentiary rulings that were adjudicated at the pretrial conference.

Now, on demonstrative exhibits, this has been more problematic in civil trials than criminal, but I will just ask that the parties exchange demonstrative exhibits that they intend to use in opening just to make certain that there are no objections. I don't want a surprise moment. I'm loathe to interrupt counsel during opening statement, but it has happened with some frequency in civil cases where a slide appears that surprises opposing counsel and we have to endure the interruption of adjudicating any objections to a PowerPoint slide during opening.

So I'll just ask that the parties work diligently to

exchange slides. I know you don't intend to present anything in your opening that's outside the scope of evidence, but just to be doubly certain on the day of the trial, let's just make certain that there are no objections to the demonstratives that are presented.

Do you understand that instruction, Mr. Barfield?

MR. BARFIELD: I do.

THE COURT: Do you understand that instruction, Ms. Bell?

MS. BELL: I do. And we'll be doing a timeline in our PowerPoint and it's just simply giving dates, Your Honor, specific dates. And then we'll be using just some screen captures of some of the exhibits.

Does defense counsel object to us using any of the conditionally admitted exhibits, or will you ask that we be bound only to the ones admitted by stipulation?

MR. BARFIELD: I would prefer the ones only admitted by stipulation --

MS. BELL: Okay.

MR. BARFIELD: -- in opening statements, Your Honor.

THE COURT: Okay.

MS. BELL: We can do that.

THE COURT: So that's by order of the Court. I'll order that the demonstratives used during opening statements be limited to those exhibits admitted by stipulation. Of course,

you can make reference to what you think the evidence will show at trial, but let's restrict photographs to those that are stipulated and preadmitted by stipulation.

So let me confer with my courtroom deputy and make sure that I have this room reserved for technology use. I always give a day where you can come in advance of trial, pretest your equipment, make sure all the connections and zip drives work.

(Pause in proceedings.)

THE COURT: Okay. So it appears that this courtroom will be made available to the parties to pre-drive and pretest their courtroom technology on Thursday, April 18th at three o'clock p.m., Central Daylight Time. And I will do my best to make a Northern District of Texas IT professional available for any problems. Worst-case scenario, we'll have somebody remote in Dallas. And we are reserving this space. We'll keep it. We'll be sure to exclude any other cases or counsel so you can bring all of your equipment in, test drive it and then coordinate with the court if you need IT support.

So just to summarize, what should be available for trial, all of the audio/video, the Elmo will be available there near the lectern. Please test any video to make sure that it works with our AV equipment. Also, pre-negotiate with opposing counsel any start/stop times on footage, just make certain that it's within an exhibit or a range that's been admitted. And

you'll have full rein of this facility. Another point of contact is Chris Kordes in the clerk's office. His last name is spelled K-O-R-D-E-S, and he should be generally available to assist with courtroom technology.

We've worked very diligently to preadmit as much evidence as possible. I'll ask that the parties work diligently to generate a complete list of exhibits that will then go with the jury to the deliberation room. So that work is actually done by the attorneys. I think both defense counsel and the AUSA have been in this court before. Please keep a running list of that so that once the jury is charged and they're prepared to deliberate that we're not messing with exhibit lists and gum labels and the rest. So let's have those to the CRD probably before the charge conference and certainly before the jury charge to speed the jury deliberations.

Now, I do give just a generalized instruction to counsel to stay within relative proximity of the courthouse as we await a verdict or any questions that come from the deliberation room. So you know the Court's procedure. I like to make a paper record of any questions that are submitted during jury deliberations. There is a Northern District of Texas, Amarillo Division format. The designated person, usually the foreperson, will write the question. If I think it is mechanical in nature, more pedestrian and the Court can answer it, I won't draw counsel back into this courtroom, but

if it is of a more legal nature requiring the input of counsel, I'll reconvene the parties and counsel for a quick hearing.

You'll get the ruling on the Court's instruction back to the jury and that will be reduced to a paper form as well. So unlike other divisions, we actually make a paper record on all questions and responses from the Court. We don't just rely on the oral record. So there's a format to that. I'll provide copies to counsel if we get questions. If we go deep into deliberations and I think an Allen charge is necessary, we'll also confer with counsel before making any Allen charge instructions if we have reason to do so.

So we will excuse alternates only after the parties close and then we'll charge the jury. At all times, my courtroom deputy is your portal to chambers. If you have any questions when the jury is out and deliberating, please refer those questions to the courtroom deputy.

I do do -- I'm sorry, I do have a rather formalized charge conference. I want to make a record on any objections, I think we're substantially complete on that, but if there's anything you want to preserve for further appellate review, we can do that at the charge conference so that there are no surprises.

The verdict is read aloud by the courtroom deputy, not the Court. And if there are any forfeiture issues, the government is hereby ordered to preview any orders that need to

happen regarding forfeiture.

I believe the U.S. Attorney's Office has a separate forfeiture money laundering section. If you need to bring in additional AUSAs for any forfeiture work, let's preview that so that we can do it at the close of the case and that there's no need to have agents or other personnel lingering. So at all times you should use Rule 32.2 for any forfeiture proceedings and you may have additional AUSAs in support roles.

Is there anything further from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Is there anything further from the government?

MS. BELL: We just designate Randy Mincher as our case agent and ask that he be allowed to sit at counsel table with us during the presentation of the testimony.

THE COURT: And, Mr. Barfield, any objection to that witness being present as the case agent and as an exception to the rule?

MR. BARFIELD: No objection.

THE COURT: Okay. So ordered.

And with that, counsel are excused. Thank you for your diligence and thank you for working into the lunch hour to get this complete. It will make for a more speedy and effective trial, so thank you for your diligence. If you have any questions between now and the start of trial, please refer

to the courtroom deputy or the NDTX portal.

You are excused and this Court stands adjourned for the remainder of the day.

(The proceedings adjourned at 12:45 p.m.)

----

C E R T I F I C A T E

I, Shayna Montgomery, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Amarillo Division, hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above entitled and numbered cause.

WITNESS MY HAND on this 29th day of October, 2024.

/s/Shayna Montgomery
SHAYNA MONTGOMERY, CSR, RMR, CRR
United States Court Reporter
205 SE 5th Ave, Room 133
Amarillo, Texas 79101