IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 2:23-cr-00069-Z-BR-5 |
| Government, | ) | |
| VS. | ) | Thursday, April 25, 2024<br>9:10 a.m. - 4:31 p.m. |
| RACHEL LYNN WADDELL, | ) | |
| Defendants. | ) | JURY TRIAL VOLUME 3 |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MATTHEW J. KACSMARYK

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
BY: ANNA MARIE BELL, AUSA
-and-
BY: JOSHUA FRAUSTO, AUSA
500 South Taylor Street, Suite 300
Amarillo, Texas 79101

FOR DEFENDANT: BARFIELD LAW FIRM, P.C.
BY: B. BROOKS BARFIELD, ESQ.
P.O. Box 308
Amarillo, Texas 79105

COURT REPORTER: SHAYNA MONTGOMERY, CSR, RMR, CRR
United States Court Reporter
205 SE 5th Ave, Room 133
Amarillo, Texas 79101

Proceedings reported by mechanical stenography and transcript produced by computer.

# I N D E X

VOLUME 3

PAGE

WITNESSES FOR THE GOVERNMENT:

PAUL GALAT

Direct Examination by Mr. Frausto................ 488
Cross-Examination by Mr. Barfield................ 494

JAY HOPENWASSER

Direct Examination by Ms. Bell................... 502
Cross-Examination by Mr. Barfield................ 506

WITNESSES FOR DEFENDANT:

(NONE)

Plaintiff's Closing Argument............................ 569

Defendant's Closing Argument............................ 589

Plaintiff's Rebuttal Closing Argument................... 602

Final Jury Charge....................................... 609

Verdict................................................. 629

GOVERNMENT'S EXHIBITS:

| NUMBER | DESCRIPTION | OFFERED | ADMITTED |
| --- | --- | --- | --- |
| 77 | 3.706 net grams of fentanyl located in Waddell's vehicle on August 27, 2023 (DEA Drug Exhibit 38) | 504 | 505 |
| 78 | 2.895 net grams of fentanyl located in Waddell's vehicle on October 2, 2023 (DEA Drug Exhibit 43) | 490 | 491 |

DEFENDANT'S EXHIBITS:

(NONE)

P R O C E E D I N G S

THE COURT: We're back on the record in Criminal Action Number 2:23-CR-69-Z-BR-5, United States of America vs. Rachel Lynn Waddell, for continuation of trial.

Are the parties ready to proceed?

MS. BELL: Yes, Your Honor.

MR. BARFIELD: Yes, Your Honor.

THE COURT: Okay. Just a bit of housekeeping.

When we come to the end of the government's case, I will confer with counsel during a break about the defendant's election of her Fifth Amendment right to testify or not to testify. This is not with any prejudice to that decision. I know you've had another evening to consult with your client, Mr. Barfield, but we'll probably need to put the defendant under oath and undertake a colloquy just to make certain that she receives legal instruction from this Court about the nature of her rights under the Fifth Amendment and then some Sixth Amendment confrontation law that she needs to know when it comes to exercising or not exercising that right.

So we'll do that colloquy, and we'll put the defendant under oath for purposes of that. I'll also turn to defense counsel for whatever nomenclature you prefer in explaining to the jury your decisions on opening statements and also any case presentation closing arguments, however you want me to describe that to the jury, I can do that or I can let you

stand and explain it to the Court in front of the jury. So we can think about those decisions when we turn to your case-in-chief.

MR. BARFIELD: I think probably, Judge, I think it would probably -- I could just -- I could probably just explain it to the Court.

THE COURT: And then I can explain it to the jury.

MR. BARFIELD: Absolutely.

THE COURT: I'm putting no pressure on you. It's your prerogative.

MR. BARFIELD: No pressure at all.

THE COURT: Some defense attorneys like to speak aloud and explain it to the jury themselves, or I can do it from the bench. So as we think --

MR. BARFIELD: I think -- I think juries listen to judges with more authority than they do the lawyers, quite frankly. So I think the first way you proposed I think would be more protective of my client's rights if you want to know my honest opinion.

THE COURT: So looking at the anticipated itinerary and schedule, let's anticipate doing some of that housekeeping work during the mid-morning break, and then I can explain to the jury the next steps.

Have the parties reached any additional agreement on the draft jury charge?

MR. FRAUSTO: Your Honor, I met with Mr. Barfield prior to starting today, and we're in agreement with the proposed jury charge and what needs to be taken out or included.

THE COURT: Okay. So I'll just ask that you e-mail that directly to my courtroom deputy. We'll begin work on that so that I can have that ready and in final form for the charge conference.

MR. FRAUSTO: And, Your Honor, the final draft has already been e-mailed in Word version. We just need to take out the portions whether or not the defendant ends up testifying.

THE COURT: Okay. So that's really kind of the last variable that remains.

MR. FRAUSTO: That's correct. And we included one additional section, but it's on the most updated draft that's been e-mailed to the Court.

THE COURT: Okay. So I'll instruct my law clerk to operate from that draft with that understanding, and hopefully, we can go into the charge conference with a substantially complete draft.

MR. FRAUSTO: Yes, Your Honor.

THE COURT: Is there anything further in terms of housekeeping?

MR. FRAUSTO: No, Your Honor.

THE COURT: Okay. So let's bring in the jury.

(The jury entered the courtroom.)

THE COURT: Mr. Frausto, you may call your next witness.

MR. FRAUSTO: The United States calls Paul Galat.

THE COURT: And, Mr. Galat, if you will stand there in the witness well and raise your right hand, my courtroom deputy will administer the oath.

PAUL GALAT,

having been called as a witness and having been sworn, testified as follows:

THE WITNESS: I do.

THE COURT: And please pull the microphone close for purposes of voice amplification.

Mr. Frausto, you may proceed. And if the witness requires a certain exhibit, identify it by number and we can display it on the screen within view of the witness.

MR. FRAUSTO: Thank you, Your Honor.

And just for the record, I will be proceeding with the entire testimony of Senior Forensic Chemist Paul Galat as an expert in forensic chemistry.

THE COURT: Okay. Let me briefly remind the jury of the difference between expert testimony and fact testimony.

Here, we work diligently with the counsel at the pretrial conference to predesignate and preadmit experts. This Court has made a preliminary determination that this witness is qualified to offer testimony as an expert based on his knowledge, skill, experience, training or education. Under various rules of evidence, this Court has determined that this testimony is based on scientific, technical or other specialized knowledge. It is based on sufficient facts or data and that his anticipated testimony is the product of reliable principles and methods. So this Court has determined that this witness is qualified to testify in an expert capacity. And you should give it the weight according to that ruling.

Mr. Frausto, you may proceed.

MR. FRAUSTO: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. FRAUSTO:

Q. Can you please state your name for the record?
A. My name is Paul Galat.
Q. And how are you currently employed?
A. I am a senior forensic chemist at the Drug Enforcement Administration.
Q. And is that in Dallas, Texas?
A. Yes, sir.
Q. And how long have you been employed with the Drug

Enforcement Administration?
A. This summer will be 26 years.
Q. And what are your current duties as a Drug Enforcement Administration or DEA senior forensic chemist?
A. Well, I receive various forms of evidence submitted by our special agents, and I test the evidence for the presence of controlled substances; things like heroin, cocaine, methamphetamine, fentanyl. I then prepare reports on my findings and sometimes I testify in court.
Q. And what education and training do you have in forensic chemistry, if you could share with the jury?
A. Well, I have a bachelor's in chemistry from Michigan State University. I also have a master's of science in criminal justice with specialization in forensic science from Michigan State University.
Q. And have you completed the clandestine laboratory investigation or safety certification program?
A. Oh, yes, sir. I completed the in-house DEA training program for forensic chemists and the clandestine lab certification program at our laboratory.
Q. And in addition to your formal education, do you receive continuing professional education forensic chemistry?
A. Yes, sir.
Q. And is that numerous classes each year?
A. Yes, sir. We're required to have at least 20 hours of

continuing education each year.

Q. Now, switching gears now, have you ever chemically analyzed a substance to determine whether that substance is narcotics or contains a narcotic drug?

A. Yes, sir.

Q. How many times would you estimate?

A. I've analyzed over 11,000 exhibits.

Q. And have you ever chemically analyzed a substance to determine whether that substance is or contains fentanyl?

A. Yes, sir.

Q. And about how many times would you say?

A. Over 150 times.

Q. Have you ever testified in court as an expert in forensic chemistry?

A. Yes, sir.

Q. How many times?

A. Over 90 times.

Q. And does that include both in federal and state court?

A. Yes, sir.

MR. FRAUSTO: Your Honor, may I approach?

THE COURT: You may approach.

(Pause in proceedings.)

Q. (BY MR. FRAUSTO) Mr. Galat, I handed you what's been previously marked as Government's Exhibit 78. Do you recognize that exhibit?

A. Yes, sir.
Q. How do you recognize it?
A. I recognize it by my seal at the bottom of the evidence bag, my name, my signature, the date that I opened it. Inside the bag there is a lab number that's associated with this evidence.
Q. And did you conduct a chemical analysis of this particular exhibit?
A. Yes, sir.
Q. And is this exhibit in the same or substantially the same condition as when you initially tested it?
A. Yes, sir.
MR. FRAUSTO: Your Honor, I'd offer to admit Government's Exhibit 78 into evidence.
THE COURT: Any objection from the defendant?
MR. BARFIELD: No objection.
THE COURT: The Court finds that the government has laid the necessary predicate and foundation and Government's Exhibit 78 is now in evidence.
(Exhibit Number 78 was admitted into evidence.)
Q. (BY MR. FRAUSTO) Now, Mr. Galat, let's talk about Government's Exhibit 78. How many units or pills were in there when you first received the exhibit to analyze it?
A. 27.
Q. And what chemical analysis did you use to analyze

Government's Exhibit 78?
A. Well, I obtained the net weight of Government's Exhibit 78, and then I performed a series of testing on the tablets.
Q. And what tests did you -- and if you could explain to the jury, what tests did you perform?
A. Sure. I removed 9 randomly selected tablets and performed two tests on each of the tablets. The first test is a presumptive test, like a screening test called immunoassay. A little bit of the sample was dissolved in water, placed on an applicator, a plastic applicator that has a test strip in it. And if fentanyl is present, an indicator line will appear, kind of like a pregnancy test. And all nine of my samples indicated that it probably contained fentanyl.
And then I did a confirmatory test on those nine tablets to positively identify what they are, and that test is called gas chromatography-mass spectrometry. And that test indicated that all nine of those samples each contain fentanyl and acetaminophen.
Q. Thank you.
And based on your analysis, were you able to form an opinion as to what Government's Exhibit 78 contained?
A. Yes, sir.
Q. And can you please state your opinion to the jury?
A. Government's Exhibit 78 contains fentanyl and acetaminophen and has a net weight of 2.895 grams.

Q. And is fentanyl a Schedule II controlled substance?
A. Yes, sir.
Q. And you stated the net weight of Government's Exhibit 78 was 2.895 grams. How is net weight determined?
A. The net weight is the weight of the material itself, the tablets without any packaging. So the tablets were in a Ziploc bag. So I weigh the Ziploc bag, empty the tablets, and then weigh the empty Ziploc bag, and subtracted that from the first number.
Q. And after you analyzed and finished your test, when you sent the exhibit back to the local DEA office, how many units or pills were remaining?
A. 18.
Q. And can you explain the reason why there's only 18 that were reserved?
A. The -- that's the 27 minus the nine that I used in my analysis.
Q. And did nine -- did it dissolve during your testing?
A. Yes, sir. I used nine full tablets for each of the two tests.
MR. FRAUSTO: I'll pass the witness, Your Honor.
THE COURT: Mr. Barfield, cross-examination. You may do so from counsel table or the lectern.
MR. BARFIELD: Oh, I'll walk up here.
//

CROSS-EXAMINATION

BY MR. BARFIELD:

Q. How are you doing today, sir?

A. Fine, thank you.

Q. Good. Now, in regards to when you received the packaging, where did you receive the packaging from the Exhibit 78 that we're referring to?

A. At our laboratory.

Q. Okay. And describe that process.

A. Well, evidence is submitted to our laboratory either mailed or hand-delivered by the special agent. It's entered into the main vault by our evidence technicians. They make sure that it's sealed. They assign a unique laboratory number and enter it into our computer system. My supervisor assigns me the case, and I check it off in the main vault.

Q. Before you -- before -- when you received Exhibit 78, do you recall whether the package was sealed, unsealed, had it been opened since it arrived in your lab?

A. It was sealed.

Q. Okay. And what did you have to do to open that package?

A. I cut the bottom of the package.

Q. Okay.

A. So I left the top seal intact, that's where the agent sealed it. I cut the bottom, removed the contents, did the analysis, returned it back to the bag, and then I sealed the

bottom.
Q. Okay. Did that package appear to have been tampered with or altered in any way from what you could observe?
A. No, sir.
Q. Okay. Are there strict protocols in place when you receive evidence from a law enforcement agency?
A. Yes, sir.
Q. And for testing purposes, what is done to make sure there's no cross-contamination with any other substances before testing takes place?
A. Well, I perform blanks when I analyze my samples. And I use clean disposable glass test tubes for each of the tablets.
Q. Let me just stop you for a second for the benefit of the jury. What is a "blank" for the benefit of the jury?
A. A blank is like a solvent or liquid that's used in the testing but there's no sample in it.
Q. Okay.
A. So that's placed on the instrument before the samples are run to make sure that the instrument is clean.
Q. Are there protocols for making sure -- I'm sure several tests on several different substances occur on a normal working day; is that a fair assessment?
A. Yes, sir.
Q. Okay. What protocols are in place to make sure the equipment is cleaned and operating properly before testing each

separate substance?
A. Sure. Well, our instruments are monthly calibrated. I'm actually an instrument monitor, so I have to maintain our instruments. And during testing we have the blanks that are ran before we run our samples to make sure that everything is clean.
Q. Okay. And in -- I use the word "cross-contamination." What is -- for the jury's benefit, what is cross-contamination?
A. Cross contamination would be where another substance is entered into your testing.
Q. Okay. And what effect would that potentially have on the results of any particular test?
A. That would make that test not reliable.
Q. Okay. In this particular instance, did you follow those protocols?
A. Yes, sir.
Q. Okay. And after you tested the blank, what was the result from the blank testing?
A. It was negative.
Q. Okay. And what does that mean?
A. That means that there's no outside material in the blank.
Q. Okay. Now, during this period of time, were the -- and I believe there was 20-something pills; is that correct?
A. 27, yes, sir.
Q. 27.

And where were the pills sitting before you tested? Did they stay in the plastic bag and then were they removed or how do you do that? I know these are mundane questions, but do you lay them on a table? Do you put them in another package? How does that work?
A. Sure. I have an analytical bench that I have in front of me with my equipment. I put a fresh piece of paper down, open up the exhibit, remove the tablets onto a fresh paper. Remove the nine, and then I immediately put the 18 back into the original Ziploc, and I put that back into the bag, put that aside, and then did the analysis on the nine that I removed.
Q. Okay. And I'm assuming the testing consumed the nine pills --
A. Yes.
Q. -- that you --
A. Yes, sir.
Q. And why did that consume those pills?
A. The -- because I have to use two portions of each tablet for -- one for one test and one for the other. And I take the one tablet, grind it up, and use a little bit for the immunoassay, and then the rest of it for the gas chromatography-mass spectrometry.
Q. Now, explain that process, the gas spectrometry chromatography, that is actually -- are you actually testing the substance, or what happens to the substance in the machine?

This is a machine that's been around a while. What does the machine do?
A. Well, the sample is dissolved in a solvent. In this case, it's methane chloride. And then a -- the sample is placed in an injection vial. The vial is placed in the machine and a syringe from the instrument pulls up a little bit of the sample, injects it into the gas chromatography.
So the machine is actually two parts; gas chromatography and mass spec. The gas chromatography part is a separation. So it separates all the drug components that are in that sample. Then once the drugs are separated, they're entered into the mass spec portion of the instrument, where it identifies each of those portions. So the sample is in a solvent, and the methane chloride is turned into a vapor. It travels through the instrument, analyzed by the mass spec, and then it produces a printout, and we -- like a pattern. Anything with mass spec is each drug molecule will produce a specific pattern. So the pattern for fentanyl is different than that of cocaine or heroin or methamphetamine or any other drug, and I compare that pattern to the known standard to positively identify it.
Q. Okay. And if the machine is not working properly during the test, does it reject the test, or does it -- is there any warning, or is that the reason you do the blank sample to start?

A. Well, the blank is to make sure that the machine does not.
Q. And are you all -- is your lab required to be periodically certified to make sure the equipment is operating properly?
A. Yes, sir. Our lab is accredited.
Q. Okay. And how often is that accreditation done?
A. The accreditation is a five-year program, and every, like, three years, they do periodic testing to make sure that we're still following our procedures. That's from an outside source, and then we also have our inside source, where actually we just had our inspection last month where the DEA headquarters will send in a crew to make sure that everything is operating -- all our procedures are correct and we are operating --
Q. Okay.
A. -- correctly.
Q. Do you have any concerns about the chain of custody and that this Exhibit 78 was tampered with in any way before you were able to perform your testing?
A. No, sir.
Q. Okay. After you performed your testing, what did you do?
A. After I performed my testing, I placed the remaining tablets back into the original Ziploc bag, and then I sealed the Ziploc bag into an inner DEA heat seal bag because it's fentanyl. So we want to place two layers of protection. So inside the Ziploc bag is sealed within an evidence bag, and then I place that new evidence bag into the original one and

then seal the original bag.
Q. Okay. All right. And your testing was not made to determine who may or may not have actually possessed any substance; is that correct?
A. That's correct.
Q. That's not your role in this?
A. No, sir.
Q. Okay.

MR. BARFIELD: All right. I'll pass the witness, Your Honor.

THE COURT: And any redirect, Mr. Frausto?

MR. FRAUSTO: No, Your Honor.

THE COURT: And any objection to this witness stepping down?

MR. BARFIELD: No, no.

THE COURT: And any objection to excusing this witness from the case?

MR. BARFIELD: No objection.

THE COURT: You may step down, and you are excused from the case.

Mr. Frausto, you may call your next witness.

MR. FRAUSTO: It will actually be Ms. Bell.

THE COURT: Okay. I'm sorry. It's like playing Whac-a-Mole sometimes, knowing which attorney's going to stand next, so I apologize for that, Ms. Bell.

You may call your next witness.

MS. BELL: Jay Hopenwasser, Your Honor. Your Honor, while we're in between, may I exchange the exhibits?

THE COURT: You may. You may approach the witness chair. And are you turning to Exhibit 77 next?

MS. BELL: Yes, Your Honor.

THE COURT: Okay. Understood.

And, Mr. Hopenwasser, you may approach the witness chair, remain standing and raise your right hand for the oath. My courtroom deputy will administer the oath.

JAY HOPENWASSER,

having been called as a witness and having been sworn, testified as follows:

THE WITNESS: I do.

THE COURT: Please be seated. And please pull the microphone close for purposes of voice amplification.

And, Ms. Bell, you may proceed.

MS. BELL: Your Honor, at this time I would tender Jay Hopenwasser as an expert in the -- in forensic chemistry, Your Honor.

THE COURT: So as you previously heard, there are rules of evidence specific to expert testimony. I did work with counsel in this case at the pretrial conference to

predesignate and prequalify this witness as an expert. As I've stated with the last witness, you may consider this witness's testimony in his expert capacity. That means that he can present to you his conclusions as to facts in issue. You remain the ultimate finders of fact, but the Court has determined that this witness is qualified based on knowledge, skill, experience, training, and education and that his testimony is adequately based on scientific technical or specialized knowledge, and he may be considered an expert in this case and you should assign that weight to his testimony.

With that, you may proceed.

MS. BELL: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. BELL:

Q. Please tell the jury your name.

A. My name is Jay Hopenwasser.

Q. How are you employed, sir?

A. I'm a senior forensic chemist for the Drug Enforcement Administration in our South Central lab in Dallas, Texas.

Q. And how long have you been with the DEA South Central laboratory?

A. Approximately 18 years.

Q. How long have you worked in the field of chemistry?

A. Approximately 21 years.

Q. Do you hold a bachelor of science degree?
A. Yes, I do.
Q. In what?
A. Molecular biology.
Q. Where did you receive that degree from?
A. Texas A&M university.
Q. Do you also hold a master's degree of science?
A. Yes.
Q. In what field?
A. Forensic science.
Q. Where did you receive that?
A. Sam Houston State University in Huntsville, Texas.
Q. What type of additional training have you received in forensic chemistry?
A. When I got hired on by the Drug Enforcement Administration, I went through about five to six months of in-house training on operation of -- excuse me -- instrumentation, analysis of evidence, and other ancillary duties, and every year since then I have to complete a minimum of 20 years [sic] of continuing education.
Q. Have you ever chemically analyzed a substance to determine whether that substance is narcotic or contains a narcotic-type drug?
A. Yes.
Q. How many times would you estimate?

A. Approximately 5,000 times.
Q. Have you ever chemically analyzed a substance to determine whether or not that substance is or contains fentanyl?
A. Yes.
Q. How many times?
A. Probably a few hundred times.
Q. Approximately how many chemical analyses do you do in a week?
A. It depends on the exhibit, but I average about eight to ten exhibits a week.
Q. And do you make these analyses as a regular part of your duties?
A. Yes.
Q. Have you ever testified before in court as an expert in forensic chemistry?
A. Yes.
Q. How many times?
A. Approximately 34 times.
Q. Before you we have what's marked as Exhibit 77. Do you recognize that exhibit?
A. Yes.
Q. How do you recognize it?
A. I recognize my signature on the label here, and I also recognize my sticker on the seal right here, where it has my signature as well.

Q. Is this exhibit in the same or substantially the same condition as when you received -- or tested it?
A. Yes.
MS. BELL: Your Honor, I move to admit at this time Government's Exhibit 77.
THE COURT: Any objection?
MR. BARFIELD: No objection.
THE COURT: This Court finds that the government has laid the proper foundation, predicate and authentication and Government's Exhibit 77 is admitted. It is in evidence. And if I did not already state on the record this conclusion, both 77 and 78 are now admitted, and they may be published to the jury.
(Exhibit Number 77 was admitted into evidence.)
MS. BELL: Thank you, Your Honor.
Q. (BY MS. BELL) What is the difference between gross weight and net weight?
A. Gross weight would be the heat seal evidence envelope with everything inside it. The net weight would be the weight of just the powder of the evidence.
Q. And did you weigh the powder evidence, or did you weigh the bag as well in Exhibit 77?
A. Yes.
Q. And what is the net weight of Government's Exhibit 77?
A. 3.706 grams.

Q. And so that would be just the substance?
A. Yes.
Q. Did you conduct a chemical analysis of the exhibit?
A. Yes.
Q. What chemical analysis did you use?
A. I did two tests. I did a marquis color test and gas chromatography-mass spectrometry confirmation test.
Q. Based on your analysis, were you able to form an opinion as to what Exhibit 77 contains?
A. Yes.
Q. Can you please state your opinion?
A. This exhibit contains fentanyl.
Q. And is fentanyl a Schedule II controlled substance?
A. Yes, it is.

MS. BELL: Thank you, Your Honor. I pass the witness.

THE COURT: Cross-examination, Mr. Barfield?

CROSS-EXAMINATION

BY MR. BARFIELD:
Q. Sir, in regards to this exhibit, when you received it, did it appear that the packaging had been altered or tampered with in any way?
A. No.
Q. Would you please describe the security protocols that take

place in your laboratory to make sure that when you receive a substance that you're satisfied that there's no chance that it's been tampered with?

A. Sure. When evidence comes to our lab, it is received by our vault. A vault technician will enter into our system and then it will be stored in our secure vault until it is time to be assigned to a chemist. At that point when a chemist has been assigned it, they will put a request in for an evidence transaction. It will go to our vault window and at that point there will be an evidence transaction that is -- that is tracked in the system. At that point, it is in the chemist's possession. Every chemist has a lock box and their own evidence cubby that they can lock inside a separate vault, which is called our in-process vault, that's where chemists can contain their evidence overnight while they're still analyzing evidence in their possession.

And at that point it is secure and when it's done it is returned to the vault with another evidence transaction and it is secured until a future time.

Q. Are there safety protocols in place in the lab that you work to prevent what we're going to refer to as cross-contamination with other substances before testing?

A. Yes.

Q. Could you please describe what is done to make the safety protocols in place to make sure cross contamination is

minimized?
A. Sure. So first off, I'm going to wear proper PPE. I'm going to wear gloves. I'm going to clean my hood where I do my analysis, and then I will analyze my exhibit. Every analysis there is a blank -- a negative blank that is run alongside the sample, and we will evaluate to see if there's anything in there. If it is, obviously there will be contamination, but we would only accept the -- a positive or negative result if the blank is considered clean by the chemist.
Q. And if the blank would return a positive result, what would -- for instance, hypothetically, if the blank would return a positive result, what protocol would then go into place?
A. Then it would -- the chemist would have to figure out what the source of that contamination be. They would see -- it would look to see maybe it's the agents they're using. Is it the instrumentation, so they would try to track down and find out what the source is before proceeding.
Q. In this particular instance, did you run a blank?
A. Yes.
Q. And what was the result of that blank?
A. It was negative.
Q. Okay. After that -- you started to describe -- you wore PPE, in other words, gloves. Do you wear a mask and --
A. Yes.

Q. Okay. Where is -- the substance comes to you in a lock box is my understanding?
A. No, I have my own lock box.
Q. Okay.
A. That's where I store it when it's in my possession.
Q. So it's in your lock box. What do you do? Do you remove it from the lock box? Where do you place the actual substance before you do the actual testing?
A. I will put it inside my hood, and then I will open up the heat seal by cutting it open with some scissors, and I'll pull out the evidence.
Q. Okay. And in this case, did you do that?
A. Yes.
Q. And after you do that, describe the testing -- I mean describe what you do physically with the substance?
A. First thing I will do is get a net weight. I will take the evidence, and I will take it to one of our balances and I will weigh it to get the weights.
Q. Now, in this case, the net weight would be the actual powder itself without any packaging?
A. Correct.
Q. What was the net weight in this case?
A. 3.706 grams.
Q. Okay. And then after you obtain the net weight, what would you do?

A. At that point, I will proceed with my analysis. In this case, I have -- I would do -- I did two tests. I did a marquis color -- yeah, a marquis color test and --
Q. Explain that briefly.
A. A color test is a reagent that will have a chemical reaction with the substance and will give a particular color when it reacts. For fentanyl, marquis will turn like an orange color, and so that's a presumptive positive for fentanyl.
Q. If there's not that presumptive color in a precursor test, is what I'm referring to it as, what would happen at that point? Let's say it doesn't turn that color?
A. Well, it really depends on what the reaction is. There's other substances that could react and give a different color. So depending on that, I might proceed -- if it turned purple, that would be indications for like MDMA --
Q. Okay.
A. -- and so I would proceed down that route.
Q. Okay. If the -- is there any time that a substance doesn't turn any color?
A. Oh, absolutely.
Q. And what does that result mean?
A. It -- it means it could be a variety of drugs. All color tests does, it kind of narrows down the possibility of what it is. It kind of limit -- any positive eliminates a lot of drugs. If it's a negative, that means a wide scope of possible

substances could be there.
Q. Now, is there any point -- if that presumptive test is -- I think that's probably a better term than what I used before, presumptive test, if that turns out positive -- which it did in this case; is that correct?
A. Yes.
Q. Then what procedures do you use to actually test the substance?
A. Can you rephrase that? I'm sorry.
Q. Yeah, sure.
So you do your presumptive test, and I'm sure that exhausts some of the exhibit or some of these --
A. Yes.
Q. Okay. Because that's kind of putting a liquid, correct? Or liquid squirted into it or something?
A. The color test itself?
Q. Yes, uh-huh.
A. Yeah, we put the color test -- yeah, we put the substance into the liquid.
Q. Okay. And then what -- and then do you use the results from that testing to actually do further testing, or do you use other parts of the substance?
A. I would use other parts. In the color test, it is consumed.
Q. Okay. So in this particular case, you had the -- what I'm

referring to as the presumptive test -- then what did you do with other parts of the powder in this case that you had before you?

A. I took a portion from the unused -- excuse me -- unused portion, and I took a portion and I put it into an autosampler vial. I also prepared a blank, and I ran those alongside each other on our gas chromatograph-mass spectrometer.

Q. And what was the result of the blank?

A. It was negative.

Q. Okay. And then what did you do -- then what was the test of the gas chromatograph? Is that what we were using here?

A. Yes.

Q. Okay. And what substances were shown after that testing?

A. That fentanyl was present.

Q. Okay. Were there any other substances that showed in that -- any other substances either scheduled or nonscheduled from that testing?

A. Indications. I can't say they were confirmed, but there were indications.

Q. Okay. And in this particular instance, do you believe there were any cross-contamination issues that record -- or this jury should be concerned of?

A. None.

Q. And why is that?

A. I did some rounds of preparing the samples to make sure

that they were clean during my analysis. And during my results, I saw no indications that there was any contamination.

Q. If there was, would that -- would the machinery catch it?

A. Yes.

Q. Okay. All right. All right.

MR. BARFIELD: I'll pass the witness, Your Honor.

THE COURT: And any redirect, Ms. Bell?

MS. BELL: No, Your Honor.

THE COURT: Mr. Barfield, any objection to this witness stepping down?

MR. BARFIELD: No, Your Honor.

THE COURT: Any objection to excusing this witness from the case?

MR. BARFIELD: No, Your Honor.

THE COURT: You may step down, and you are excused from the case.

THE WITNESS: Thank you, Your Honor.

THE COURT: And with that, the government may call its next witness.

MS. BELL: The government rests, Your Honor.

THE COURT: Okay. At this time, members of the jury, the government has rested. And I need to do some motions practice with the attorneys outside the presence of the jury. When you return, I'll give you a preview of the next portion of the case, which is the defendant's case-in-chief, and I'll give

you instructions for that phase. But right now, I need to do some motions practice and lawyer work with the attorneys. You are excused to the jury deliberation room, and please abide by all the Court's prior instructions about communicating facts of this case or doing any independent research. With those instructions in place, you may retire to the jury deliberation room until 9:55 a.m.

(The jury exited the courtroom.)

THE COURT: Please be seated, and we are now outside the presence of the jury. Only the parties and counsel remain. Does the defendant now move for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a)?

MR. BARFIELD: The defendant does so move, Your Honor.

THE COURT: And does the government have a response?

MS. BELL: Your Honor, we believe we have submitted to the Court and jury sufficient evidence to sustain a conviction. In this case, we need to prove that the defendant made an agreement with two or more persons to distribute fentanyl, Your Honor. We believe that we have met that burden. In fact, there are many conspiracies in this case not only with Mr. Winbigler, Carlisle, Kylie James, Ms. Valencia-Morales, Mr. Bloomer, Colton Rohrbacher and others, Your Honor. The agreement was to distribute or possess with intent to distribute fentanyl.

Second, that she knew of the unlawful purpose and certainly she did and her text messages prove that -- and her own admissions prove that she knew the unlawful purpose of the agreement was to distribute fentanyl. She referred to it as fentanyl. When asked by Officer Mincher whether or not the substances were fentanyl on many occasions to describe the pills, they were very specific with their words, Your Honor. And so we believe that we have proven the agreement was to distribute fentanyl.

And finally that she joined in it willfully. There's no evidence that she was forced in any way and her behavior and running it as a business, Your Honor, and basically employing Mr. Bloomer to deliver to her customers or working with him to deliver to customers shows the agreement and that she was very willfully involved in it. So we believe we have met our burden, and we'd ask the Court to deny the motion.

THE COURT: Okay. The motion is denied for the reasons stated in the government's response. And this Court's independent determination that the evidence presented is sufficient to sustain a conviction on all three counts of the indictment as required by Federal Rule of Criminal Procedure 29(a), and we will now turn to defendant's case-in-chief.

Mr. Barfield, have you had an opportunity to fully explain to your client her Fifth Amendment rights to testify or not testify?

MR. BARFIELD: I have, Your Honor.

THE COURT: And have you made an election at this time?

MR. BARFIELD: Your Honor, after consulting with my client on multiple occasions, the most recent being yesterday towards the end of the day, after having serious discussions, it's my understanding that my client has decided to exercise her Fifth Amendment rights to not testify in this case at this particular time.

THE COURT: Okay. So, Ms. Waddell, I know that you have received capable and effective assistance of counsel through Mr. Barfield, and I want to make certain that you understand fully your Fifth Amendment rights, also some Sixth Amendment consequences that might obtain, I want you to hear it from the Court as well.

So at this time I'll place you under oath. So remain standing, raise your right hand and my courtroom deputy will administer the oath.

(The defendant was sworn.)

THE DEFENDANT: I do.

THE COURT: Okay. Now that you're under oath, I want to explain to you, first of all, that you do have a Fifth Amendment right to refrain from testifying. I have instructed this jury that no inference as to your guilt or innocence may be made from your choice not to testify. And that they may not

hold your choice not to testify against you. However, it is also your right to testify at this trial, if you so choose.

Second, if you do choose to testify, you will waive any Fifth Amendment privilege regarding cross-examination reasonably related to the subject matter of your direct examination. This just means that if Mr. Barfield were to put you in the witness chair and engage a direct examination, that would entitle the government to a cross-examination. This in a way implicates the Sixth Amendment, which deals with rights of confrontation and Court proceedings.

So that would mean that the government would be allowed to cross-examine you, and like any other witness, they may attempt to impeach you by attacking your credibility or any part of your testimony using evidence and questions of cross-examination.

Third, if you were to testify but refuse to answer any question on cross-examination that is reasonably related to your direct examination and testimony, this Court may properly advise the jury that it may consider your refusal to do so as part of the jury's evaluation of your credibility should you refuse to answer a proper question on cross-examination. Alternatively, this Court may strike your testimony in whole or in part.

Fourth, and finally, if you do testify but refuse to answer any question on cross-examination that is reasonably

related to your direct examination, then the government may comment on your refusal to answer that question during its closing argument. So in this way, if the trial were to take that pattern or that course of proceeding, they would -- the government would be entitled to comment on your refusal to testify in a way that they're not if you exercise your Fifth Amendment right.

Do you understand these rights as I've explained them?

THE DEFENDANT: I do, Your Honor.

THE COURT: And have you had a full and complete opportunity to discuss your Fifth Amendment rights with Mr. Barfield?

THE DEFENDANT: I have, Your Honor.

THE COURT: And is your decision to elect not to testify knowing and voluntary after consulting with counsel?

THE DEFENDANT: It is, Your Honor.

THE COURT: Okay. The Court finds that defendant has knowingly and voluntarily invoked her Fifth Amendment right to testify. This Court will continue to include jury instructions, explaining what the jury may or may not infer from that, and you may be seated, Ms. Waddell.

Now, with that, how do you intend to proceed with your case-in-chief, Mr. Barfield? And we've already previewed some of those decisions, but I know it's ultimately the

defendant's prerogative to try her case as she chooses.

MR. BARFIELD: Yes, Your Honor. In regards to my case-in-chief, Your Honor, I believe all the witnesses that would be relevant to this trial have already testified on the state's case-in-chief. So my plan for my case-in-chief is to merely rest. We've already made the 29(a) motion. We discussed it before we started today. I would prefer to entirely waive closing as previously discussed, because I just think basically I would be repeating myself.

MR. FRAUSTO: Waive opening.

THE COURT: Just --

MR. BARFIELD: I apologize. Thank you, Josh.

THE COURT: Opening, I believe.

MR. BARFIELD: Opening.

I got a save from the prosecutor's table there, Judge. I misspoke.

Opening because I think it would be just the same as closing and I just talk once.

THE COURT: Okay.

MR. BARFIELD: And with that being said, I would like on the record I do not believe that by not making an opening statement since I would not have any witnesses or my client's testimony, I do not believe in any way, shape or form that would prejudice my client's case whatsoever.

THE COURT: Okay. And you would prefer the Court to

explain that election to the jury from the bench rather than explaining it directly?

MR. BARFIELD: I would, Your Honor.

THE COURT: Okay. I will afford you an opportunity to rise and explain that you are resting, and then I can then follow that with a bench instruction on your decision to waive opening statements because they would be duplicative and proceed to closing. I don't think with no additional witnesses, any rebuttal is necessary for the government. So I can tell the jurors to anticipate closing arguments next and then we can do a charge conference as soon as possible.

So is there any objection to that order of operation from the government?

MS. BELL: No, Your Honor.

THE COURT: Any objection from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Last bit of housekeeping, have all demonstratives been exchanged so that we don't have any interruptions of closing arguments?

MS. BELL: They have -- we've shown those to Mr. Barfield to make sure he approves our slides, and he does not have any objections.

THE COURT: Okay. And have you done likewise, Mr. Barfield, in exchanging any demonstratives that you have?

MR. BARFIELD: I'm going to be the only

demonstrative, Your Honor. I have no other physical demonstrative exhibits that I'm going to present on my summation, so yes.

THE COURT: Okay. So as we're preparing for closing arguments and the charge conference, I will instruct any support staff for government and defendant to reconcile the list of exhibits that are admitted into evidence, make certain that those are clearly stated to the courtroom deputy and clerk's office so that when we do give this case to the jury, those will be ready for the jury deliberation room. So I intend to call the jury back, give Mr. Barfield an opportunity to explain his case-in-chief. I'll then explain his waiver of opening statements, and then we'll proceed to the charge conference outside the presence of the jury.

There will be a little bit of in and out there, but I'll explain to them that's just a function of the jury charge and the charge conference process.

So with that, let's bring in the jury.

(The jury entered the courtroom.)

THE COURT: Please be seated. The government has now rested. Mr. Barfield, you may now begin your case-in-chief.

MR. BARFIELD: Your Honor, at this particular time I believe all the witnesses relevant to this case have testified. My client has elected to exercise her Fifth Amendment right as she's entitled to do. Therefore, at this point in time, I'm

going to go ahead and rest.

THE COURT: Okay. Members of the jury, so defendant has now rested her case-in-chief, and you'll also receive instructions on defendant's election of her Fifth Amendment right not to testify. Just as a preview, you may not infer anything from that decision. It is her constitutional right to assert the Fifth Amendment privilege. There will be a more lengthy description of that in the jury charge as you receive it.

So we are going to go into what is called a charge conference next. This is where we go over the jury charge that you will receive. Those will be your instructions for jury deliberations. That must be done outside the presence of the jury as well. I apologize for the shuffling, but we are going to speed through the charge conference as efficiently as possible while you remain in the jury deliberation room, and we should have that final charge ready and printed for you and then we'll proceed to closing arguments. So that's the order of operation from here. One more round of lawyer work with the charge conference. We'll go line by line making certain that both parties agree and don't have any objections to that jury charge. Then we'll promptly resume this case for you in the form of closing arguments.

So -- and I'll give you some instructions on the time that's been allotted and whether the government is holding back

any rebuttal, I'll explain how that works. So I apologize for the shuffling effect this morning, but it's just a function of the lawyer part of a criminal trial. So you shouldn't infer anything from that, both the government and defense counsel are simply doing their job and we must do that outside your presence. So with that, I'm returning you to the jury deliberation room while we work on the charge conference.

(The jury exited the courtroom.)

THE COURT: So are we able to move directly into the charge conference at this time, or does the Court need to supply copies of the most recent edition of the agreed proposed jury charge? Mr. Frausto?

MR. FRAUSTO: Your Honor, I have a copy of the most recent one.

THE COURT: And, Mr. Barfield?

MR. BARFIELD: I -- as far as what's in the charge, I have no objections at this point. I would like to get my hands on a copy at some point.

THE COURT: Okay. So, Mr. Frausto, is it the same first amended agreed proposed jury charge that was submitted as ECF 320?

MR. FRAUSTO: It's Document 328, the first amended agreed proposed jury charge.

THE COURT: Okay. So I'll print three copies just to make certain that we're all working from the same draft, and

then we'll go by that line by line or page by page. And I believe at the pretrial conference, we identified --

MR. FRAUSTO: And, Your Honor, just for the record, I've already met with Mr. Barfield, but do you have a working copy in front of you?

THE COURT: No. What I think I have is the copy from the pretrial conference, but I'm going to have --

MR. FRAUSTO: Okay.

THE COURT: -- a printed ECF Number 328 just out of an abundance of caution to make certain -- I just want to make sure that we're dealing with copies that have the ECF file stamp across the top just to be absolutely certain that nobody is dealing with prior drafts. So I've ordered my courtroom deputy and law clerk to produce three copies of ECF Number 328. And in the interim while we're printing those copies, if counsel could flag the portions of that charge where the variable inserted language appears, I think that could speed the process while we await those hard copies.

MR. FRAUSTO: Your Honor, I could give you those page numbers now.

THE COURT: Please do so.

MR. FRAUSTO: Page 12, first paragraph, under 1.05 and that one's in bold, but we would include that language and take away the italics and the bold. Page 16, we will delete "including the defendant," that one's in bold and in brackets.

Page 17, we would delete what's in brackets and in bold, "regarding the testimony of the defendant." Page 18, we would delete in its entirety because she did not testify and that was in regards to impeachment information subject to 1.12. And then page 23 we included 1.32 "Similar Acts," which both parties asked to be included.

THE COURT: Okay. So 12, 16, 17, 18 and 23 -- I'm sorry, my microphone was not on.

Pages 12, 16, 17, 18, and 23 are the paragraphs that require a ruling from this Court on variable language; is that correct?

MR. FRAUSTO: That's correct, Your Honor.

THE COURT: Okay. And, Mr. Barfield, do you concur?

MR. BARFIELD: Yes, sir.

THE COURT: I'm just flagging those pages to speed the process. And now, Mr. Barfield, do you have a file-stamped copy of ECF Document 328, which was filed on April 17 and styled as the first amendment -- first amended agreed proposed jury charge?

MR. BARFIELD: I do, Your Honor.

THE COURT: Okay. And, Mr. Frausto, do you now have that file-stamped copy?

MR. FRAUSTO: Yes, Your Honor.

THE COURT: Okay. We will proceed with the charge conference.

Mr. Barfield, any objection to proceeding page by page with additional time for any argument and ruling on the aforementioned pages?

MR. BARFIELD: I have no objection to proceeding that way.

THE COURT: Okay. So page 1 of the first amendment -- amended agreed proposed jury charge is the signature block and the style that signature block reflects that it has been reviewed and signed by the United States Attorney's Office, signed by AUSA Joshua Frausto, and then also includes a signature block for defense counsel. Let's move to page 2, preliminary instruction.

Any objection to the language appearing on page 2, Mr. Frausto?

MR. FRAUSTO: No, Your Honor.

THE COURT: Mr. Barfield.

MR. BARFIELD: No, Your Honor.

THE COURT: Turning to page 3, which is a continuation of the preliminary instruction. Any objection to the content on page 3, Mr. Frausto?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objection, Mr. Barfield?

MR. BARFIELD: No, Your Honor.

THE COURT: Turning to page 4, which is a continuation of those preliminary instructions patterned after

Fifth Circuit Pattern 1.01, does the government have any objections to the content on page 4?

MR. FRAUSTO: No, Your Honor.

THE COURT: Does the defendant have any objections?

MR. BARFIELD: No, Your Honor.

THE COURT: Turning to page 5, also a continuation of the preliminary instruction, does the government have any objection to the content appearing on page 5?

MR. FRAUSTO: No, Your Honor.

THE COURT: Does the defendant have any objection?

MR. BARFIELD: No, Your Honor.

THE COURT: Moving to page 6, which is a continuation of the preliminary instruction, does the government have any objection to the content appearing on page 6?

MR. FRAUSTO: No, Your Honor.

THE COURT: Does the defendant have any objection?

MR. BARFIELD: No, Your Honor.

THE COURT: On occasion, this portion of the Fifth Circuit Pattern 1.01 "Preliminary Instruction" occasionally draws objection to some of the antiquated technologies referenced such as the Blackberry and Myspace, but this was read aloud when we started the case. I'm inclined to leave the technology in there. There might be somebody who still uses a Blackberry.

MR. BARFIELD: Your Honor, I deal with this every

trial, and I just wish that they would delete the technology that no longer -- I don't know that Myspace even exists. I'm not necessarily objecting in this charge conference, but I just wish the pattern charges would be updated.

THE COURT: Well, you should take a drive down on I-27 and talk to my classmate and colleague Judge Hendrix, he's on the pattern committee. Talk his ear off about Blackberries and Myspace, and why they don't really need to be in this instruction, but I'm going to leave it in place because it is the pattern.

MR. BARFIELD: It's not harmful in any way, shape or form.

THE COURT: Okay. Page 7 is a continuation of that preliminary instruction.

MR. FRAUSTO: No objection.

THE COURT: No objection from the government.

Does defendant have any objection?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. So we're moving into a different pattern on page 8. This is the Fifth Circuit Pattern 1.48, "Cautionary Instruction During Trial, Transcript of tape-recorded conversation." Does the government have any objection to the content on page 8?

MR. FRAUSTO: No, Your Honor.

THE COURT: Does the defendant have any objection?

MR. BARFIELD: No, Your Honor.

THE COURT: Moving to page 9, a new Fifth Circuit Pattern 1.49, "Transcript of Foreign Language tape-recorded conversation." Does the government have any objection to the content on page 9?

MR. FRAUSTO: Your Honor, this comes straight from the Fifth Circuit Pattern. However, as noted at the bottom, it was modified to include text messages as that's what was transcribed in this particular case. So we ask that it remains but we do ask that the bottom paragraph in this -- there was not two transcripts so that needs to be deleted, and then the notification that it was modified to include text messages. So --

THE COURT: Okay. So I think there are three possible edits. So in paragraph 1, there in sentence 3, there's a bracketed reference to defendant because defendant did not offer and this Court did not admit transcripts in addition to the government's proffered transcripts. Should we delete that bracketed reference to defendant?

MR. FRAUSTO: Yes, Your Honor.

THE COURT: Any objection to that edit, Mr. Barfield?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. So the Court will instruct the clerk staff to delete that from the final template. I don't think there are any objections to paragraph 2.

Is that correct, Mr. Frausto?

MR. FRAUSTO: That's correct, Your Honor.

THE COURT: And, Mr. Barfield?

MR. BARFIELD: That is correct.

THE COURT: So now we're to that final third paragraph, which is bracketed.

Mr. Frausto, do I understand that you want to delete the entire bracket?

MR. FRAUSTO: Yes, Your Honor, because there was not two transcripts --

THE COURT: Okay.

MR. FRAUSTO: -- that provided different versions.

THE COURT: And, obviously, this Fifth Circuit Pattern 1.49 is modular in nature and is drafted to anticipate competing transcripts, but we don't have that in this case. Mr. Barfield, any objection to deleting that bracketed third paragraph?

MR. BARFIELD: No. And as well as the parentheses bolded "modified to include text messages" I believe should probably be taken out as well.

THE COURT: Okay. That was my last potential edit.

Any objection, Mr. Frausto?

MR. FRAUSTO: No, Your Honor.

THE COURT: Okay. So I will instruct the clerk staff to also delete the bolded parenthetical that states modified to

include text messages, as I understand from the pretrial conference that was for the benefit of the Court and counsel. Now that we're going to charge the jury, there's no need for that guidepost.

Now moving to page 10, Fifth Circuit Pattern 1.03, "Introduction to Final Instructions." Any objection to the content on page 10, Mr. Frausto?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objection from the defendant?

MR. BARFIELD: No objection.

THE COURT: Let's move to page 11, Fifth Circuit Pattern 1.04, "Duty to Follow Instruction."

Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: So now we are to page 12, which does have modular language that should be included. I believe that is in the first paragraph. So here the parties have used Fifth Circuit Pattern 1.05, "Presumption of innocence, burden of proof, reasonable doubt."

And does the defendant ask this Court to include the bolded bracketed sentence at the end of the first paragraph, which reads "And no inference whatever may be drawn from the election of a defendant not to testify"?

MR. BARFIELD: Yes, Your Honor.

THE COURT: And during a break, Mr. Frausto, I think you've told this Court that the government does not object to that inclusion.

MR. FRAUSTO: No, Your Honor. We just need to unbold it and then take off the brackets.

THE COURT: Okay. So ordered. I'll coordinate with the clerk staff to include the following language: "And no inference whatever may be drawn from the election of a defendant not to testify." Removing the brackets and the bold so that that text is consistent with the remainder of the 1.05 pattern.

Page 13, this is the Fifth Circuit -- okay. Let me ask a question back to that insertion on the prior page, page 12. Does the government ask that this language be italicized?

MR. FRAUSTO: No, Your Honor.

THE COURT: And does defendant ask that this language be italicized?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. So removing the brackets, the bolding and the italics. If I wasn't clear, that's the Court's intention so that the final sentence in the first paragraph of Pattern 1.05 reads in the same font and style as the rest of that instruction. So ordered.

Turning to page 13, this is the Fifth Circuit Pattern

1.06, "Evidence excluding what is not evidence." It carries over to page 14. Does the government have any objection to that content?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objection from the defendant?

MR. BARFIELD: No objection to pages 13 or 14, Your Honor.

THE COURT: Okay. So let's turn to page 15, Fifth Circuit Pattern 1.08, "Evidence inferences - direct and circumstantial."

Any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Let's turn to page 16. This is the Fifth Circuit Pattern 1.09, "Credibility of witnesses." It carries over to page 17, and I believe that there are two modules that need to be addressed. As previewed at the pretrial conference on page 16, there is a bracketed proposed insertion reading "including the defendant." This would have been relevant had defendant testified in the case.

Mr. Barfield, are you asking -- any objection to deleting that reference?

MR. BARFIELD: Your Honor, specifically, no, I have no objection. And that would be -- I believe we're referring

to the second paragraph, where there's parentheses or brackets "including the defendant who testified in the case." I believe that all needs to be removed and a period should appear after the word "witnesses."

THE COURT: Okay. Well, I believe it should read after the bracketed module is deleted, the sentence should read as follows: "An important part of your job will be making judgments about the testimony of the witnesses who testified in this case" period.

MR. BARFIELD: Absolutely.

THE COURT: Okay. Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: So -- so ordered. Let's turn to page 17.

Similarly, there is a bracketed and bolded and italicized module for the following: "The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness."

Mr. Barfield, any objection to deleting that module?

MR. BARFIELD: No, sir.

THE COURT: Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: So ordered. That will be deleted and will not appear in the final charge.

So we're now to page 18. I understand the government to argue that this section should be deleted in its entirety,

that we not include any portion of the Fifth Circuit Pattern 1.12.

Mr. Barfield, does defendant object to that deletion?

MR. BARFIELD: No. I believe the entirety of 1.12 on page 18 should be deleted.

THE COURT: I don't imagine defendant wants a separate section referencing her 2017 conviction because she did not elect to testify, and there was no cross-examination containing that impeachment evidence. This Court finds it would be extremely prejudicial to defendant. This Court is ordering page 18 and the entirety of the proposed Fifth Circuit Pattern 1.12 to be deleted. This may affect the ultimate pagination but the substance will be the same. This proposed 1.12 impeachment module will be deleted in its entirety.

We are now to page 19. There -- this is the Fifth Circuit Pattern 1.18, "Expert Opinion Testimony." There is a parenthetical at the end of that instruction that reads "Modified to delete first sentence."

Mr. Barfield, any objection to deleting that parenthetical?

MR. BARFIELD: No, Your Honor.

THE COURT: Mr. Frausto.

MR. FRAUSTO: No, Your Honor. That would just place to notify the Court the difference of the Fifth Circuit Pattern charge versus what's on there, so we ask that it be deleted

too.

THE COURT: Okay, so ordered. That Fifth Circuit Pattern 1.18 will be included, but we will delete the parenthetical note that reads "Modified to delete first sentence."

So ordered.

Page 20, Fifth Circuit Pattern 1.19 "On or about." Does the government have any objection to that content?

MR. FRAUSTO: No, Your Honor.

THE COURT: Does defendant have any objection.

MR. BARFIELD: No, Your Honor.

THE COURT: It will be included.

Moving to page 21. Fifth Circuit Pattern 1.21 "Caution - Consider only the crimes charged." Does the government object to any content in that proposed charge?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objection from defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. And I know you had to pause there, because it's very important that the burden of proof be accurately stated. Am I correct, Mr. Barfield, that defendant has no objection to the proposed 1.21 "Caution" language?

MR. BARFIELD: No, Your Honor. We would have no objection, and we'd ask that it be included actually.

THE COURT: Okay, understood. It will be included.

Turning to page 22, Fifth Circuit Pattern 1.22 "Caution, dash, punishment. " Does the government object to this content?

MR. FRAUSTO: No, Your Honor.

THE COURT: Does the defendant object?

MR. BARFIELD: No, Your Honor.

THE COURT: It's an accurate restatement of the bifurcated sentencing process and the federal system. The Court will include it.

Turning to page 23, "Similar Acts" 1.32. This is Fifth Circuit Pattern. It carries over to page 24. I know this is one we need to discuss. I believe the government is requesting that this Fifth Circuit Pattern be included in the final jury charge; is that correct?

MR. FRAUSTO: That's correct, Your Honor.

THE COURT: Any objection, Mr. Barfield?

MR. BARFIELD: No, Your Honor.

THE COURT: This Court agrees with the government and hearing no objection will include the Fifth Circuit Pattern for 1.32 "Similar Acts" as it appears in this document page 23 and 24.

Page 25, Fifth Circuit Pattern 1.41 "Knowingly to Act." Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: This pattern will be included.

Moving to page 26, the Fifth Circuit Pattern 1.33 "Possession."

Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objection from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: That pattern language will be included.

Moving to page 27, this is the meat of the criminal counts. They are paired with Fifth Circuit Pattern language and Title 21 United States Code 846. This instruction spans two pages, page 27 and 28. Any objection to the proposed 2.97 "Conspiracy to distribute and to possess with intent to distribute a controlled substance language," from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: So the Court agrees with counsel for the defendant and counsel for the government that the proposed charge language 2.97 detailing the elements of the offense and applicable case law is correct and the proposed 2.97 language will be included in the final jury charge.

We are finally to page 29 and 30. This is the Fifth

Circuit Pattern 1.26 "Duty to deliberate and verdict form." There is on page 29 following the sentence that reads "A verdict form has been prepared for your convenience," a parenthetical that is bolded and italicized that reads "Explain verdict form."

Does the government object to deleting that reference?

MR. FRAUSTO: No, Your Honor.

THE COURT: Does defendant object to deleting that parenthetical?

MR. BARFIELD: No, Your Honor.

THE COURT: The Court will delete the "explain verdict form" language. I know that appears in the Fifth Circuit Pattern, but it is more of a signal to the Court than any substantive legal language and the Court will delete the explain verdict form language as it appears in document Number 328 on page 29.

That carries over onto page 30. With that deletion, do I hear any other objections or recommended deletions to the Fifth Circuit Pattern 1.26 "Duty to deliberate verdict form" from the government?

MR. FRAUSTO: No objection from the government, Your Honor.

THE COURT: Any from the defendant?

MR. BARFIELD: No objection.

THE COURT: Okay. Now we are to the verdict form. This is on page 31. Of course, only one copy will be provided to the jury. This will be separate and apart from the jury charge which all jurors will receive. Does the government have any objections to the verdict form as it appears on page 31 of Document 328?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objections from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: We will begin to make those edits and we will produce 14 copies for the jury and three copies for the Court and counsel. That process will start now.

MR. FRAUSTO: Your Honor, if I may, I noticed just one edit that needs to be on the verdict form "Conspiracy to distribute," and instead of "and" it should be "or possess with intent to distribute fentanyl."

THE COURT: Okay. So let's return to that page 31 of document Number 328, "Verdict of the Jury." It presently reads "We, comma, the jury, comma, find the defendant, Rachel Lynn Waddell, colon, Count 1 of the superseding indictment, dash, conspiracy to distribute and possess with intent to distribute fentanyl" and then it has the spaces for the guilty/not guilty election. Which word is wrong?

MR. FRAUSTO: Instead of "and" we would ask for "or" because it's --

THE COURT: Okay. So let's refer back to prior pattern instruction on 2.97 "Conspiracy to distribute and to possess with intent to distribute the controlled substance." Why would it be an "and" in the Fifth Circuit Pattern 2.97 but an "or" in the verdict form?

MR. FRAUSTO: We've proven -- we allege in the conjunctive but we just have to prove in the disjunctive, Your Honor.

THE COURT: And do I have an argument from defense counsel?

MR. BARFIELD: Your Honor, I'm just going back and looking. I was comparing this to the superseding indictment and the superseding indictment states "To knowingly and intentionally distribute and possess." So I would -- I'm sorry for sitting. I would state that the verdict form that's been proposed on page 31 tracks the superseding indictment and should remain tracking the superseding indictment is what I would suggest.

THE COURT: Okay. So here the Court has a copy of the sealed Document Number 61, superseding indictment. It is styled as Count 1 "Conspiracy to distribute and possess with intent to distribute fentanyl." And then on page 2 as it is describing the facts of the offense, the government alleges defendant did, quote, "Agree with each other and with persons known and unknown to the grand jury to commit an offense

against the United States, that is to knowingly and intentionally distribute and possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl." But do recall that there is Fifth Circuit precedent on an indictment stated in the conjunctive followed with a pattern stated in the disjunctive.

Does the government have any case law on that point?

MR. FRAUSTO: In the process, Your Honor.

THE COURT: And I am logging on to Westlaw now because I do have some recollection of that distinction in Fifth Circuit Pattern law.

(Pause in proceedings.)

MR. FRAUSTO: And, Your Honor, in 2.97, the language is in this case, the defendant charged with conspiracy to distribute or possess with intent to distribute fentanyl, which was unobjected to.

THE COURT: Remind me the --

MR. FRAUSTO: Page 27 on our working copy.

So it's correct there, we just need to correct the verdict form of conspiracy to distribute or possess with intent to distribute fentanyl.

(Pause in proceedings.)

THE COURT: So here the Court is reviewing Holley, H-O-L-L-E-Y, Fifth Circuit case from 2016, 831 F.3d 322. And I am not a speed reader, so I'm trying to catch up to this

language and what the Fifth Circuit has explained on this conjunctive versus disjunctive point.

(Pause in proceedings.)

THE COURT: Here the Court will read aloud for the benefit of defense counsel and government counsel language from that Holley opinion. Here, the Court is at page 328 of the opinion. It's keynote or headnote 5. Quote, "The Supreme Court has instructed that the general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive as defendant's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged. Put another way, defendant's sufficiency challenge fails if there was sufficient evidence that he entered a conspiracy to either manufacture marijuana plants, distribute marijuana plants, possess with intent to manufacture marijuana plants, or possess with intent to distribute marijuana plants."

And then the Court goes on to explain the facts in that case. Though defendant contends that he did not conspire to distribute, there is ample evidence that he conspired to manufacture. At trial the government introduced evidence of both. So here the Fifth Circuit explains, quote, "The government had to establish only that defendant conspired with one of these individuals to prove a violation of Section 846. Considering the evidence and all reasonable inferences in the

light most favorable to the prosecution, a rational jury could have concluded that defendant conspired with all six codefendants."

So obviously, this is a case on appellate review where the verdict form returned was a guilty finding.

MR. BARFIELD: Your Honor, what was that citation again, if you don't mind?

THE COURT: 831 F.3d 322.

MR. BARFIELD: Thank you, sir.

THE COURT: The Court goes on on the next page to explain, "Though Count 3 was pleaded conjunctively, the government had several routes to a conviction." The relevant question is whether the government presented sufficient evidence of an additional count that may be committed in multiple ways. This case was on a sufficiency challenge but does stand for the general proposition that an 846 offense may be conjunctively pled and disjunctively submitted to the jury.

This is why we have charge conferences so we can avoid any confusion at the Fifth Circuit. I will take a ten-minute break so I can return to chambers with some of my reference manuals, and then we'll continue this charge conference and I'll hear arguments from both the government and defendant on this conjunctive versus disjunctive point.

MR. FRAUSTO: Your Honor, may I provide one other case for the Court?

THE COURT: You may.

MR. FRAUSTO: United States vs. Bennett, which cites the Holley case, it's 874 F.3d 236, it's out of the Fifth Circuit. And it discusses alleging in the conjunctive and then proving in the disjunctive at cite 257.

THE COURT: Okay. I have that case, and let's take a mid-morning break for rest and research. Let's return for continuation of the charge conference at 10:50.

(Off the record at 10:37 a.m.)

(On the record at 11:10 a.m.)

THE COURT: Okay. All right. So I apologize for that delay. We had some housekeeping internal to the Court and then this jury charge question specific to this case. So we were trying to do both at the same time. So I've provided counsel with a copy of the Fifth Circuit case following and reviewing the Bennett district court case. So here United States vs. Bennett, 874 F.3d 236, and if you will turn to page 15 of the printed color copy headnotes beginning at 3334.

This is a case where the Fifth Circuit reviewed a constructive amendment argument. It does explain the different standards of review that apply to such review. That's not necessary for our analysis. So if you move past that section of paragraph 5, the relevant portion appears in the last two paragraphs of that Section 5. There the defendant argued that the jury instructions used a disjunctive or in each count where

the conjunctive and had been used in the indictment which charged, quote, "Distributing and dispensing controlled substances" that was altered in the charge language which specified distributing or dispensing controlled substances. This is followed by other counts relevant to other underlying offenses.

And she urged that that constructive amendment of the indictment violated her Fifth Amendment rights. And here the Fifth Circuit holds as follows, quote, "The district court correctly determined that United States vs. Holley, a case already cited by the government in United States vs. Haymes, H-A-Y-M-E-S, foreclosed relief from those grounds."

In Holley which is citing Haymes, this Court stated, quote, "It is well established in the circuit that a disjunctive statute may be pled conjunctively and proved disjunctively." And Haymes, like here, the statute used or the indictment used "and" and the Court charged the jury using "or." We rejected the argument that these differences meant the government improperly amended its indictment. That is the argument for us now and rejected once again.

So this Court finds that the Fifth Circuit opinions in Holley and Haymes and now Bennett are binding upon this Court and the government has correctly stated the general rule. I think the confusion...

(Pause in proceedings.)

THE COURT: So I think here the potential confusion is attributable to the intersection of a conspiracy statute and patterns that use the conjunctive "and" and then the statute for the underlying offense which uses disjunctive language "or." Looking back to the charging instrument, of course, the government alleged both. On page 1 of the superseding indictment, it does use in the style section a conjunctive phrase, conspiracy to distribute and possess with intent to distribute fentanyl, but this is followed on page 2 with the underlying offense, comma, "in violation of Title 21 U.S. Code Section 841(a)(1). If counsel refer to Section 841(a)(1), you'll see that that statute uses disjunctive language in a series of "ors," which specify how the violation may occur and then, of course, be proven in a court of law.

So the Court for that reason agrees with the government and of course the Fifth Circuit that a disjunctive statute may be pled conjunctively and proved disjunctively and that this Court would not err in revising the charge to reflect the same.

So with that I'll hear final argument from the defendant and then the government. That's my tentative determination at this point.

Mr. Barfield.

MR. BARFIELD: Thank you, Judge. And I found the -- I found the Bennett case as well. Thank you for the Court

providing a copy. I believe -- and I have read all the cases that have been referred to. I'm not going to argue what the cases say and what the Fifth Circuit said on this issue. I do believe for the purposes of appellate record purposes that I would need to make a 30(d) objection to that inclusion in the jury charge and request it remain "and" as already stated, and that's for the purposes of the appellate record. I will go further to state if the Court overrules said objection, I would not have any further objection to the charge as presented to the jury so that we could proceed with the conclusion of this trial.

Does that make sense to the Court what I just said?

THE COURT: I have your argument and I'll consider that alongside the government's argument on this final charge issue.

MR. FRAUSTO: Your Honor, I have nothing else to add outside of what the Court's already reiterated in the United States vs. Bennett case and the subsequent cases that the Court's already cited.

THE COURT: So, Mr. Frausto, if we were to change the verdict form to read "Conspiracy to distribute or possess with intent to distribute," would we -- would the government propose modifying page 27? And I know these page numbers will change here. We're just working from the amended agreed proposed jury charge in Document 328. Would we need to address the

conjunctive/disjunctive problem in the style of the Fifth Circuit Pattern 2.97 header which reads "Conspiracy to distribute and"?

MR. FRAUSTO: Yes, Your Honor. It's right in the body. We could change it to the disjunctive and put "or" instead of "and" on the heading.

THE COURT: So here the third sentence of that first paragraph sets out the underlying offense elements, quote, "The elements of distribution or possession with intent to distribute fentanyl are, Number one, that the defendant knowingly distributed or possessed a controlled substance; Number two, that the substance was, in fact, fentanyl; and then, Number three" -- and this is where the next disjunctive language appears -- quote, "That the defendant distributed the substance or possessed a substance with intent to distribute it."

Is the government arguing that we should change the 2.97 header to parallel that disjunctive language and the proposed disjunctive language in the verdict form?

MR. FRAUSTO: Yes, Your Honor. Just to keep it consistent.

THE COURT: Okay. So here the Court finds that the defendant has received capable and effective assistance of counsel in arguing for the conjunctive form. The Court finds that defendant has preserved for further appellate review that

issue.

(Pause in proceedings.)

THE COURT: But the Court overrules defendant's objections to the proposed insertion and amendment.

Mr. Barfield, you had mentioned a Rule 30(d). Could you explain to the Court which rule of procedure or evidence you're invoking?

MR. BARFIELD: I believe -- and if I'm correct, Judge, that would be in federal rules of criminal -- well, let me speak. Federal Rules of Criminal Procedure Rule 30 under jury instructions. Now that -- objections to instructions and basically a party objects to any portion of the instructions or a failure to give a requested instruction, a defendant must inform the Court of the specific objection and the grounds for the objection before the jury retires to deliberate. And basically, I just need to make sure my understanding of the law and the Court I believe cited Rule D yesterday. So I'm just making sure that the objection is specifically made and preserved for appeal, Your Honor.

THE COURT: Okay. The Court finds that you have preserved for further appellate review that motion. Any response from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: The Court overrules defendant's motion and will revise or edit -- I'm sorry, will revise and edit the

jury charge as follows. On page 27 of Document Number 328, the style of the Fifth Circuit Pattern 2.97 will read as follows. We can call this a style or a header.

"Conspiracy to distribute or to possess with intent to distribute a controlled substance thereby reading" -- "thereby rendering the heading consistent with the disjunctive clauses that appear later in the first paragraph, specifically the elements of distribution or possession with intent to distribute fentanyl, which are both accurately stated in the disjunctive consistent with 21 U.S.C. Section 841(a)(1) as it appeared in the indictment." And then the Court is ordering the verdict form to be revised to read as follows, in relevant part: "Count 1 of the superseding indictment, dash, conspiracy to distribute or possess with intent to distribute fentanyl," and then it's followed by the spaces for guilty or not guilty and the signature of the foreperson.

Any objection, Mr. Frausto?

MR. FRAUSTO: No, Your Honor.

THE COURT: Mr. Barfield, I already have your objection. I've ruled on your motion. Any additional argument for appellate preservation purposes?

MR. BARFIELD: I believe that's been preserved, Your Honor.

THE COURT: Okay. So when we read aloud the jury charge, I'll quickly convene a hearing outside of the presence

of the jury for a renewed motion for judgment of acquittal under Rule 29(a), if necessary. Oh, I'm sorry. I'm getting my rules switched up here. So when I read aloud the jury charge I'll give the parties an opportunity to object to the reading under Rule 30(d). So that can be taken outside the presence of the jury.

But with that, do we have -- other than the objection which is now preserved for further appellate review, do we have any additional arguments relevant to the charge?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. I'll instruct the clerk and court staff to generate copies of the jury charge consistent with those rulings.

How do the parties propose to proceed to closing arguments from the government?

MS. BELL: Your Honor, I'm concerned about our juror. He was a diabetic. We're almost to 11:30. And by the time we make copies and such and the Court reads that, we're going to be into the lunch hour. Should we take an early lunch break and allow them to at least eat and come? I hate to close after lunch.

THE COURT: I know this is Amarillo, but 11:30 feels like brunch.

MS. BELL: It does. It does. We're prepared to go forward with whatever the Court allows.

THE COURT: I know. That was more -- that was more of a joke than a serious comment.

Any objection, Mr. Barfield? I can bring the jurors in. I can explain that there was an extended hearing on various points of appellate law and that the charge conference took longer than anticipated. I can dismiss them for their lunch break, order them to reappear at one o'clock for closing arguments. That may satisfy the necessary medical accommodations for I think two jurors who have requested accommodation for diabetic condition.

Any objection?

MR. BARFIELD: May I consult with the government real quick?

THE COURT: Yes. I'll order the microphones disabled at this time.

(Counsel conferred off the record.)

MR. BARFIELD: Your Honor, I think after consulting with the government, I think we're of the like mind that breaking for lunch solely for the benefit of the jurors, not necessarily for counsel, would probably be in the best interest of the jurors' medical needs.

THE COURT: Would you propose that they have a quicker turn around and return at 12:30 so that there's not

such a delay and risk of communications or a temptation to do research?

MR. BARFIELD: Absolutely, Judge. Like I say, I mean, I'd be fine to push on but I don't see any reason to take any chances that way, we're late in the trial. Yes, that would be perfect.

THE COURT: Okay. And I recall from the pretrial conference that the government requested 30 minutes; is that correct, Ms. Bell?

MS. BELL: That was for opening. We are requesting 45 minutes for close, Your Honor. That's my concern is that if we go so long, we might be into the lunch hour. I'm asking for a 25-minute warning and a 30-minute warning, Your Honor.

THE COURT: And are you holding back any of your time for rebuttal?

MS. BELL: Yes. Whatever remaining time would be reserved for rebuttal but, yes, that would be about ten minutes.

THE COURT: Okay. And, Mr. Barfield.

MR. BARFIELD: Your Honor, I can certainly work within those time parameters and two-minute warning's fine with me.

THE COURT: So I will allot you 45 minutes for close and a two-minute warning. Okay. And I think the duration of -- or I should say, the anticipated duration of those

closing arguments further necessitates a break at this point. We've got multiple jurors who requested medical accommodation. Some have diabetic conditions. We can do both lunch and a restroom break, and they can be refreshed and ready to hear closing arguments when they return at 12:30. That's the Court's intention. Any reason not to bring the jury in?

MS. BELL: No, Your Honor.

MR. BARFIELD: No, Your Honor.

THE COURT: Bring in the jury.

So that they're ready to submit to the deliberation room. I know everybody was scrambling to find cases on Westlaw, but if support staff can do that.

(The jury entered the courtroom.)

THE COURT: We're back on the record in Criminal Action Number 2:23-CR-69-Z-BR-5, United States of America vs. Rachel Lynn Waddell, for continuation of trial.

Unfortunately, I could not allow you to observe the vigorous appellate advocacy between government counsel and defense counsel, but it's just part of our process that the jury's not present when we debate issues relevant to the jury charge and the legal language that you'll receive for this case. That explains the delay, though. I wanted you to know that both counsel for the government and counsel for the defendant were working vigorously so that we could have a full and final jury charge ready for closing arguments.

Unfortunately, because the Court and counsel were chasing Westlaw cases to find the relevant Fifth Circuit authority, we bled into an almost hour-long charge conference which I did not anticipate.

And that means you are getting an early lunch break so that we can print the jury charge, each of you will be provided a copy. You'll also receive just one verdict form, which will be held in the possession of the foreperson at all times. We're going to make all those copies. We're going to ensure that courtroom technology is ready for the presentation of closing arguments, and because the parties have reserved 45 minutes per side, I think this is a better time for an early break. We can do both restroom breaks, refreshment breaks and lunch and then we will work during that period so that you can come back refreshed and ready for closing arguments because that may consume almost an hour and a half if both parties use their full 45 minutes.

So with that, one more shuffle, then you're off to your lunch break and then we will have closing arguments. You'll hear the jury charge from the Court and then you will have this case. So we're almost to the finish line. Please abide by this Court's continued instruction that you not communicate any facts or details of this case with each other, with any person in this courtroom. Please keep that jury identification badge on your person at all times. That lets

parties, litigants, witnesses know that you're a juror and that you should not be spoken to.

We also have some court proceedings on the second floor courtroom. So we have a lot of people moving about the building today, so that jury badge will be doubly important. With all of those instructions in place and with the apologies of the Court for an extended appellate argument that lasted longer than I anticipated, you are dismissed for an early lunch break and we will resume this trial with closing arguments set to begin at 12:30. With that, you are dismissed with those instructions.

(The jury exited the courtroom.)

THE COURT: So just in the interim, you may take your lunch break as well. Please test drive the courtroom technology if you're using demonstratives, and please provide to the courtroom deputy and clerk staff the exhibits that should go back to the jury deliberation room. Let's get that done during this break and then we are going to work to have charge conference copies ready. Those will be distributed in each seat, and then I believe we're ready for closing. Any objection?

MS. BELL: No, Your Honor.

THE COURT: Any objection.

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. Let's proceed according to that

plan and you're ordered to reappear for closing arguments at 12:30.

(Off the record at 11:34 a.m.)

(On the record at 1:03 p.m.)

THE COURT: So we've got three printers running. Tried to get this all done, and then we had a couple document corruption issues because we were cutting and pasting and inserting into multiple versions of the agreed jury charge and then the first amended. So we elected to go with a footer in a style that just says "Final Jury Charge." You should have that copy now.

And I will represent to counsel for the defendant and counsel for the government that the only material changes other than those discussed at the charge conference is the insertion of the translation warning and the transcript warning which are now out of order, but I think it's necessary for the final jury charge to remind the jurors of what I told them during preliminary instructions, that when you have a transcript of a tape-recorded conversation you should follow this Court's instructions on which form of evidence they should prioritize and then 1.49.

So as newly added, this is the newly inserted page 24 and page 25. These were initially listed as part of the preliminary instruction. This Court has already read aloud to the jury the preliminary instruction and explained the need to

heed this Court's warnings about tape-recorded conversations and transcripts, but because there were so many recordings and transcripts, I moved that preliminary instruction into the final instruction. They now appear as page 24 and 25 but the content is identical.

And for record purposes, the Court is continuing the jury charge conference ahead of closing arguments. This is a continuation of that charge conference. Do I have any objections to this proposed amendment by the Court's own motion to insert the 1.48 "Cautionary Instruction" and the 1.49 "Transcript Instruction" as the new page 24 and page 25 from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objection from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: I just think because we had so many recordings and transcripts and we had an extended instruction to the jury about Spanish translations and the rest that those should be also in the final instructions. So let's just quickly go page by page. I'm just going to ask if there are objections.

Does the government have any objections to page 1?

MR. FRAUSTO: No, Your Honor.

THE COURT: The defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Does the government have any objections to page 2?

MR. FRAUSTO: No, Your Honor.

THE COURT: The defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Page 3, any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Page 4, any objections from the government? You may see that third element for conspiracy pushed to another page, but it is identical to the language we've previously discussed and as it appeared in the agreed proposed jury charge.

MR. FRAUSTO: Yes, no objection, Your Honor.

THE COURT: Okay. Any objection from the defendant?

MR. BARFIELD: No objection to page 4 continuing on to page 5, where it says "third" and after up to "conduct of the jury," Your Honor.

THE COURT: Okay. And that was a spacing issue that we were dealing with. We tried to keep the formatting as identical to the agreed charge as possible but because of headers and footers, things just kept jumping a page break. So I apologize. That's why we're going through this extended

process.

Any objections to page 5 from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Any objections to page 6 from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: The defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. Any objections to page 7?

MR. FRAUSTO: None from the government, Your Honor.

THE COURT: Okay. From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Now we're into the portion that will be relevant to this Court's final charge to the jury, page 8. This is the beginning of 1.03 "An introduction to final instructions."

Any objections to page 8 from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Any objections to page 9 from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Page 10 from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: The defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Page 11, any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: And that does carry over on to page 12 now. Any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objections from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: We're up to page 13, 1.08 "Evidence." Any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: We're up to page 14, 1.09 "Credibility of witnesses." This carries over now to page 15. Any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objections from the defendant?

MR. BARFIELD: No objections to page 14 or 15.

THE COURT: Okay. We're now up to page 16, 1.18 "Expert opinion testimony."

Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Page 17 is now the 1.19 "on or about" instruction. Any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: From the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: On page 18, 1.21 "Caution - Consider only the crime charged." Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: And the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Page 19, 1.22 "Caution - Punishment." Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: And the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: And on page 20, this is the Fifth Circuit Pattern on 1.32 "Similar Acts" that now pushes over on to page

21, any objections from the government?

MR. FRAUSTO: No, Your Honor. And none to page 20 or 21.

THE COURT: Any objections from the defense?

MR. BARFIELD: No objections to either page, Your Honor.

THE COURT: Okay. And we're now up to page 22. This is 1.41 "Knowingly to act." Any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: And from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Page 23, Fifth Circuit Pattern 1.33 "Possession." Any objections from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objections from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: And this is where this Court has moved the placement for two instructions, page 24 is now 1.48 "Cautionary instruction during trial transcript of tape-recorded conversation." Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objection from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: That is followed by the new page 25, which is the Fifth Circuit Pattern 1.49 on "Transcript of foreign language tape-recorded conversation." Any objection from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Any objection from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: And to reiterate and for record purposes, those are identical -- 1.48 and 1.49 are identical to the instructions originally included in the preliminary instructions submitted by agreement of the parties. The Court has simply removed those sections and placed them as parts of the final instructions and chose to do so at page 24 and 25. So now, we are up to page 26, and I'll ask counsel to pay close attention because there are material changes in response to objections and this Court's rulings.

This is the Fifth Circuit Pattern 2.97 "Conspiracy to distribute or to possess with intent to distribute a controlled substance." That header is now rendered consistent with the Court's ruling and that section continues through page 27. Understanding that defendant has preserved for further appellate review his objection to the use of conjunctive or disjunctive language moving from indictment to case to charge, any objections as it now appears as page 26 and 27 that's not already covered by that reserved objection?

MR. FRAUSTO: None from the government.

MR. BARFIELD: Thank you for recognizing my previous objections, Your Honor. No objection.

THE COURT: Okay. So we're now up to the pattern on 1.26 "Duty to deliberate." That now carries over to page 29. So any objections from page 28 and 29, the duty to deliberate?

MR. FRAUSTO: None from the government.

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. And finally, this is the verdict of the jury form. This has been revised to conform to the Court's ruling on the disjunctive/conjunctive objection of defendant. The Court has overruled that objection, has found that it is preserved for further appellate review and is now conformed, the verdict form to conform with same, specifically conspiracy to distribute or possess with intent to distribute fentanyl.

With all of that now litigated, any additional objection to this form, Mr. Barfield?

MR. BARFIELD: No additional.

THE COURT: Okay. Any from the government?

MR. FRAUSTO: No, Your Honor.

THE COURT: Okay. We now have copies, I believe, and we will place those in the chairs of the jurors and we have 12 plus two, so 14 copies to be distributed. I'll instruct the CRD and clerk staff to do so. Am I correct that that was the

parties' expectation?

MS. BELL: Before we bring in the jury, could we get wired up with the microphones so we don't have to awkwardly --

THE COURT: Oh, absolutely. But I am correct that you wanted copies of the final jury charge in the chair.

MS. BELL: Whatever the Court would like, yes, I think it's fine.

THE COURT: Any objection?

MS. BELL: I think they like to read along.

THE COURT: Okay, all right. We will -- we will leave the copies in the chair of each juror, but I will not read the charge until after closing arguments. Is -- again, attorneys sometimes worry that people are not going to pay attention to closing argument.

What is your preference, Mr. Barfield, distribute each juror's copy before or after closing argument?

MR. BARFIELD: Let's just distribute them, Your Honor.

THE COURT: Okay. And let me make certain with court staff that those copies do not include the verdict form. There should only be one verdict form for the foreperson. Okay. So I'm instructing the CRD and court staff to distribute hard copies of the final jury charge one per juror and for the alternates. And I've received confirmation that the verdict form does not appear in those copies.

At this point, Ms. Bell and Mr. Barfield, you may mic up for your closing.

MS. BELL: Thank you. It's a little more awkward when you don't have a pocket.

THE COURT: At least we don't give you a headset that makes you look like a McDonald's drive-through operator.

MS. BELL: Or a pastor.

THE COURT: Or a pastor.

(Pause in proceedings.)

THE COURT: And are you ready to proceed, Ms. Bell?

MS. BELL: Yes, Your Honor.

THE COURT: And are you mic'd up and ready to proceed, Mr. Barfield?

MR. BARFIELD: Ready to proceed, Judge.

THE COURT: Understanding that you'll be on mute for this portion, but I have your request for time breaks, 45 minutes on the clock, Ms. Bell. 25-minute warning and a 30-minute-warning; is that correct -- or 23-minute warning, or I have sloppy penmanship.

MS. BELL: Let's just do a 30-minute warning.

THE COURT: Okay. We'll do 45 minutes on the clock with a 30-minute warning. With that, let's bring in the jury.

(The jury entered the courtroom.)

THE COURT: And, members of the jury, please be seated. Counsel and parties may be seated. And again, thank

you to the jury for your extended patience. And this time the delay was attributable to some computer malfunctions and printing malfunctions. We wanted to have the jury charge ready in your seat when you arrived from lunch for closing arguments but the various copiers and machines didn't comply. So you allow me to come within 5 feet of technology, and this is what happens. So I take full responsibility for the delay, and I apologize for that. We are now ready to proceed to closing arguments. And, Ms. Bell, you may begin. I have 45 minutes for your closing and you will receive a 30-minute warning from the Court.

MS. BELL: Thank you, Your Honor.

PLAINTIFF'S CLOSING ARGUMENT

MS. BELL: Good afternoon, and thank you so much for your patience and your time. I'd like to start this afternoon going through the elements that the judge will read to you shortly. We talked about them a lot in the voir dire process. But how did the government prove those elements? That's what's important and I'd like to just go through that evidence again with you and go through those jury instructions. And we talked about in opening and voir dire that there are three things that the government has to prove to -- for you to find the defendant guilty.

So let's go through those three things one at a time

and a lot of the evidence that proves those three things. Now, a lot of this evidence is going to be a bit duplicative. It's going to apply to the first element, the second element, and maybe the third. And so -- but I've tried to break it down on just some of the things that matter as to each element for you. Now, the first element is that "Two or more persons directly or indirectly reached an agreement to distribute or possess with intent to distribute fentanyl."

Now, we talked a lot about the word "agreement" being really the most important part of the jury instruction here in Element 1. We're focusing on an agreement. Now, it can be directly or indirectly. It doesn't have to be a written contract. And it doesn't have to be spoken in every term we are going to do this, we are going to do this, then we're going to do this. It can be just a loose agreement between people but we know this agreement has to be either to distribute fentanyl or possess enough fentanyl to distribute.

Now, here are the people that we've talked about in Exhibit 62. And you now know through the testimony that all of these people were charged in this conspiracy. But how are they connected and how do they conspire? That's what I'd like to present to you today. First, we start with Ms. Waddell. She's the defendant in this case and the two people she began conspiring with.

Now, she was initially getting her fentanyl pills

from Mr. Winbigler, and she went to him and asked him to introduce her to Mr. Carlisle. Mr. Carlisle, remember, lived in Albuquerque and Mr. Winbigler would go and get his pills from Mr. Carlisle at very cheap, $1.60 a pill. And Ms. Waddell was paying $10 in Amarillo, and she wanted to get it at a cheaper price so she could make a better profit.

And so she was introduced to Mr. Carlisle so that she could get pills directly from him, directly from the source of supply. Well, where are the agreements there? Mr. Winbigler made an agreement to take Ms. Waddell and introduce him [sic] to his source of supply so she could get pills and distribute them to others. We also have an agreement, Mr. Carlisle makes an agreement with Ms. Waddell. He's going to sell her bulk pills. And remember, you heard testimony she got a thousand at a time bulk pills to sell to other people, and there's no doubt that he knew when he sells those thousand pills to her at a time that she's going to distribute them to others.

So what evidence did you see to prove of these two agreements? Well, we got the interview with Ms. Waddell where she says I met -- she was asked how did you meet G, Mr. Carlisle? Through Michael Winbigler. Michael Winbigler used to sell her pills, and he introduced her to Mr. Carlisle. She says it was maybe three or four months ago, and that makes sense because she started getting pills from Mr. Carlisle in May of 2023. And so in August she was correct, three to four

months before she had been introduced.

They went to Albuquerque to a motel. They went inside and Michael got pills. They're very specific about their words. Officer Mincher asked her very specifically fentanyl pills. We're talking about distribution of fentanyl and possession with intent to distribute. We know what Mr. Winbigler went there to get, and she said she didn't know how many he got because they don't talk like that. She didn't get an amount, but she knew that he got fentanyl pills.

When she was interviewed the second time, she was asked again about the meeting with Mr. Carlisle and going through Mr. Winbigler. She says Mr. Winbigler owed her a favor because she gave him some money. And she wouldn't have to pay $10 apiece anymore for her pills. So we went to Albuquerque and Mr. Winbigler, he introduced her to Mr. Carlisle, confirms it was at a motel.

Then she says she didn't buy anything the first time but she just went along with Michael. "How many pills did Michael get?" She was asked a second time. She wasn't sure, but she gave Mr. Winbigler money to help him out with the purchase of pills. She joined in an agreement with Mr. Winbigler to buy some pills that time. So even though Michael bought them, she was giving money and helping him buy pills. We know that she was connected with Mr. Carlisle, that Mr. Carlisle had her saved as a contact and that the week that

he was in Amarillo distributing fentanyl pills, that they met and that she got pills from him. Remember that text message that first week of August, where she said, "Those beans for dinner are so good." We know that she told Officer Mincher "beans" means fentanyl pills. She was very specific that they were fentanyl pills, not any other type of pills, fentanyl pills. That means she had gotten them before and she wanted to get another serving of them before he left.

So she not only bought bulk pills from him that week, she wanted more.

She also bought powdered fentanyl. And how we know is that on August 6th, she text him "Can I get another one of those powder puff girl episodes?" And she uses powder and pow in a lot of ways, but we know that she said powder and pow mean powdered fentanyl during her interview. And she just adds in other things to make it assume like she's talking about something else. Kung Pow chicken, powder puff girl episodes, but she's talking about powdered fentanyl. Can she get another one, another gram or two, if he has it.

She says she got a bunch of partials in the beans, some of them were broken. She wanted to talk to him about it. And she's headed his way. Now this is August 7th. This is the next day. So she met with him on the 5th. She met with him the 6th. She met with him the 7th. And she's headed that way to get another one or two of the powder puff girls. She's

getting more grams of powder from Mr. Carlisle.

We also heard about Kylie James, who used to get her pills from Mr. Carlisle and they had some sort of falling out and she started getting her pills from Ms. Waddell. We know she sold pills to Ms. James. We know that she was asked "Was Kylie one of your top customers?" And she said "Probably." Colton and Kylie were the two people she talked to the most when selling pills.

We know that Kylie James sent Ms. Waddell some payments and we know that even though it's mostly cash payments, $400 payments, $250 payments are consistent with the purchase of bulk fentanyl pills.

Now, we know Ms. Waddell had other customers. We talked a lot about Colton. He's also known as X. And we know that she sold to Colton, and we know that he sold to customers. So she was selling in bulk enough for Colton to have other customers. She was asked "What do you think Colton would have to say?" And she says "I think Colton sells more pills than I do," and in fact one time he supplied her. And now that she had Mr. Carlisle, she supplied him. She was asked "What would Colton say about how often he was getting pills from you?" And she said "He'd probably say he got them all the time. Colton -- Colton's probably my biggest customer." She sold to him a lot.

She was asked "What's the most pills you ever gave to

him at a time?" She said "30 or something, probably 20 or 30." So she's admitting to selling him large amounts of pills and you heard from task force Officer Wilson that ten or more pills is more consistent with distribution. So if she's selling to Colton 30 at a time, she knows he's further distributing them.

She also says she's only been doing this for three months since the beginning of the summer. "Is that when you started dealing with Colton selling to him? Three months ago?" And she says "Yes." She confirms she's been selling for months to Colton.

We see Colton Rohrbacher as a contact on her phone in the Cash App application. And we know that he sent payments in June. And we know that Ms. Waddell said that her Cash App was shut down at some point. And I would suggest to you it's probably June, late June because there's no payments on her Cash App from anybody after that point, nor her making payments to others. So at some point it's shut down, but we can see that she was accepting payments in June from Colton.

He also sends messages to Blue about Ms. Waddell. And you can see the date here is August 10th of 2023. And so her Cash App shut down and so Colton sends Blue this message "Please tell Rachel I have $700." And so he's communicating with Blue, but he's still buying from Rachel and he's talking to her delivery person, her boyfriend, T. Blue Bloomer.

We know that Rachel -- this is from Rachel's phone.

Again, when you look at this owner, means this was found on her phone. Ex Colton was on his way to the park with 300 cash, she tells Blue, who's, again, her -- delivering for her.

Significant about this date -- this is August 22nd, 2023. Now, remember, by this time Carlisle's been arrested. He was arrested August 9th and this is more than two weeks later. And she's still selling pills. You heard testimony and you heard from in her own voice that she said during her last interview when she was arrested October 2nd, "Oh, I made all those pills I got from Carlisle last up until now." That wasn't true. She's selling pills weeks and weeks after he was arrested. She wasn't keeping those for her personal use. She lied to Officer Mincher about that.

Now, she told Blue what to charge? Charge him $10 each, okay. But she sells in bulk and gets a discount $7 if it gets 50 pills or more, and so she sells a lot of pills to Colton, her biggest customer.

We know there's other customers and we heard a little bit about Tina and Alie, and those were text messages found directly on Ms. Waddell's phone.

Now this is TT, or Tina as Ms. Waddell called her, and there was a message and again here we are in August, August 22nd, she's still selling pills right before her arrest in August. "Can we meet? Got a bill." That means $100 bill according to Officer Mincher. We need 100 of them. We have

$400. And Ms. Waddell says "I had to pay way more this time. I have to have $7 each if you get" -- "even if you get 100." Now this implicates that maybe she used to sell them for less than $7, but remember Mr. Carlisle is arrested now. She's not getting them for $1.60 a pill. She had to find a new source of supply. And she was continuing to go to Albuquerque.

And so she had to have to make a profit now, $7 for each pill. And so you can see that she had continued to distribute even after Mr. Carlisle's arrest even though she denied that.

All right. Now, this is the day of the traffic stop, Sunday, August 27th. And Tina says "Can Jeffrey just go to your house? I just need to know something so he can put them in the grill and I can put the money there also." They're going to make an exchange for some pills. They discussed amounts prior to that, and she says "Okay, can Jeff go?" "Give me five." "I'll text to let you know." "What's up?" "I need to know for sure." "Is it 250 or 300?" So even as she's in Oklahoma and they're attempting to buy fentanyl powder there, she's still making deals.

And remember Blue was at her house with her son and he was going to make deliveries for her, and we know that he did. On that day on the 27th, Blue tells Rachel "I don't hate TT" -- Tina -- "she's a great customer. She's in and out fast and she brings a couple of bills every time. A couple of

hundreds." And then it confirms later that day she stopped by and she got 17 pills. And he put the money in the drawer for Ms. Waddell. You should have no doubt after seeing the text messages in this case. And by her own admission, Blue was working for her. They were in agreement to distribute fentanyl pills. They were in a conspiracy together.

Ms. Waddell also sells to Alie directly. She says "Alie says, hey, I've got 130 now." She tells her to go to the park. She'll be right there. Alie says "I'm meeting them at the Sonic." And Ms. Waddell tells her "I don't have any" -- here we have the words "'Kung Pow chicken' for sale right now, only beans." So she was out of powder but she had fentanyl pills for sale, showing that she sold both powder and pills. Despite her denying that she sold powder, her text messages prove that she did sell both.

All right. Very quickly, she sold -- she had a conspiracy with Kat, Katherine Valencia-Morales. What is that conspiracy? They're going to go buy fentanyl powder in Oklahoma City, and Ms. Waddell's going to sell it in Amarillo.

How do we know about that conspiracy? Well, Ms. Waddell admitted they went to Oklahoma City together on the 26th of August to score and they were going to get powder. And there was some powder found in the vehicle. That Kat was the one that set up the deal, and you heard the translations of those text messages as Kat talked to the source of supply and

set up the deal for $900 worth of powder, that it was a cash transaction, it was to be all cash. And you heard at the end of that translation that the transaction happened. The source of supply said "Can we do more business?" She said "Yes, we'll be back in three days." So they got powder and she was going to come back later, Katherine was, and go get more powder.

You saw those text messages setting up the agreement to go to Oklahoma, the conspiracy to go and buy fentanyl powder. Katherine was texting from Britt's phone. They set up a deal, and Rachel Waddell says I'll sweeten that deal. You kept it at 30. And we had testimony that what that meant was $30 per gram and do 5 for you and 3 for her. Some of the product will go to Britt. Some of the product will go to Kat. But the rest will be Ms. Waddell's. Why do we know that? Well, if it's a $900 deal and Ms. Waddell put in $700 of it, she's getting most of the product. She's getting most of the fentanyl powder.

I mean, if you do the math, $900 at $30 a gram, they're getting 30 grams of fentanyl powder. You heard testimony from task force Officer Wilson that a gram -- more than a gram is distribution. And you heard testimony also and the words of Ms. Waddell, it's very strong. In fact, she said it's so strong it'll kill people. And that it would last her three weeks at a time, just one gram. That is over a year's worth. 30 grams is over a year's worth of fentanyl powder.

It's for distribution. It's not for personal use.

And we know that Ms. Waddell said she's going to bring beans on the trip, she's got some foil they can all use at least once. But remember she lied to Officer Mincher. She said in her interview that we're all sick, we don't have anything. I don't have anything. Nothing's at my house. But you've just seen Blue's at her house selling to TT or Tina on that day, and she's taking pills on the trip.

So we know she was untruthful.

We know that she got fentanyl powder based on this text message. First of all, we know it because some was found in the car. And you think, well, if they got 30 grams, why is this little amount found in the car? Why is only, you know, about 4 grams found in the car? Here's why. Ms. Waddell on the way home, again they stop somewhere and she's irritated at her passengers because they're taking too long. You know, she's got an emergency at home, she's got to go home.

Not to mention her stuff was 5 grams short and she was mad about it. And I submit to you, ladies and gentlemen, this amount that was found in the car was the fentanyl that they gave to her and said "Oh, you're 5 grams short, let's give you some more." And she accidentally left it in the car. Remember, she was very slow to pull over, you saw that on the video. She gets onto the shoulder and then travels a long way almost a minute before she pulls over. Panicked, they've got

30 grams of fentanyl in the car. What do we do? Officer Mincher saw an item fly out of the car. It's thrown out of the passenger window, the front passenger.

Now, she's got that 5 grams to make up for what she was short. And, of course, the officers can't find it. They traveled such a long way. It was dark. There's grass on the side of the road. It's not that big. I want to show you the exhibit. This is the 5 grams. It's not that big. We had 30 grams total and so 25 grams went out the window. So it's not that big of a chunk.

And so, of course, they can't find it.

But even that 5 grams is distribution amount. It is. Because if a gram lasts you a week, 5 grams is 15 weeks, that's not what somebody, a user, would possess. It is something a distributor would possess.

All right. Now we get to her boyfriend T. Blue Bloomer. And the agreement between them to sell fentanyl pills to customers. He sells to Colton. He even delivers to Tina, TT. And their business was selling fentanyl pills. That was their agreement. And they argued about it. Again, this is on Rachel Waddell's phone. Blue says "I'm not trying to take over your business." And they're talking about the pill distribution. And she says "That's fine. I'm allowing you to work with me." She's in charge of this business. She tells him where to go, who to meet with, what to

charge, and she's letting him work with him.

He says to her "I can't even believe you would say I take your business." And this was sent back in July of 2023. And she says "I've been doing this for months now, and I've grown it to this point not for you to just step in and think you're going to take it over. It's absurd that you even think that." They're arguing about it because he's selling pills for her and remember what he was doing. He told Carlisle he was trying to take the risk for her so that if they got into trouble, it would be him that was arrested. He was trying to insulate her. But she thought he was stepping on her toes and taking over the business.

They argued about it a lot.

But she had tried to grow this business. She was trying to get more and more fentanyl pills to distribute in the Amarillo area. We know that she was buying thousands of pills and this text message happens the week that Mr. Carlisle's in town and he's selling them tons of fentanyl pills. Blue says "That thousand dollars I gave you yesterday got you what? 625 pills at 1.60 a piece." And so we know he thinks they've got 625 pills. She says "No, we have 500 pills." That's what she thinks she has. And he clarifies "You're not understanding. Right now, we've got 1700 pills." Again, this just confirms for you the scale and scope of their operation. They're working in thousands of pills.

All right. We've got this text message and again this is the same day, August 7th, 2023, and Blue is trying to negotiate a different price for the pills so they can make more money. Blue tells her "At $7 each, we'll make this amount, but I think you should sell them at $9. But that's just me. That's a different amount of profit, we'd make almost $1500 more than we would getting rid of them at $7."

So he's saying, Hey, let's make some more money. Let's increase our prices. People will pay them. She says "I don't charge anyone that price and you know that." She's in charge. He's very deferential to her.

He says, "Well, you can go up a dollar, but I know you won't." She's directing all of this. And she's paying him to distribute fentanyl pills with her. On August 7th, same day, he says, "so I don't know. I think I should get $2,000 of the $5,625 you'll make off our thousand dollar investment that we went and bought pills from Mr. Carlisle." And she says, "You've already gotten $4,100 from me last week, Blue." He's getting part of the profit. They have an agreement, a conspiracy between them to distribute fentanyl pills and he's getting paid for it. And they're selling so much that she was able to make ends meet to have re-up money and to pay him $4,100.

She's paying him to assist her distributing the pills.

And we know what she's doing's illegal, because she's upset that she thinks he met a potential narc, narcotics officer or someone who's going to tell the police on her. And this was August 8th of 2023. And she says she's mad at him and she says, "We were the only place in town and now we're out of business as well." And remember just about a week or two before people who were selling large amounts of pills were arrested. Mr. Witt and Ms. Schmitkons. And she's taking over as "the big place in town" to sell fentanyl pills. She's grown this business. She wants to be the one selling the most pills in Amarillo. It is a business arrangement for her, an agreement, a conspiracy.

She even tells Blue on August 7th, "Don't take on any new customers. That's how you get busted." So she's directing him again and, in fact, she said the business is hers and "I was directing him because he wanted me to, so I just did it." She tries to put it off on him a little bit not taking responsibility, but she admits "We fought about it, but ultimately I'd rather keep the peace. I was directing him." How did she direct him? She would send him messages telling what to charge and who wants pills -- X wants 300, Amanda pays $10 each, she's in charge.

All right. We know that this conspiracy goes back to May 15th of last year. We have the pills in a picture that was taken by Blue Bloomer's phone May 15th in Santa Rosa, and we

know that Ms. Waddell paid for those pills in part by Cash App on May 15th. And so there's no doubt despite her story that, "Oh, maybe it was Mr. Winbigler who took that picture and maybe he took my car," the evidence shows that she was on this trip with Blue and that they got all of these pills. And look at that number of pills.

I want to show you Government's Exhibit 77. I never get too close with these things. Oh, wrong one. 78. These are the pills. These blue pills that you see in the picture, same kind of pills. And I know that defense counsel asked at one point, how do we know what these were? Well, they look the same as the pills that were tested by the lab, confirmed to be fentanyl. We know that these pills are fentanyl because Rachel Waddell told us that they were, and not only did she make agreements to sell fentanyl, but she used these pills too. And if she used the pills, as a user, she would know what they were. She never said to Officer Mincher, "Hey, I went to buy fentanyl pills and I got Xanax or I got sugar pills." She never says I got anything else but fentanyl.

The other way that you know that these are fentanyl pills is that she had repeat customers: Colton Rohrbacher, Kylie James. We saw other customers: Austin, Kris, Tina, Allie. We saw a lot of customers and we know that some of them or even all of them were repeat customers.

Now, if a customer comes and says "I want to buy some

fentanyl pills from you, Rachel," and she sells them a sugar pill, they won't come back. Because she's selling sugar pills, not fentanyl. Which is what they want and their customers want too. And so we know that these were fentanyl pills in part because she had repeat fentanyl customers, and she tried them herself and she knew they were fentanyl.

THE COURT: And, Ms. Bell, this is your 30-minute warning, which means you have 15 minutes left.

MS. BELL: Thank you. We know that Blue, on the same day, said that they wanted to try those colorful pills.

All right. Yay. I made it to the second element. All right. That she knew of the unlawful purpose of the agreement. So we knew that this was fentanyl. She was selling pills. She admitted it. And we know that it's an agreement to sell fentanyl because she talks about fentanyl. Why would TT buy fentanyl? Well, her boyfriend uses fentanyl. She's calling it fentanyl herself. And we know that the phrases that we saw before, "beans" are fentanyl, powdered fentanyl, all of the things that she said before.

She was selling pills and she's not a high-level dealer. She admits she's a drug dealer, but she doesn't want to put herself out as a high-level drug dealer. All right. We know that she's been doing this for months. Since like the beginning of the summer. And we know that she was able to buy a thousand pills at a time, or "one boat." And we know from

her own admission she got that at least four to five times. She says, "I don't feel like I sold that many," and she's asked "What do you think's not that many?" "5,000, that's probably closer."

So at one point she says "I bought 4- to 5,000" but when asked later, she said "I sold closer to 5,000."

In her October interview, she claimed that she had quit selling fentanyl pills but admitted that she had sold them before. She admitted that there would be a ton of new messages from all kinds of people asking her for pills. And when asked, she said, "Well, I have been giving them some to my friends so they wouldn't be sick." So she admitted to still distributing to some people. And we know that she sold pills herself because she said "I almost sold all of these." She's met six people, and she did her last drop and had 15 left, so we know that she was also active in distributing those pills.

All right. Element 3 that she joined in it willfully to -- with the intent to further the unlawful purpose. There is no evidence that she was forced. She joined in this conspiracy willfully. She took charge of it. She was the business leader of it between her and Blue Bloomer and so she joined in it willfully.

We know that she had that PillEye application pictures taken at her house and we know from that application that she got large amounts of pills and even back in May of

2023 had those colorful pills that we saw in the other picture. We know that she used the application because she talked about using the application and that she was breaking down bags into hundreds, hundreds, hundreds, hundreds and 150. She was breaking down the bags to sell to customers. All right. We know that they both distributed and would deliver at times to different customers that won't even fit on this. But this is what a conspiracy looks like. There's tangled webs. There's a lot of people involved in a drug conspiracy. And what you need to focus on is that conspiracy is an agreement between two or more people, and I want to tell you a very, very important part when you go back into that jury room, something you need to know.

Now, you do not have to agree or be unanimous on one thing. Who she was in a conspiracy with? This half may believe she's in a conspiracy with Mr. Carlisle. And this half of our jury may believe that she's just in a conspiracy with Mr. Bloomer. Or another person on this chart. You do not have to be in agreement or unanimous about who she conspired with as long as it's with another person. She must conspire with another person to distribute fentanyl or possess it with intent to distribute.

Based on all of the evidence you heard and with this short amount of time, I tried to pick just our best evidence but you heard and saw many other text messages and her

statements and admissions. We proved that there was an agreement between her and many people to distribute fentanyl. We proved that she had knowledge of the unlawful purpose to sell fentanyl, to possess with intent to sell fentanyl. And we heard that she joined in it willful. We proved that through all of the evidence. And so we ask you to find her guilty as charged of conspiracy to distribute and possess with intent to distribute fentanyl. Thank you very much. And thank you, Your Honor.

THE COURT: And, Mr. Barfield, you may proceed with your closing argument. And you have 45 minutes on the clock, and I have a note to remind you of your two-minute warning.

DEFENDANT'S CLOSING ARGUMENT

MR. BARFIELD: May it please the Court, counselors.

Ladies and gentlemen of the jury, it's good to get to talk to you again. I've kind of sat mostly quiet through this trial. But now I get to -- you have a big thick sheet of paper in front of you here and it's several pages long. The reason you're given a copy of this is there's a lot of information in there and you get to take that back and you get to read it and everything else. In this trial you've also seen a lot of exhibits and the jury will have access to any exhibit they want to re-examine.

What I want to talk to you a little bit right now is

what have we learned? We have learned that in the drug community it is not uncommon for the same users to sell to each other and now they're dealers in this vicious circle. What we've learned is that fentanyl's a very, very addictive narcotic that once you get addicted to it, it becomes something that you have to have unless you want to get really, really, really sick. And so what we've learned is this vicious cycle continues to regenerate itself. By me saying that, I'm not trying to make you feel sorry for people that are drug addicts or people that sell drugs to each other to support each other's habits, and that's not why I'm bringing it up.

What you also learned in this trial is that a hard user uses many, many pills to satisfy their habit, okay? To satisfy their habit. We learned that they smoke up to several pills at a time to prolong that feeling. So what we learned is that one starts taking the fentanyl pills, then they become addicted to the fentanyl pills and then they physically need the fentanyl pills to survive physically without being sick.

Now, what does that have to do with anything? It has to do with a lot of things. Rachel Waddell was an addict. She was supporting her habit. What we learned in this trial is they did not seize a bunch of conspiracy drug dealer money from Rachel Waddell in the two traffic stops or the search of her house. What we learned is that, quite frankly -- and you'll see this in the jury charge, and I think it may be page 13,

"inferences - direct and circumstantial evidence." And what you'll see on page 13 is that you're given instructions that there's direct evidence and there's circumstantial evidence. Well, direct evidence is basically what it says. Circumstantial evidence is made by inference.

And then I'm going to tell you what we've had in this trial basically in regards to a conspiracy in regards even more specifically as to fentanyl involved in a conspiracy, and I submit to you what we have is no evidence. What? What? Mr. Barfield, you're saying no evidence, but what about all these text messages? What about the PillEye app? What about all that? What did we learn about the evidence? One, we learned that the PillEye app does not tell you what's being photographed. Is it even illegal? It doesn't tell you what it is. It doesn't tell you anything about the numbers because the numbers could be duplicated. We don't know the margin of error on the PillEye app. We really don't know much at all about the PillEye app. So really what you're being asked to do by the government in this case is jump to Point A to Point C, ignoring the fact they can't prove anything they're showing you is illegal.

Think about that. Did they prove anything in the PillEye app that was shown to you was an illegal substance? Did an expert witness get on that stand, and you may wonder what brings me back to a point. There was two experts that

came in here today, wasn't there? Why do you think that has to happen in a court of law? Why do you think the government has to prove that drugs are actually drugs in a felony case?

Hopefully, that's a rhetorical question because would it be fair to convict somebody of a felony for something you can't even prove is illegal? Obviously not. So let's talk about the picture. I believe Exhibits 37, 38. Rachel didn't take those pictures. Rachel wasn't there. Was there testimony that those were an illegal substance? Did the government prove to you that those pills were an illegal substance by any stretch of the imagination? In fact, no. They did not at all. It's not Brooks Barfield saying that. It's Officer Mincher saying that because I asked him, if you recall my cross-examination, it wasn't very long, but it was pretty direct. It was to the point. It was to the point of, Well, can you prove that it's illegal? And if you turn to page 26 of this jury charge, there's a word here under "first" at the bottom. It says "With intent to distribute fentanyl."

I submit to you, ladies and gentlemen of the jury, in order to distribute fentanyl and charge somebody with fentanyl, the government should be held to the burden of actually proving what they're showing you is fentanyl. And they have not done that, ladies and gentlemen. Here's what we've seen. Here's what was testified in this court, is Exhibits 77 and 78. Well, Exhibit 77 not very much for a drug ring, is it? No. This is

a user amount. Exhibit 78, vast conspiracy, no, it's a user amount of fentanyl pills. It's a user amount.

So what's been proven is that Rachel Waddell was caught with some user amounts of fentanyl, not a conspiracy. They haven't proven that she distributed anything. They want you in one side to say, well, believe Rachel Waddell when she says those were pills. And then the next statement they're saying Rachel Waddell's a liar. Is she a liar? Is she telling the truth? Is she a liar? Is she telling the truth? Well, she's a liar when it's convenient for the government but when it's not convenient she's telling the truth. And I submit to you I don't care -- well, let me strike that. It doesn't matter what Brooks Barfield believes.

We're dealing with what's proof. What has been proved is that the government has not met its burden to show you that all these alleged blue tablets they've shown you were illegal. They have to prove that. They haven't.

Now, in criminal cases, you're in court trial for a reason sometimes and sometimes those reasons are very technical and sometimes it's very difficult to be a juror because you see evidence that's, well, this person is -- is -- is -- she's using drugs and this person's an addict, and this person, you know, is dealing with these other people that are addicts and everything. Yeah, it's hard. It's hard. But the law sometimes is very technical. We've spent over an hour arguing

over a two-letter word because it's important, because people's freedom are on the line because the government should be held to a standard above speculation, conjecture and jurors having to do guesswork if what they're being asked to convict somebody of is illegal.

Now, I also want to reference something else that's even farther away than the PillEye app, and what you're being asked to consider that you heard on the government's initial part of summation and that is this alleged 30 grams of illegal substance that has never been seen, never been proven, never been recovered, no one ever had. So now the government's asking you to make even a further leap and say, Oh, just take our word for it. There was 30 grams of drugs in that car. Just believe me. There was 30 grams in the car. We can't prove it. There's no way to prove it. There's no evidence of it, just take our word for it and convict somebody of a felony.

Big ask. Big ask. There was a movie a long time ago called "A Bridge Too Far." I don't know if any of you all have seen that movie because it's black and white and you probably aren't World War II movie buffs, but this is a bridge too far. This is a bridge too far. You are probably sitting there wondering what in the world is this goofy guy sitting over there going to talk to us about when he gets up on closing arguments after this vast array of text messages and everything. Well, this is what I'm talking to you about,

actual evidence.

And what I mean actual evidence, actual proof of an illegal substance. And you have to ask yourselves, did the government prove this stuff was illegal? Because if it's not illegal, you can't have a conspiracy to make something illegal. Now with that being said, you heard Rachel's statements. I'm not going to stand up here and tell you what Rachel said she didn't say. I'm not trying not to be ignorant. Sometimes it works, sometimes it doesn't. So my -- my whole reason for being here is to show you can't have a conspiracy without the thing that's conspired about. Rachel, in her mind, talked to the police officers in that last interview. She was wearing the green sweatshirt. She was using vast amounts of drugs for personal use based on her addiction. Now I submit to you the drugs that have been submitted in court was what the government proved. And what does it prove? It proves that Rachel is an addict.

Now, do you think I'm asking you to ignore the text messages and to ignore her conversations with Blue Bloomer? I asked Officer Mincher about any type of -- and it was a -- did you ever find a written contract or anything like that? Now, again, you don't -- the law is clear you don't have to have a written contract for a conspiracy charge. You don't. But did you ever see any text messages from any of these people agreeing to -- we're talking with Carlisle right now --

agreeing to sell. And I asked Officer Mincher a question, "Well, what proof do you have that Carlisle's getting a kickback from the sales? What proof do you have that he's being enriched?" And his response was, Well, he's being enriched because she came back.

Well, that means if I go to Lowe's and buy a lawnmower and then go back and buy a hardware tool, then I'm in conspiracy with Lowe's to buy stuff from them by that definition. It's not a conspiracy. It's not a conspiracy. And even if she bought whatever she bought, the government can't prove whatever she bought was illegal. They can't prove it.

So she was in a relationship with Blue Bloomer. They're arguing back and forth, back and forth, back and forth. They're in a relationship. They're both -- they're both addicts. Everyone involved in this case is an addict. Okay? We hear a lot about X or Colton Rohrbacher. I asked specifically, "Is Colton Rohrbacher part of this conspiracy?" "No." "No." Did the government prove that Colton Rohrbacher ever bought a narcotic? Did they prove what he bought was a narcotic, or did they prove someone may have said something, whether it be Rachel or Colton or whoever, or did I prove that we have something that may be suspected of something? And I submit to you suspecting something illegal does not make it illegal in this country. It has to be illegal in the first

place.

We have some text messages and this is technical stuff. My job is to point out technical stuff. Exhibits -- and I went -- Exhibits, I believe, 37 and 38, those are the pills in Santa Rosa. Really no connection at all to being illegal. And one thing I want to point out to you guys too is page 27, the last paragraph on page 27. And I'm just going to read it. "Mere presence at the scene of an event even with knowledge that a crime is being committed or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of the conspiracy does not thereby become a conspirator."

That wasn't put on a big board for you to read. It's in the jury charge. It's there for a reason. What that simply means is just because you're engaging in something that could be an illegal act, doesn't make you a conspirator. And a bunch of addicts trying to support their habit does not make a conspiracy. The mere fact that Rachel may have gone to someone who purportedly deals drugs, and I don't know that there was any proof that was submitted to you in court that any of these other conspirators were caught with any drugs. Was there any

proof by the government that these other people were ever caught with drugs? Think about that. No, there wasn't. At all. Again, we're back to wanting to convict somebody without proving something's illegal. That's what we're back to. They keep circling around to that.

And the trip to Oklahoma City, the trip to Oklahoma City Rachel was there, I think she was busted on the way back. She was there. She was trying to get something for her habit. And you may ask, well, why would you buy, you know, if one gram can last you a week, why would you buy? Well, it's kind of like in 2020. I remember everybody was hoarding toilet paper, including myself. Okay? When something's scarce you're going to hoard it for yourself. It's what people do. We have a whole subsection in this country called "preppers" and they have garages and holes in the ground in four different locations where they have a mask, vast amounts of food and weapons and all that. Why? Because they're afraid if something bad happens, they're not going to have what they need to live. Am I condoning -- are we asking you to condone the use of fentanyl and drugs and everything? No, no, that's not what we're saying here at all.

Are we asking you to condone behavior that is -- should not happen? No. What we're asking you is to consider and get out of the box and actually consider what's really going on in someone's life. That's what we're asking. Okay?

So the reason that this here, this as much as it is, is so it'll last Rachel so she doesn't get sick. Is what's on this table a conspiracy? I submit no. There's a lot of text messages. There was some testimony that -- well, in the interview if you'll recall, Would it surprise you, Rachel, in the interview when she's being questioned, that 20 people text your phone? No, wouldn't surprise me. Is that proof that Rachel did anything illegal? I think my question was, Have you ever gotten a spam call? Of course we do. I bet if you looked at your phones right now you probably have spam. Well, you can't do that. Let me strike that before someone attacks me.

What I'm saying is you can't look at your phones. What I'm saying is after this is all over, you're probably going to have spam on your phone or unsolicited texts. We all have people all the time. That's not a crime.

If someone texts you and you don't respond, I think there's exhibits of that in there as well with Blue Bloomer, I think we're in the 60s. Again, you get to look at the exhibits for yourself. And you don't respond, it's not a crime. Okay?

Now, we realize there's an ad nauseam amount of text messages and messages we've had to sit through for the past day and a half. Okay? We get that. And we get that you're going to have to go back in that room and make a decision, a hard decision and the decision you're going to have to make is well -- well, what that lawyer just pointed out to us and,

quite frankly, I'm just going to be blunt, and I'm asking you to find Rachel not guilty of conspiracy as indicted.

And I know it's a hard thing for us to ask. And the reason for asking that is because there was a failure to prove the illegal substance. The hardest part of jury duty is being asked to do a hard thing for a technical reason. But in our country and it's in the charge, a person is presumed innocent in a court of law. One thing I do want to kind of touch on is one may wonder if they never had jury service or not, and I can't remember off the top of my head how many of you may have or have not, but, you know, in our society most people don't go in courtrooms and spend time in courtrooms. I'm in courtrooms pretty much every day. And the difference is that it isn't TV. It is the technical stuff. It is the law that one must look at. And most people are shocked when they hear the defense rests without putting on a witness. Well, I don't have to prove -- we -- I keep saying I -- we, as the defense, don't have to prove anything. And one, we can't prove a negative. I can't prove to you nothing and what I'm submitting to you, what you've seen in the evidence regarding this conspiracy to distribute is nothing. So what was I going to put on zero times zero is zero, always will be. I'm a lawyer, I'm not good at math but I know that much.

And I will point out and the jury instructions and the judge said to you and the jury instructions say it cannot

be held against Rachel for not getting up there and testifying on the stand because that's the law. That's what it says. And for a variety of reasons for that. And so again we talked about you all being good citizens and all that and showing up for jury duty. And if you'll remember in voir dire, I went through this intellectual honesty thing and all that kind of stuff in regards to jurors questions and we had some juror's who had one opinion and then they thought about it for a little bit and what happened? You know what? That's right. So sometimes we as human beings just need a little prompting to kind of figure things out and that's kind of what I'm -- and if you'll notice, they're not sitting with you today, they were excused as they should be.

And I'm asking you to kind of do the same thing with the evidence in this case, okay? That's really what I'm asking you to do. And again I get it, believe me. I get what I'm -- what we're asking you to do is hard. But we can't help that there's no evidence. So that's why I'm asking you to do a hard thing.

Now, I don't have much more to say. I don't get to -- it's the government's burden of proof, and I don't get to get back up and talk to you. The hardest thing to do as a criminal offense lawyer, sit there while somebody else rips what you've just told somebody. It's hard for all of us but let me tell you, ladies and gentlemen, I'm just asking you to

look at what amounts of actual illegal activity were proved in this court of law. No speculation, no guessing as to what might be or might not be on a PillEye app, no guessing about what does not exist might have been thrown out of a vehicle. Did they prove the fentanyl part of this case? I submit to you the government did not, and for that reason, I'm asking you to return a guilty -- a not guilty verdict and we really, on behalf of Rachel and her family and myself, thank you so much. God bless you.

THE COURT: And, Mr. Frausto, the government has nine minutes and 41 seconds of rebuttal time, and I'll just round that up to ten minutes.

MR. FRAUSTO: And, Your Honor, may I have a two-minute warning?

THE COURT: Okay. You will have your two-minute warning.

(Pause in proceedings.)

PLAINTIFF'S REBUTTAL CLOSING ARGUMENT

MR. FRAUSTO: May it please the Court.

THE COURT: You may proceed.

MR. FRAUSTO: Counsel.

MR. BARFIELD: Counsel.

MR. FRAUSTO: Ladies and gentlemen, I want to thank you for the time you endured the last several days. In a few

moments, you're going to go back and deliberate. It's not important what we say in arguments or opening. What's important is these instructions. The law you have to follow in making your decision, the Court's going to read these after I'm finished in about eight minutes, and that's what matters. You're going to ultimately decide in a few minutes whether or not the defendant conspired, if she entered some conspiracy to distribute or possess with intent to distribute fentanyl.

Now, in these instructions, you'll hear them but I'll read them. On page 28 -- you don't have to turn there, you're going to hear it. But defense counsel said "Consider what's going on in someone's life. She's an addict. It's an addict giving another addict pills. Consider what's going on in their lives." It specifically says on page 28 "Do not let any bias or sympathy or prejudice that you feel -- may feel toward one side or another influence your decision." We're asking you to follow the law in the instructions that the Court's going to provide you and that you're going to go back and we entrust that you're going to do that, that's why you're sitting here.

Now, let's go over some of the things that you're not going to see here. Some of the things that were discussed is, Does there have to be a formal written agreement? Remember we talked during jury selection. Businesses typically have an agreement between two or more persons for a lawful purpose. Conspiracies, they typically don't write down all their illegal

activities. And in these instructions, you'll learn just as I talked to you during jury selection, a formal agreement is not required. It's whether they reached an agreement directly or indirectly. Nothing has to be in a written contract or a formal agreement.

What else does not have to be proven? How much fentanyl was seized? How much was possessed? How much was distributed? Or even if the fentanyl was even tested. Now we proved to you some of the fentanyl seized did in fact test positive for fentanyl. Now, a lot of those pictures on the PillEye app and a lot of those bulk pictures that were located on the defendant's phone and Blue Bloomer's phone, yes, those weren't tested but that's not something we have to prove. Nowhere in these instructions are you going to be asked to decide did the government prove that the substance was in fact fentanyl? Nowhere in here is it going to make you -- make us prove that. That's not something that has to be proven.

One thing to keep in mind is you heard from an expert, Vernon Wilson with 40 years of experience, who testified and said in his 40 years of experience every time he saw those blue M30 pills, they never came back anything other than fentanyl. We don't have to prove whether the conspirators discussed and knew all the details. She doesn't have to know where Gary Carlisle's getting his supply from. She doesn't have to know all the details. We don't have to prove that they

even discussed all the details. And you'll see a lot of these instructions on page 27. So when you go back there, you can turn to page 27 and you're going to see, Look, the government doesn't have to prove that they knew all the details, not even if they discussed all the details.

The government doesn't have to prove that they even succeeded in accomplishing their unlawful objective. Remember the bank robbery example I gave you? Yeah, one person got the gloves and the mask. The other person got the getaway car. It doesn't matter if they get caught walking into the bank. They agreed.

So we don't even have to prove that they succeeded in accomplishing their unlawful objective. Here, if they just think they're dealing fentanyl, we don't have to prove that they actually succeeded and did, in fact, distribute fentanyl. Now, I submit to you that the evidence shows that they were distributing fentanyl. But that's not something we have to prove.

Now, the burden is beyond a reasonable doubt, not beyond all doubt. And that's a burden we welcome. But don't add extra elements and burdens that we have to prove that are not required by the law.

There was lots of talk that the PillEye app does not test the substance. It may not even count the substance. That doesn't matter. None of this matters. Did they succeed? Was

it, in fact, fentanyl? How much did she really truly possess? Was all the substance tested?

What matters, in this case, is one thing -- one other thing. Everyone's role we don't have to prove. We don't have to prove who had the bigger role or the lesser role. We don't have to prove even all the coconspirators involved in this case because we don't know who supplied Gary Carlisle.

But what's important and what matters is the agreement. That's what a conspiracy is. Just like the bank robbery. It's the agreement to commit an unlawful purpose. An agreement by the defendant, with just at least one other person, to accomplish an unlawful purpose. That's what the law says.

Nothing in here regarding conspiracy, I know, that's why I talked about it during jury deliberation or jury selection. Because conspiracy in the criminal context, that word is not something we hear often. But it's the agreement to accomplish an unlawful purpose.

And once that unlawful purpose, in this particular case -- the defendant entered an agreement with at least one other person to distribute or possess with intent to distribute fentanyl. Even if she thinks she's dealing fentanyl and it's not fentanyl, that's enough. She reached an agreement to distribute or possess with intention to distribute fentanyl.

Now, I submit to you that an addict probably knows

her product. But this is what's important. Not whether they actually succeeded, not who's the bigger player in the conspiracy.

One thing I want you to keep in mind -- again this is on page 27. You'll see this. If a defendant -- and I told you during jury selection if a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme, even on one occasion, that is sufficient to convict.

If you believe she dealt and she conspired with Bloomer just to deal fentanyl to TT, who she said "We're dealing." She -- in her own words, "Jeffrey uses fentanyl. That's why we supply TT so she could give it to her boyfriend who uses fentanyl."

So she thinks, in her mind, I'm dealing fentanyl, I'm having Blue deliver to TT fentanyl to Jeffrey.

THE COURT: Two-minute warning, Mr. Frausto.

MR. FRAUSTO: Thank you, Your Honor.

She's going to Gary Carlisle for four or five boats, four or five thousand pills that she believes is fentanyl. She's an addict, she knows her product. It's about the agreement.

I'm not going to go over all the elements. We've beat a dead horse. You know the elements. These are the three elements. They are going to be in your instructions on page

26. But she only has to agree with one person. Ms. Bell told you these elements, an agreement between the defendant and one other person. She had knowledge of that unlawful purpose to distribute or possess with intent to distribute fentanyl and she joined in it willfully to carry out that intent.

The question you're going to be asked in a few minutes is, did the defendant play any part or role of this conspiracy? And during jury selection, you all said you could agree, even just like the business, she played multiple roles but even like a business manager, CEO, whatever, they -- front desk, part-time employee, they all play a role to make it run.

She played multiple roles. She directed Bloomer. She went to go get dope from Carlisle and transported it. So she was the delivery person. She made six drops, she sold. She set the prices. She communicated with customers. She managed Bloomer. She played a role.

THE COURT: And this should be your final comments. We're at your time limit.

MR. FRAUSTO: Thank you, Your Honor.

We ask you to follow the law. Find the defendant guilty of the crime charged. And not make us prove anything that's not required by the law. It's about the agreement.

Thank you.

THE COURT: Now, members of the jury you will briefly receive this case and begin your jury deliberations.

Let's turn, now, to this Court's charge to you. You've each received a copy of the final jury charge. That was generated through the pretrial conference, the jury charge conference. And you may recognize, on page 2, the preliminary instructions which were read aloud to you at the beginning of this trial.

I turn now, to page 8, for your final instructions. And this should guide your deliberations and may be paired also with the preliminary instructions you received at the outset of this trial.

FINAL JURY CHARGE

THE COURT: 1.03 "Introduction to Final Instructions." Members of the jury, in any jury trial, there are in effect two judges. I am one of the judges, the other is the jury. It is my duty to preside over the trial and to decide what evidence is proper for your consideration. It is also my duty, at the end of the trial, to explain to you the rules of law that you must follow and apply in arriving at your verdict.

First, I will give you some general instructions which apply, in every case. Such as, for example, instructions about the burden of proof and how to judge the believability of witnesses. Then, I will give you some specific rules of law about this particular case. And finally, I will explain to you

the procedures you should follow in your deliberations.

1.04 "Duty to Follow Instructions." You, as jurors, are the judges of the facts. But in determining what actually happened, that is, in reaching your decision as to the facts, it is your sworn duty to follow all of the rules of law, as I explain them to you.

You have no right to disregard or give special attention to any one instruction. Or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinions, as to what the law is or ought to be.

It is your duty to apply the law as I explain it to you, regardless of the consequences. It is also your duty to base your verdict, solely, upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties, as jurors. And they have a right to expect nothing less.

1.05 "Presumption of Innocence, Burden of Proof, Reasonable Doubt." The indictment or formal charge against the defendant is not evidence of guilt. Indeed, the defendant is presumed by the law to be innocent. The defendant begins with a clean slate. The law does not require defendant to prove his innocence or produce any evidence at all. And no inference whatever may be drawn from the election of a defendant not to testify.

The government has the burden of proving the defendant guilty beyond a reasonable doubt. And if it fails to do so, you must acquit the defendant. While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proved beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt.

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important decisions of your own affairs.

1.06 "Evidence, Excluding What is Not Evidence." As I told you earlier, it is your duty to determine the facts. To do so, you must consider only the evidence presented during the trial. Evidence is a sworn testimony of the witnesses including stipulations and the exhibits. The questions, statements, objections, and arguments made by the lawyers are not evidence.

The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case. And in so doing, to call your attention to certain facts or inferences that might otherwise escape your

notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you.

During the trial, I sustained objections to certain questions and exhibits. You must disregard those questions and those exhibits, entirely. Do not speculate as to what the witness would've said if permitted to answer the question or as to the contents of an exhibit.

Also, certain testimony or other evidence has been ordered removed from the record. And you have been instructed to disregard this evidence. Do not consider any testimony or other evidence which has been removed from your consideration in reaching your decision. Your verdict must be based solely on the legally admissible evidence and testimony.

Also, do not assume from anything I may have done or said during the trial as stating that I have any opinion concerning any of the issues in this case. Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own verdict.

1.08 "Evidence, Inferences, Direct and Circumstantial." In considering the evidence you are permitted to draw such reasonable inferences from the testimony in the exhibits as you feel are justified, in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from

the facts which have been established by the evidence.

Do not be concerned about whether evidence is direct evidence or circumstantial evidence. You should consider and weigh all of the evidence that was presented to you. Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness.

Circumstantial evidence is proof of a chain of events and circumstances indicating that something is or is not a fact. The law makes no distinction between the weights to be given either direct or circumstantial evidence. But the law requires that you, after weighing all of the evidence, whether direct or circumstantial, be convinced of the guilt of the defendant, beyond a reasonable doubt, before you can find him guilty.

1.09 "Credibility of Witnesses." I remind you that it is your job to decide whether the government has proved the guilt of the defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence.

This does not mean, however, that you must accept all of the evidence as true or accurate. You are the sole judges of the credibility or believability of each witness and the weight to be given to the witness's testimony.

An important part of your job will be making judgments about the testimony of the witnesses who testified in this case. You should decide whether you believe all, some

part or none of what each person had to say and how important that testimony was.

In making the decision, I suggest that you ask yourself a few questions. Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness have any relationship with either the government or the defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses?

These are a few of the considerations that will help you determine the accuracy of what each witness said. Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say.

In making up your mind, in reaching a verdict, do not make any decision simply because there were more witnesses on one side than on the other. Do not reach a conclusion, on a particular point, just because there were more witnesses testifying for one side on that point. You will always bear in mind that the law never imposes upon a defendant, in a criminal case, the burden or duty of calling any witnesses or producing

any evidence.

1.18 "Expert Opinion Testimony." If scientific, technical or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may testify and state an opinion concerning such matters. Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion. You should judge such testimony like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion and all other evidence in the case.

1.19 "On or About." You will note that the indictment charges that the offense was committed on or about a specific date. The government does not have to prove that the crime was committed on that exact date so long as the government proves beyond a reasonable doubt that the defendant committed the crime on a date reasonably near a date unknown to the grand jury and continuing until on or about September 28, 2023, the date stated in the indictment.

1.21 "Caution consider only the crimes charged." You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crime

charged. The defendant is not on trial for any act, conduct or offense not alleged in the indictment. Neither are you called upon to return a verdict as to the guilt of any other person or persons not on trial as a defendant in this case, except as you are otherwise instructed.

1.22 "Caution - Punishment." If a defendant is found guilty, it will be my duty to decide what the punishment will be. You should not be concerned with punishment in any way. It should not enter your consideration or discussion.

1.32 "Similar Acts." You have heard evidence of acts of the defendant, which may be similar to those charged in the indictment but which were committed on other occasions. You must not consider any of this evidence in deciding if the defendant committed the acts charged in the indictment. However, you may consider this evidence for other very limited purposes. If you find beyond a reasonable doubt from other evidence in this case that the defendant did commit the acts charged in the indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment or whether the defendant had a motive or the opportunity to commit the acts charged in the indictment or whether the defendant acted according to a plan or in preparation for the commission of a crime or whether the defendant committed the acts for

which she is on trial by accident or mistake.

These are the limited purposes for which any evidence of other similar acts may be considered.

1.41 "Knowingly to Act." The word "knowingly" as that term has been used from time to time in these instructions means that the act was done voluntarily and intentionally, not because of mistake or accident.

1.33 "Possession." Possession as that term is used in these instructions may be one of two kinds; actual possession or constructive possession. A person who knowingly had direct physical control over a thing at a given time is in actual possession of it. A person who, although not in actual possession, knowingly has both power and the intention at a given time to exercise dominion or control over a thing either directly or through another person or persons is in constructive possession of it.

Possession may be sole or joint. If one person alone is actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint. You may find that the element of possession is present. If you find beyond a reasonable doubt that the defendant had actual or constructive possession either alone or jointly with others.

1.48 "Cautionary instruction during trial, transcript of tape-recorded conversation." Certain exhibits have been

identified as a typewritten transcript of the oral conversation which can be heard on the tape recording received in evidence. The transcript also purports to identify the speakers engaged in such conversation. I have admitted the transcript for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the tape recording and also to aid you in identifying the speakers. You are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony you have heard concerning the preparation of the transcript and from your own examination of the transcript in relation to your hearing of the tape recording itself as the primary evidence of its own contents. And if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. It is what you hear on the tape that is evidence, not the transcripts.

1.49 "Transcript of Foreign Language. Tape-Recorded Conversation." Among the exhibits admitted during the trial were recordings or text messages that contained conversations in the Spanish language. You are also provided English transcripts for those conversations. The transcripts were provided to you by the government so that you can consider the content of the conversations on the recordings or text

messages. Whether a transcript is an accurate translation in whole or in part is for you to decide. You should not rely in any way on any knowledge you may have of the language spoken on the recording. Your consideration of the transcript should be based on the evidence introduced in the trial. In considering whether the transcript accurately describes the meaning of a conversation, you should consider the testimony presented to you regarding how and by whom the transcript was made. You may consider the knowledge, training and experience of the translator as well as the nature of the conversation and the reasonableness of the translation in light of all the evidence in the case.

2.97 "Conspiracy to distribute or to possess with the intent to distribute a controlled substance." With regard to Count 1 of the superseding indictment, Title 21 United States Code Section 846, makes it a crime for anyone to conspire with someone else to commit a violation of certain controlled substances laws of the United States. In this case the defendant is charged with conspiring to distribute or possess with intent to distribute fentanyl. The elements of distribution or possession with intent to distribute fentanyl are: Number one, that the defendant knowingly distributed or possessed a controlled substance. Number two, that the substance was in fact fentanyl. And number three, that the defendant distributed the substance or possessed the substance

with the intent to distribute it.

Fentanyl is a controlled substance within the meaning of this law. A conspiracy is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of partnership in crime in which each member becomes the agent of every other member. For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt: First, that two or more persons directly or indirectly reached an agreement to distribute or possess with intent to distribute fentanyl. Second, that the defendant knew of the unlawful purpose of the agreement. And third, that the defendant joined in the agreement willfully, that is with the intent to further its unlawful purpose.

One may become a member of the conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If the defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The government need not prove that the alleged conspirators entered into any formal agreement. Nor that they directly stated between themselves all the details of the

scheme. Similarly, the government need not prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out. Nor must it prove that all of the persons alleged to have been members of the conspiracy were such or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives. Mere presence at the scene of an event, even with the knowledge that a crime is being committed or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator.

1.26 "Duty to deliberate verdict form." To reach a verdict, whether it is guilt or not guilty, all of you must agree. Your verdict must be unanimous. It is your duty to consult with one another and to deliberate in an effort to reach agreement, if you can do so. Each of you must decide the case for yourself but only after an impartial consideration of the evidence with your fellow jurors. Do not let any bias, sympathy or prejudice you may feel toward one side or the other influence your decision in any way. In particular, do not let racial, ethnic, national origin or other bias influence your decision in any way.

During your deliberations, do not hesitate to re-examine your own opinions and change your mind if convinced that you were wrong but do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Remember, at all times, you are judges, judges of the facts. Your duty is to decide whether the government has proved the defendant guilty beyond a reasonable doubt. When you go to the jury room, the first thing that you should do is select one of your members as your foreperson, who will help to guide your deliberations and will speak for you here in the courtroom.

A verdict form has been prepared for your convenience. The foreperson will write the unanimous answer of the jury in the space provided, either guilty or not guilty. At the conclusion of your deliberations, the foreperson should date and sign the verdict. If you need to communicate with me during your deliberations, the foreperson should write the message and give it to the court security officer. I will either reply in writing or bring you back into the court to answer your message. Bear in mind that you are never to reveal to any person not even to the Court how the jury stands numerically or otherwise on the indictment until after you have reached a unanimous verdict.

And the foreperson will receive the one and only copy

of this verdict of the jury form. And it reads as follows: "We, the jury, find the defendant Rachel Lynn Waddell, Count 1 of the superseding indictment, conspiracy to distribute or possessed with intent to distribute fentanyl, guilty/not guilty." There are spaces provided for your response and then a space that should be signed by the foreperson and dated by that foreperson.

Now I need to invite the attorneys here to the bench for one final motions practice and then you will begin your deliberations in this case.

(The following proceedings were held at the bench between Court and counsel:)

THE COURT: Okay. So -- so pursuant to Federal Criminal Rule Procedure 30(d), I'm giving each party a final opportunity to object either to the jury charge as read or failure to give a requested instruction.

MR. BARFIELD: Your Honor, I would maintain my objection under 30(d) regarding the changes in regards to the 3010 -- Your Honor, I would maintain my objections to the charge insomuch as the verdict form, the word "and" was changed to "or" from the conjunctive to disjunctive and I believe it was page 27, Your Honor, or 26. I forgot to bring my charge up here in the title on whatever page that's --

THE COURT: Okay. The Court finds that defense counsel has previously argued this objection, the Court

overrules the objection but does find that the argument was preserved adequately for further appellate review and the Court is denying defendant's motion and objection under Rule 30(d).

Do you have any other objections to the Court's reading of the jury charge?

MR. BARFIELD: I have no objections to the Court's reading.

THE COURT: Okay. Any objections from the government?

MS. BELL: None, Your Honor.

THE COURT: Okay. You may return to counsel table.

(The following proceedings were held in open court:)

THE COURT: Now, just further clarification on communications to the Court. So there will be a court security officer posted outside the door of the jury deliberation room. We will provide a form for any questions that you may have.

So in this regard, federal court differs a bit from state or municipal court. We will actually record and place in the electronic file every question that you submit to this Court. So be careful to use this form when you're submitting questions and it should be processed through the foreperson.

If I think the question can be answered directly by this Court without contribution of the attorneys, I'll do so in written form. That too will be made part of the record. If I think I need to hear arguments or input from the attorneys, I

may reconvene a short hearing, hear their arguments on the response to the questions. Then you'll have my final ruling and response, also in written form. So that's the process for jury notes.

Now, in submitting those jury notes, bear in mind the Court's instruction that you are not to indicate to this Court or anybody else where you stand numerically or in any other way. You cannot divulge that information to the Court or to counsel or any other persons until you've reached a unanimous verdict.

Now, we have two alternate jurors and this would be Jurors Number 13 and 14. If you'll please stand now. We have reached the end of this trial process. I want to thank you for your contribution as alternates and I assure you that contribution was necessary.

To give you a recent bad example, a district judge in the Fort Worth Division took a lengthy trial all the way to deliberations. They had to dismiss two alternates for COVID or related illnesses. Then, someone fell down the stairs and they did not have the requisite 12 jurors necessary for a criminal case.

So if you think that this was futile, just remind yourself, we never know when somebody can slip and fall. So -- Or something worse can happen. So your participation is absolutely essential to this process. And I thank you for your

patience and your time in this matter.

Jury services will contact you once this jury has reached a verdict. At that point, you may discuss the case with friends, family, and the others. But you are never under an obligation to do so. It is a specific local rule of the Northern District of Texas that the attorneys may not contact you to discuss your participation in this case.

I'll just ask, if any do, that you please contact the Court and the courtroom deputy so that we can address that. It's a local rule here in the Northern District of Texas that you are not required to respond to those inquiries by attorneys.

Now, at this time, alternates Jurors 13 and 14 are excused; you may return to the jury assembly room to collect your effects. Please follow the instructions of the court's security officers. I'll give you a moment to collect those effects. And then I'll instruct the jury to retire for their deliberations. You are now dismissed from the case with the thanks of the Court.

(The alternate jurors exited the courtroom.)

THE COURT: Okay. I'll give you your last bit of instruction while we ensure that they're exiting that room. All 12 of you must be present for all deliberations. So if there's any sort of break for rest or restroom or anything of that sort, you must discontinue your deliberations while any

member of your jury is absent. So please be disciplined in those deliberation instructions and remember if you're moving about this courtroom to always have that jury identification badge. With that, you may now retire to the jury deliberation room for deliberations and we'll speak once we have a verdict.

(The jury exited the courtroom.)

THE COURT: And you may be seated. So I'll just instruct counsel to remain in relative proximity to this courthouse. You're under no obligation to sit in this courtroom and await a verdict but please remain reasonably close so that we can reach you by cellular phone or mobile device. Make certain that the courtroom deputy and the clerk's office has those numbers if we need to recall you either for a question or the verdict form.

Is there anything other than exhibits, Ms. Bell?

MS. BELL: No, Your Honor. They've been checked and they're ready to go back. I think we have to sign something first.

THE COURT: Okay. So once the CRD returns we'll make sure that that document is executed. We've also made available at court expense a laptop for the viewing of any audio visual files that are in evidence. And let's be doubly certain that we're only dealing with redacted forms if that applies. So with that, we will begin the jury deliberation process. You'll hear from this Court when we have a verdict, or I think a

question requires a response from the attorneys.

With that, we stand in recess until such time.

(Off the record at 3:04 p.m.)

(On the record at 4:23 p.m.)

THE COURT: The Court is back on the record in Criminal Action Number 2:23-CR-69-Z-BR-5, United States of America vs. Rachel Lynn Waddell, for continuation of trial proceedings.

This Court has received a verdict form from the jury, and at this point I'll instruct the court security officers to bring in the jury.

(The jury entered the courtroom.)

THE COURT: And please be seated.

Members of the jury, I've been advised that you have reached a unanimous verdict in this case. I will hand the verdict form to my courtroom deputy and this is the procedure we'll follow.

First, the courtroom deputy will read aloud the verdict form in its entirety. After that's read, I'm going to ask each of you individually if this is your verdict. We'll just go down the row sequentially 1 through 12, if you will respond yes or no for record purposes that will constitute this Court's polling of the jury.

So we'll begin with the reading of the verdict form and I'll ask that the defendant stand with counsel for the

reading of the verdict.

VERDICT

THE COURTROOM DEPUTY: In the United States District Court for the Northern District of Texas, the Amarillo Division, United States of America vs. Rachel Lynn Waddell, Case Number 2:23-CR-69-Z, verdict of the jury.

We, the jury, find the defendant Rachel Lynn Waddell, Count 1 of the superseding indictment, conspiracy to distribute or possess with intent to distribute fentanyl, guilty.

THE COURT: Now that the verdict has been published, I will poll the jury on the Court's own motion.

Juror Number 1, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 2, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 3, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 4, is this your verdict.

THE JUROR: Yes.

THE COURT: Juror Number 5, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 6, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 7, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 8, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 9, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 10, is this your verdict?

THE JUROR: Yes.

THE COURT: Juror Number 11, is this your verdict?

THE JUROR: Yes.

THE COURT: And, Juror Number 12, is this your verdict?

THE JUROR: Yes.

THE COURT: Having now polled the jury, the Court does find that the verdict is unanimous and I'll leave you with some final instructions.

We have reached the end of this trial process. I want to thank you for your deliberations, also your attention throughout many long days of testimony and evidence, also a lengthy voir dire process. So I know that this has been a stressful process, and I thank you for your sense of civic responsibility. As the Court's jury charge explained, your deliberations are secret. You never have to explain your verdict to anyone, but when you are excused you may discuss it among yourself or with family member.

Those communication restrictions will then be lifted,

but I do want to advise you of Northern District of Texas local Rule 24.1. That rule states that a party attorney or representative of a party or attorney shall not before or after trial contact any juror, prospective juror, or the relatives, friends or associates of a juror or prospective juror unless explicitly permitted to do so by the presiding judge. I am not permitting the attorneys to do so in this case and if you feel at all harassed in any way by attorneys or parties, please contact the Court. I don't allow attorneys to contact jurors for that purpose. And I do strictly enforce Rule 24.1.

You may leave your juror badge in the deliberation room. You may pick up all of your effects. And on behalf of this Court and staff and everyone else associated with this case, I want to thank you for your service today.

Any objection to excusing the jury?

MS. BELL: No, Your Honor.

THE COURT: Any objection to excusing the jury?

MR. BARFIELD: No, Your Honor.

THE COURT: Okay. Jurors, you are excused from service.

(The jury exited the courtroom.)

THE COURT: And please be seated.

One bit of motions practice. Does defendant renew her motion for judgment of acquittal?

MR. BARFIELD: We do so renew, Your Honor, our motion

for judgment of acquittal.

THE COURT: A response from the government.

MS. BELL: For the same reasons stated before, we -- excuse me -- ask the Court to deny the motion.

THE COURT: The Court does deny that motion pursuant to Federal Rule of Criminal Procedure 29(a) and the Court is satisfied that at all times the government met its burden under that rule and others.

In the coming days, this Court will enter an order setting schedule for sentencing. This will require the participation of a United States probation officer. That will also require the preparation of a presentence report or PSR. So in the coming days that scheduling order will set the deadlines for that process.

Mr. Barfield, I know you're well acquainted with this Court's sentencing practice and process. I'll just instruct you to advise your client of her rights to have you present or other counsel throughout the sentencing process.

Just because we've reached a verdict, that does not mean that you are without a right to representation from this point forward. So you have a right to counsel during the sentencing process, during your meetings with the United States probation officer and during that PSR process.

That anticipated order will also set a date for the sentencing hearing. So I'll ask parties to be diligent in

noting that date and all deadlines that apply.

Is there anything further from the defendant?

MR. BARFIELD: No, Your Honor.

THE COURT: Anything further from the government?

MS. BELL: No, Your Honor.

THE COURT: We are adjourned in this matter. Counsel are excused. Please coordinate with the clerk's office and CRD to gather your effects. And the defendant is remanded into the custody of the United States Marshal.

(The proceedings adjourned at 4:31 p.m.)

C E R T I F I C A T E

I, Shayna Montgomery, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Amarillo Division, hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above entitled and numbered cause.

WITNESS MY HAND on this 29th day of October, 2024.

/s/Shayna Montgomery
SHAYNA MONTGOMERY, RMR, CRR
United States Court Reporter
205 SE 5th Ave, Room 133
Amarillo, Texas 79101
(806) 468-3816