IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 2:23-cr-00069-Z-BR-4 |
| | ) | |
| Government, | ) | |
| | ) | |
| VS. | ) | Tuesday, June 4, 2024 |
| | ) | 10:03 a.m. - 10:56 a.m. |
| JULIAN GABRIEL APODACA, | ) | |
| | ) | |
| Defendant. | ) | SENTENCING HEARING |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MATTHEW J. KACSMARYK

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE GOVERNMENT:         UNITED STATES ATTORNEY'S OFFICE
                            BY:  ANNA MARIE BELL, AUSA
                            500 South Taylor Street, Suite 300
                            Amarillo, Texas 79101


FOR THE DEFENDANT:          FEDERAL PUBLIC DEFENDER'S OFFICE
                            BY:  C. LEN WALKER, ESQ.
                            3401 SW 6th Avenue
                            Amarillo, Texas 79106


COURT REPORTER:             SHAYNA MONTGOMERY, CSR, RMR, CRR
                            United States Court Reporter
                            205 SE 5th Ave, Room 133
                            Amarillo, Texas 79101


Proceedings reported by mechanical stenography and transcript produced by computer.

P R O C E E D I N G S

THE COURT:  The Court calls Criminal Action Number 2:23-cr-069-Z-BR-4, United States of America vs. Julian Gabriel Apodaca, for sentencing.

Are the parties ready to proceed?

MS. BELL:  The United States is ready, Your Honor.

MR. WALKER:  The defense is ready, Your Honor.  My client, Mr. Apodaca, is with me.

THE COURT:  Counsel for the United States is present. Counsel for defendant Julian Gabriel Apodaca is present.

Mr. Apodaca, please acknowledge your presence in court today by stating your full name for the record.

THE DEFENDANT:  Julian Gabriel Apodaca.

THE COURT:  And, Mr. Apodaca, from this point forward you may participate in this hearing seated or standing, whatever is most comfortable and consistent with the advice of counsel.

Before we proceed with sentencing in the usual order, the Court will announce its tentative determination that upward variance is necessary based on the information contained in the presentence report and the addendum.  This Court has tentatively determined that a nonguidelines upward variance to a term of imprisonment of 240 months followed by a term of supervised release of three years is sufficient but not greater than necessary to give appropriate weight to the factors that

apply at sentencing, pursuant to 18 U.S.C. Section 3553(a).

In United States vs. Mejia-Huerta, the Fifth Circuit expressly held that, quote, "Sentencing courts are not required to give presentencing notice of their sua sponte intention to impose a nonguidelines sentence, regardless of the pre-Booker pronouncements of Burns vs. United States or Rule 32(h)." Counsel may find this case, which collects other cases, at 480 F.3d 723, a Fifth Circuit case from 2007.

Nonetheless, the Court has announced its tentative determination to provide defendant with a full and complete opportunity to object to the Court's upward variance, and the time to enter those arguments and provide that information to the Court is after this Court calculates and announces the advisory guidelines range, which must serve as our starting point.

Now, Mr. Apodaca, you appeared before United States Magistrate Judge Lee Ann Reno on January 31st, 2024.  At that time, you entered a plea of guilty to Count 4 of the superseding indictment charging you with possession with intent to distribute fentanyl, in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C).

On that date, Magistrate Judge Reno found that your guilty plea was knowledgeable and voluntary and that it was supported by an independent basis in fact containing each of the essential elements of that offense.  You told Judge Reno

that you understood the elements of the offense, you agreed to the accuracy of the factual resume, and you admitted that you committed all essential elements of that offense.  Accordingly, on February 16, 2024, this Court entered an order accepting your plea and adjudging you guilty of the crime alleged in the superseding indictment.

Now, this plea of guilty was entered pursuant to a written plea agreement, a written factual resume and a written plea agreement supplement.  And pursuant to Section 6B1.2(a) and Rule 11(c)(1)(A), this Court reviewed your plea agreement, factual resume, superseding indictment and the undisputed facts set forth in the PSR and thereby determined that the remaining charge does adequately reflect the seriousness of your actual offense behavior so that accepting your plea agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines, all relevant conduct having been taken into consideration in calculating the total offense level.

For those reasons and consistent with Rule 11(c)(4), this Court accepts your plea agreement and judgment and sentence will be consistent with that plea agreement.

Now let's turn to the PSR and the addendum that followed.

Ms. Bell, did the government receive timely copies of both the PSR and addendum?

MS. BELL:  Yes, Your Honor.

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

THE COURT:  Other than the government's written response in Document Number 291, does the government have any additional response, objection or requested factual clarification?

MS. BELL:  No, Your Honor.

THE COURT:  And does the government adopt the facts and conclusions set forth in the PSR as modified by the addendum?

MS. BELL:  Yes, Your Honor.

THE COURT:  Now, Mr. Walker, did you and your client receive timely copies of both the PSR and addendum?

MR. WALKER:  We did, Your Honor.

THE COURT:  And did you have a full and complete opportunity to review both the PSR and addendum with your client?

MR. WALKER:  Yes, sir.

THE COURT:  And did you explain to your client how the PSR and addendum work in this sentencing process?

MR. WALKER:  I did, Your Honor.

THE COURT:  Are you confident that your client understands every word, sentence and paragraph of that PSR and addendum?

MR. WALKER:  Yes, Your Honor.

THE COURT:  Now, here, defendant timely filed proposed clarifications in Sealed Document Number 296 that are

arguably rendered moot by the addendum.  These are specific to information appearing in PSR paragraph 68.

Does defendant agree with the Court that the addendum corrected the information discussed in defendant's proposed clarifications to PSR paragraph 68 such that they are now moot?

MR. WALKER:  We agree with that, Your Honor.

THE COURT:  Okay.  Does defendant have any untimely objections, responses or requested clarifications?

MR. WALKER:  No, Your Honor.

THE COURT:  And does the defendant accept the -- accept and adopt the facts and conclusions set forth in the PSR as modified by that addendum?

MR. WALKER:  We do, Your Honor.

THE COURT:  Okay.  So let's turn to acceptance of responsibility.

Ms. Bell, pursuant to Section 3E1.1(b), this defendant may qualify for a one-level deduction upon motion of the government if he timely assisted authorities in investigating his own misconduct and timely noticed his intent to plead guilty.  Here, PSR paragraph 30 states the defendant did both.

Does the government agree with the PSR and move this Court to grant the one-level deduction for acceptance of responsibility?

MS. BELL:  Yes, Your Honor, the government so moves.

THE COURT:  The Court grants the government's motion and will apply the third point for acceptance of responsibility in calculating the advisory guidelines range.

Now, having ruled on defendant's requested clarifications and confirmed with defense counsel that they are mooted by the addendum, the Court hereby adopts the remaining findings and conclusions of the PSR and addendum in their entirety.

The Court will now calculate and announce the advisory guidelines range.

Here, the Court is applying the federal statutes relevant to this offense of conviction and the 2023 Guidelines Manual.  The Court compared that newer 2023 Guidelines Manual to the guidelines in effect on the date of the instant offense of conviction and thereby determined that application of this newer 2023 Guidelines Manual will not violate the ex post facto clause of the Constitution or any right of defendant.

Mr. Walker, do you agree that this Court should apply the 2023 manual?

MR. WALKER:  I do, Your Honor.

THE COURT:  And does the government agree?

MS. BELL:  Yes, Your Honor.

THE COURT:  This Court will apply the 2023 Guidelines Manual in calculating the advisory guidelines range, but before doing so, the Court will note the considerable impact of the

plea agreement entered in this case and applicable statutory maximums noted in the PSR.

Here, defendant could have faced an additional maximum sentence of 20 years imprisonment had he been convicted on Count 1 in the superseding indictment. Additionally, a total offense level of 32 and a criminal history category of VI would have generated an advisory guidelines range of 210 to 262 months but for statutory maximums that apply. So this Court finds that defense counsel capably and effectively negotiated a plea agreement that significantly reduced defendant's overall sentencing exposure.

Having considered the probation officer's calculations and conclusions set forth in the PSR and addendum, and there being no objections to those calculations and conclusions, this Court adopts the probation officer's calculations and conclusions and thereby determines that the correct advisory guidelines range is as follows: a total offense level of 29, a criminal history category of VI, an imprisonment range of 151 to 188 months, a supervised release range of three years, a fine range of 30,000 up to $1 million, and restitution in the form of community restitution.

Understanding that this Court will next adjudicate its own motion for upward variance, does defense counsel have any objections to the Court's calculation of the advisory guidelines range which must serve as our starting point?

MR. WALKER:  To the calculated guideline range as stated in the PSR, no objection, Your Honor.

THE COURT:  Okay.  Any objection to those calculations, Ms. Bell?

MS. BELL:  No, Your Honor.

THE COURT:  The Court will apply that advisory guidelines range as its starting point.

I'll turn now to the Court's own motion for upward variance announced at the outset of the hearing.

Here, the Court has determined that a nonguidelines upward variance to 240 months imprisonment is sufficient but not greater than necessary pursuant to the following Section 3553(a) factors and facts.

And as you know, Mr. Walker, and as you know, Ms. Bell, the Court will state aloud its reasons for determining that upward variance is necessary using each 3553(a) factor.  I'll make that announcement factor by factor, then I'll invite any argument or response that is not cumulative of information already before the Court in written form.

First, pursuant to Section 3553(a)(1), here, the history and characteristics of the defendant includes a lengthy criminal history beginning as early as 15 years of age.  This is reflected in PSR paragraph 45.  These convictions include possession of a controlled substance in a drug-free zone,

failure to identify as a fugitive from justice, possession of marijuana, assault causing bodily injury to a family member, theft of property, evading arrest or detention, and burglary of a habitation.  This is all detailed in the unobjected-to PSR paragraphs 45 through 54.

Additionally, defendant committed the instant federal offense while under a criminal justice sentence.  This is reflected in PSR paragraph 57.

The Court finds that the history and characteristics of this defendant are aggravating in the extreme and weigh heavily in favor of the proposed upward variance.

Next, pursuant to Section 3553(a)(2)(A) which requires the Court to consider the nature and circumstances of the offense, to reflect the seriousness of and to provide just punishment for that offense, here, defendant trafficked at least 7,000 fentanyl pills in and through the Amarillo Division, and the Court expressly finds that this is a conservative estimate of defendant's actual drug trafficking activities.  Here, the Court is relying in part on PSR paragraph 24.

Notably, the potency of fentanyl presents an enormous danger to the public.  A January 2021 report released by the United States Sentencing Commission on fentanyl and fentanyl analogs states, quote, "Fentanyl is approximately 30 times more potent than heroin and approximately 60 times more potent than

morphine, resulting in increased potential for fatalities, particularly when the user is unaware that they are using fentanyl."

Upon his arrest, defendant was found in possession of fentanyl pills, cocaine and a firearm all within close proximity to each other.  This combination of drugs and a firearm constitute what the Fifth Circuit has labeled "drug trafficking tools of the trade."  Counsel may refer to United States vs. Zapata-Lara, 615 F.3d 388, a Fifth Circuit case from 2010, collecting other cases explaining the "tools of the trade" nomenclature.

Importantly, this combination of firearms and other drug trafficking implements increases the potential for deadly conduct when trafficking controlled substances.  Additionally, defendant possessed a stolen firearm, which is an additional aggravating factor not currently contemplated by the United States sentencing guidelines.  Here, the Court is relying in part on PSR paragraph 16.

Finally, defendant also supplied a fentanyl pill to a 16-year-old coworker who complained to defendant about a hurting back.  That episode is reflected in PSR paragraph 25. The 16-year-old boy unknowingly consumed the fentanyl pill believing it to be a pain pill and thereby overdosed on fentanyl.

As described by the probation officer in

unobjected-to PSR paragraph 98, defendant left his minor coworker passed out in his car, and this required bystanders to call 9-1-1.  The victim was ultimately resuscitated with the use of Narcan, N-A-R-C-A-N, and defendant continued distributing fentanyl pills after nearly causing the death of this coworker.  This too is reflected in PSR paragraph 98.

This offense conduct, however, did not result in a higher advisory guidelines range, and this Court finds this information in PSR paragraph 98 and PSR paragraph 25 provides additional grounds for a nonguidelines upward variance to reflect the seriousness of defendant's actual offense conduct, consistent with Section 3553(a)(2)(A).

The Court finds that that factor and underlying facts are aggravating in the extreme and weigh heavily in favor of upward variance.

Finally and importantly, pursuant to Section 3553(a)(2)(C), this Court must promote respect for the law, afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant.  As stated aloud at the sentencing hearing, defendant trafficked an enormous amount of fentanyl into the Amarillo Division.  He has not been deterred from criminal conduct despite prior terms of incarceration, and despite causing at least one overdose, defendant continued in his criminality, and this Court finds he would have done so but for the intervention of law enforcement.

The Court finds that the 3553(a)(2)(C) factor is aggravating in the extreme with particular focus on the need to protect the public from further crimes of this defendant, and this 3553(a)(2)(C) factor and facts weigh heavily in favor of upward variance.

For the reasons and 3553(a) factors stated, this Court has tentatively determined that nonguidelines upward variance to 240 months imprisonment is necessary.

Now, this is a tentative determination.  I've provided counsel for both parties this Court's factor-by-factor reasoning and weighting.  I'll now invite any argument that is not cumulative.

Mr. Walker, you may proceed.

(Pause in proceedings.)

MR. WALKER:  Your Honor, I can't argue about the criminal history of my client; it's a fact.  They appear to be accurate, the criminal history does appear to be accurate.

I think that the -- a large consideration for the Court to consider, however, would be the circumstances of the young boy involved in this.  We certainly understand the gravity and seriousness of him overdosing.  My client has been consistent in saying that he did and admitted giving him a fentanyl pill because he did -- the boy was complaining of some pain, back pain I believe.

We do not believe that that would have been

sufficient.  I would ask the Court to consider that my client has also been consistent in saying, at least to me, that the boy knew that there must have been more and broke into the car and took we don't know how many -- how many pills.

Now, obviously, it's not much of an excuse to have the pills because they were certainly in my client's possession and in his car, but they were not made readily-accessible to that -- to that young man, but it is absolutely unfortunate that he did gain access and consumed them.

I do understand that the factors in 3553 of fentanyl is certainly dangerous.  It's one of the most dangerous drugs out there.  I'm not sure that my client fully understood that this firearm that he was in possession with was stolen, although I'm not trying to excuse the fact that a firearm was obtained and was in close proximity to the narcotics.

Judge, my client has shown to me a tremendous turnaround.  The original guideline range is -- is significant in itself.  I do believe that the amount of time that the Court could sentence my client in that guideline range would be sufficient to promote respect of law and to protect the citizens and the public at large.

13 to 15, 16 years is a significant amount of time, and I would ask that under the factors of 3553, that the Court do -- impose a sentence that is within that guideline range.

THE COURT:  Thank you, counselor.

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

The Court will give appropriate weight to the argument of defense counsel.

And, Ms. Bell, you may respond on behalf of the government.

MS. BELL:  Thank you, Your Honor.

Your Honor, as the Court has stated, the defendant gave a pill to a minor and he was with that minor when the minor overdosed, Your Honor, which is reflected in PSR paragraph 25.  Mr. Apodaca was very cowardly that day and he had warrants, and so he left the minor overdosing and in a bad state in his vehicle.  He did tell other landscapers to call 9-1-1, but he left the area.  He just didn't want to go to jail, Your Honor.  That is a very cowardly act.

After that, as the Court had noted, Mr. Apodaca just continued to sell fentanyl pills knowing the danger, and in paragraph 21 it reflects that on the week that Mr. Carlisle was in town, which is the first week in August, four weeks after the overdose of the minor, Mr. Apodaca said he sold at least a thousand pills.

Mr. Apodaca is only 28 years old and yet he has racked up enough criminal history points for his convictions to be in Criminal History Category VI, the highest category, Your Honor.  And as the Court noted, he sold at least 7,000 pills, but likely sold many, many more.  Given the danger to the public and the seriousness of this offense and to protect the

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

public from future crimes of this defendant, the government cannot argue against the Court's proposed upward variance.

THE COURT:  Thank you, counselor.

The Court will give appropriate weight to the argument of the AUSA.

(Pause in proceedings.)

THE COURT:  This Court adopts its tentative determination as its final finding and ruling that upward variance is necessary for all the aforementioned 3553(a) factors and facts previously discussed and analyzed.

Additionally, this Court will note that PSR paragraph 26 reflects that, quote, "Defendant would only admit to the agents that the male must have found the pill in Apodaca's car and took it," reflecting that he was not fully cooperative in taking responsibility for the episode leading to the overdose discussed in PSR paragraphs 25 and then again in 98.

Though defense counsel, the government and this Court have paid particular attention to this one overdose episode, it is not the weightiest factor in this Court's 3553(a) analysis, and instead, this Court is arriving at upward variance through a totality of the 3553(a) factors and facts previously discussed.

It is the totality of the criminality reflected in the PSR and defendant's criminal history and this particular federal offense of conviction that causes the Court to conclude

that upward variance is necessary to give appropriate weight to the 3553(a) factors that apply at sentencing.

So this Court overrules defendant's objections to upward variance and does adopt as its final finding the tentative determination that upward variance to 240 months imprisonment is necessary.

So let's turn to statements, final arguments and allocution.

Ms. Bell, did the government comply with any and all victim reporting requirements?

MS. BELL:  We did, Your Honor, and just to put on the record again, we did notify the juvenile's family.  I have called.  We have sent letters to his family of every hearing and of this proceedings, and I have attempted to make contact with them.  They have, I believe, chosen not to participate in this proceeding, but we have made every notice -- every effort to notify them and they were, in fact, notified of this hearing date.

THE COURT:  Okay.  And so through the victim witness coordinator and the Amarillo Division U.S. Attorney's Office, the government did comply with the victim impact requirements imposed by statute, is that correct?

MS. BELL:  We did, Your Honor, and I myself attempted to make -- and left voicemails, Your Honor, and tried to make contact.

THE COURT: Okay. Thank you for that clarification.

The Court finds that the government discharged its duty under the statutes and rules requiring that victims be involved in this sentencing process.

Now, Mr. Walker, this Court did not receive any written character statements on behalf of defendant, but I will waive any deadlines that otherwise apply if you intend to present character statements at this sentencing hearing either through live testimony or written document.

MR. WALKER: Your Honor, we did speak about letters and we chose to have people present themselves to the Court. We have three, if the Court would allow.

THE COURT: Okay. And for record purposes and the benefit of the court reporter, can you give me those three names?

MR. WALKER: Your Honor, we have Anisia Apodaca. We have Mark Hutchins and we have his mom, Christina. Luera, Christina Luera.

THE COURT: Okay.

MR. WALKER: Oh, I'm sorry. I'm corrected. Anisia Garcia, Your Honor.

THE COURT: Okay. So I'll allow you to call those three persons in that order. You may call your first character statement.

MR. WALKER: Anisia Garcia will go first, Your Honor.

THE COURT:  And, Ms. Garcia, you may approach the podium.  I just request that you start with a statement of your full name, and then you may take as much time as you need.

ANISIA GARCIA:  Anisia Garcia, Your Honor.

I just wanted to state that my brother is loved and he too was on that bad drug that led him down all these paths.  I just want to say that I hope he doesn't get the most time so he can come back out with his family and his two sons.  And we love him.

THE COURT:  Okay.

ANISIA GARCIA:  And he still is a human that made a bunch of bad choices, but he is still loved.

THE COURT:  Okay.

ANISIA GARCIA:  Thank you, Your Honor.

THE COURT:  Thank you, Ms. Garcia.  The Court will give appropriate weight to your character statement.

Mr. Walker, you may call your next character statement.

MR. WALKER:  Thank you, Your Honor.  Mark Hutchins.

THE COURT:  And please speak clearly into that microphone and begin with a statement of your full name.

MARK HUTCHINS:  Okay.  My name's Mark -- Mark Stephen Hutchins.

THE COURT:  Okay.  You may proceed and take as much time as you need.

MARK HUTCHINS:  I just want to say Julian has worked for me since he was 18.  He's always been a great worker.  I always noticed he had addiction to drugs, which was his biggest problem.  He came off and on of it.  I've seen him sick and everything, you know, just trying to get off drugs, but he just -- he just couldn't do it.  We've tried to get him some help.

And he just -- you know, he's a good -- he's got a good heart.  He loves his kids.  His kids love him.  He's just -- you know, he's always helped me out on working and just always nice to every -- you know, everybody I know.

And, you know, anyway, that's about all, you know. He's got a good heart and just this drug addiction that's got him ever since he was like 18 years old and started with heroin.  He got off that, and so he got on to other stuff. So --

THE COURT:  Okay.

MARK HUTCHINS:  -- anyway --

THE COURT:  Thank you, sir.

MARK HUTCHINS:  All right.  Thank you.

THE COURT:  I'll give appropriate weight to your character statement.  You may return to the gallery.

Mr. Walker, you may call your third and final character statement.

MR. WALKER:  Thank you, Your Honor.  We'll call my

client's mom, Christina Luera.

THE COURT:  And I'll just ask that you speak clearly into the microphone and you begin with a statement of your full name.

CHRISTINA LUERA:  My name is Christina Luera.

THE COURT:  You may take as much time as you need.

CHRISTINA LUERA:  Well, just basically what they've all said.  He's a good person with a good heart and I can say that because I raised him.  Since he was little, we'd go pick up cans and I'd recycle them and say this is what you do when you work, you earn money.  So I've done my best to guide him and he is a good person and he does have two sons that know him and love him, and I believe he's already looking better.

When he gets out, I believe he can come out to do the right thing because we love him and we miss him and he is human and God forgives and I pray that he can be forgiven for his mistakes also because he is human and he is loved and missed.  Thank you.

THE COURT:  Thank you, Ms. Luera.  You may return to the gallery.

And for all three persons who presented character statements through live testimony, I wanted to highlight what defendant reported to the probation officer through the presentence report.

In PSR paragraph 61, he states that he was raised by

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

his mother and she was a, quote, "big part of his life."  He also states that he is close to and was raised with his maternal half-sister, Anisia Garcia.  And in PSR paragraph 65, he states that his former employer, Mark Hutchins, has been a positive influence on his life and a good friend.

So though we are all here to address the criminality of this offense of conviction, I did want the family and friends to know that the defendant in his own words notes the positive influence that you've been on him and what an impact that you have made in his life.  And I know that he does have several good people in his life that are influencing him in the right way, and I wanted you to know that even the defendant in his own words to the probation officer acknowledges the positive impact you have all had on his life.

With that, let's turn to final arguments.

You have this Court's ruling on the Court's motion for upward variance.  That is without prejudice to either parties -- either of the parties entering final arguments, arguing for a sentence within the advisory guidelines range, for variance or departure.  I just caution counsel, if you are arguing for departure, please identify relevant guidelines sections so the Court may properly adjudicate that request, and if you're arguing for a different form or degree of variance, please use the 3553(a) factors as your guardrails and guideposts.

with that, Ms. Bell, you may proceed with any final argument the government deems necessary.

MS. BELL:  Nothing outside the arguments already made, Your Honor.

THE COURT:  And, Mr. Walker, you may proceed with any final argument you deem necessary.

MR. WALKER:  Your Honor, the only thing I would add is that, you know, I've -- as the Court knows, I've been on both sides of the bar.  I respect both sides of the bar.  It's not easy being on the prosecution side, just like it's not easy being on the defense.  But along the way, when I defend these people, I do get to know them.  I do think that this -- that this still very young man has potential to be useful to society at some point.  I do not think that it's absolutely necessary to go to the full 240 months.  I ask the Court to reconsider that and to impose a sentence within the original guidelines as stated in the PSR.  Thank you.

THE COURT:  Thank you, counselor.  The Court will give appropriate weight to your final argument.

And I'll now explain to defendant his right of allocution.

Mr. Apodaca, you have the absolute right to allocute at federal sentencing.  Allocution simply means you may tell the Court any information you think is relevant to the sentencing decision.  You may read aloud a prepared written

statement, you may present arguments, and you may present facts for the Court to consider. You have an absolute right to allocute at this sentencing hearing, but you can never be forced to allocute.

Is there anything you would tell the Court at this time in the form of allocution?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Please proceed.

THE DEFENDANT: I just want to start by saying with a 16-year-old kid I would never intentionally give him a fentanyl pill if I didn't -- you know, I didn't think he would get into my car. Because he knows I always keep things in my car, so that's how he got access to the pill. But also, I just want to say, I want to take this opportunity to accept what's happening and just thank you for this opportunity even though it's a bad one, but --

THE COURT: And, Mr. Apodaca, at a later interval in the sentencing hearing I'll request recommendations for your continued care, vocational training, facility placement. I take seriously those recommendations to the Bureau of Prisons. If there are any particular programs or vocational tracks or education tracks that you have interest in, please consult with your attorney. He will make those requested recommendations to the Court.

That too is part of this sentencing process. I know

that this is an intimidating and daunting process, but it also includes those recommendations for your continued care, your treatment, your education, and I do intend to make specific recommendations in those areas.

THE DEFENDANT:  Thank you.

THE COURT:  If there are any programs or treatments that you would request, please relay that information to Mr. Walker; we will make that part of the record.  That part of sentencing simply happens towards the end of the hearing.

So with that, Mr. Walker, do you know of any reason why this Court may not impose lawful sentence?

MR. WALKER:  No, Your Honor.

THE COURT:  Any reason known to the government?

MS. BELL:  No, Your Honor.

THE COURT:  Having considered the permissible factors set forth at 18 U.S.C. Section 3553(a), the advisory sentencing guidelines, the conduct admitted in the factual resume, and the capable and effective assistance of defense counsel which persuaded this Court to accept the plea agreement and also weighed heavy in the Court's analysis on variance, and all mitigating and aggravating factors, it is the judgment of the Court that the defendant Julian Gabriel Apodaca is hereby committed to the custody of the Federal Bureau of Prisons for a period of 240 months.

This represents an upward variance to the statutory

maximized authorized sentence -- I'm sorry, statutory maximum authorized sentence for the reasons stated in the Court's adjudication of its own motion, the 3553(a) factors and facts previously identified and for the reasons appearing in the statement of reasons.

The Court does not order a fine because defendant lacks the financial resources or future earning capacity to pay a fine.  The Court does order a mandatory special assessment of $100, which is due and payable immediately.

And with this announcement of the term of imprisonment, this Court overrules defendant's objections to upward variance and request for a sentence within the advisory guidelines range.

The Court does not order restitution because there are no identifiable victims other than society at large.

The Court further orders that upon release from imprisonment, defendant shall be placed on supervised release for a term of three years.

While on supervised release, defendant shall comply with the mandatory conditions listed at Section 3583(d) and Section 5D1.3(a) of the Guidelines Manual, the standard conditions listed at Section 5D1.3(c) of that Guidelines Manual, and the following discretionary, special and additional conditions of supervised release derived from Sections 5D1.3(b), (d) and (e) of the Guidelines Manual.

Number one, the defendant shall participate in outpatient mental health treatment services as directed by the probation officer until successfully discharged.  These services may include medications prescribed by a licensed physician.  The defendant shall contribute to the cost of services rendered copayment at a rate at at least $25 per month.

Number two, the defendant shall participate in an outpatient program approved by the probation officer for treatment of narcotic drug or alcohol dependency that will include testing for the detection of substance use, abstaining from the use of alcohol and all other intoxicants during and after completion of treatment and contributing to the cost of services rendered copayment at the rate of at least $25 per month.

Mr. Walker, did you and your client receive a timely copy of the written notice of intent to impose conditions of supervised release?

MR. WALKER:  We did, Your Honor.

THE COURT:  Did you have a full and complete opportunity to review the notice with your client?

MR. WALKER:  I did.

THE COURT:  Did you explain to your client the conditions of supervised release stated in this notice and pronounced aloud at sentencing?

MR. WALKER:  I did, Your Honor.

THE COURT:  Did you specifically explain the discretionary, special and additional conditions appearing on page 4 of the written notice and pronounced aloud at sentencing?

MR. WALKER:  Yes, sir.

THE COURT:  Does your client have any objections to the conditions of supervised release stated in the notice and pronounced aloud?

MR. WALKER:  No objections.

THE COURT:  And, Mr. Apodaca, I will ask you directly.  Do you agree to follow and adhere to the conditions of supervised release stated in this written notice and pronounced orally at the sentencing hearing?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And, Ms. Bell, did the government receive a timely copy of that notice?

MS. BELL:  Yes, Your Honor.

THE COURT:  Any objections to the conditions of supervised release appearing therein and pronounced aloud at sentencing?

MS. BELL:  No objections.

THE COURT:  The Court did receive and did review a fully-executed copy of the notice.  It is dated June 4, 2024. It bears the signature of the defendant, defense counsel and

this Court.  It is made a part of the record in this case and in any record on appeal.

The notice and conditions of supervised release stated therein are hereby adopted, ordered and imposed as just pronounced by the Court.

(Pause in proceedings.)

THE COURT:  The Court will now enter its statement of reasons, as required by 18 U.S.C. Section 3553(c)(1).  Because defendant's advisory guidelines range exceeded 24 months, the Court will state its reasons at a particular -- with particularity, as required by 3553(c)(1).

Here, the sentence is sufficient but not greater than necessary to comply with the statutory purposes set forth at Section 3553(a), specifically the reasons stated by the Court when adjudicating its motion for upward variance.  Those 3553(a) factors, facts and analysis are incorporated by reference here as this Court's statement of reasons.

This Court did give significant mitigating weight to the argument of defense counsel in electing to accept this plea agreement and gave significant mitigating weight to defendant's drug addiction, which appears throughout the presentence report.  And though the Court did consider the close proximity of the firearm an aggravating factor supporting variance under 3553(a), this Court at all times was guided by Fifth Circuit jurisprudence that explains why the relevant firearm guideline

section does not apply in this case.  Here, the Court is simply making reference to that stolen firearm as an aggravating factor supporting variance.

So here, when the Court was discussing the stolen nature of the firearm in adjudicating the upward variance in referencing binding Fifth Circuit case law relevant to drug trafficking tools of the trade, this Court was guided by the Fifth Circuit jurisprudence explaining when the stolen nature of a firearm does and does not apply to a guidelines calculation.  Understand that the stolen nature of that firearm did not apply to the guidelines calculations but instead was given weight as a variance factor.

Now, on supervised release the Court did impose a three-year term of supervised release because it'll provide an added measure of deterrence and protection.  In light of the Fifth Circuit's opinion in Diggles and cases applying same, the Court adopted, imposed and ordered the discretionary conditions of supervised release because they are consistent with Section 3583(d)(1), (d)(2) and (d)(3), and the Court expressly states that the discretionary conditions set forth in the notice and pronounced aloud at sentencing involve no greater deprivation of liberty than reasonably necessary, consistent with 3553(a)(2)(B), (a)(2)(C) and (a)(2)(D).

The Court has now entered its statement of sentence and reasons therefore.

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

Does defendant have any objections to the sentence as stated?

MR. WALKER:  No objection, Your Honor.

THE COURT:  Does the government have any objections to the sentence as stated?

MS. BELL:  No, Your Honor.

THE COURT:  The Court hereby orders the sentence imposed as stated.

Finally and importantly, even if the correct advisory guidelines range was not considered, this Court would have imposed the exact same sentence had it not made the error and it would have done so for the exact same reasons given during the sentencing hearing, regardless and irrespective of the applicable advisory guidelines range.

And now, as you know, Mr. Walker, this is the phase of the sentencing hearing I explained to defendant following his allocution.  I will hear your requested recommendations on medical care, vocational and educational training, and residential placement.  Let's take them up in that order.

On medical care, PSR paragraphs 67 through 72 report that he is interested in mental health treatment and substance abuse treatment.  Are there particular programs you would request?

MR. WALKER:  Your Honor, we would request some amount of inpatient treatment right away to -- to meet this head-on.

I do believe that his addiction is at the extreme level, and I think he would benefit from that, perhaps an initial placement in a Federal Medical Center prior to his extended detention. And -- but other than that, he is relatively healthy.  He would also benefit from some mental health counseling, I believe.

THE COURT:  And, Mr. Walker, I know sometimes a mental health recommendation for prescription medications is controversial and often opposed by criminal defendants.  If I make a mental health recommendation, does defendant object to a recommendation for prescribed medications if supervised by a licensed medical professional?

MR. WALKER:  No objection to that at all, Your Honor.

THE COURT:  Okay.  Ms. Bell, any objections to the aforementioned medical recommendations?

MS. BELL:  No, Your Honor.

THE COURT:  This Court does emphatically recommend the most intensive substance abuse treatment consistent with defendant's anticipated security classification and eligibility, if possible a residential substance abuse treatment program; and if necessary, this Court does recommend initial placement in a Federal Medical Center or FMC if required to complete a rigorous drug rehabilitation regimen.

This Court further recommends that defendant be allowed to participate in a mental health evaluation to identify possible treatment, including talk therapy, counseling

and prescribed medications if monitored by a licensed physician or psychiatrist, MD or Ph.D.

On vocational training, we had a character statement from defendant's former employer, Mr. Hutchins, that speak to defendant's work ethic.  This Court finds the defendant is an ideal candidate for continued vocational training and education.  Are there particular courses you would request?

MR. WALKER:  There are, Your Honor.  My client and I discussed this several times.  His entire employment record is in the trades.  He enjoys the trades.  He has an interest in electrical or possibly HVAC vocational training, and the -- it looks like to me the very best facility with the most resources available is Big Springs and we would request a recommendation for placement at Big Springs if suitable.

THE COURT:  Okay.  Any objection to the requested vocational and residential recommendations?

MS. BELL:  No objections.

THE COURT:  This Court does recommend that the defendant be allowed to pursue vocational training and possible certification and licensure in electrical and HVAC fields, and the Court does find defendant is an ideal candidate for continued vocational training.  And the Court does agree with defense counsel that defendant would benefit from the programming available at FCI Big Spring in the South Central Region of the Bureau of Prisons, and the Court further finds

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

that FCI Big Spring would provide programs beneficial to defendant and relative proximity to family and friends, which this Court deems essential to his success during and after incarceration.

Ms. Bell, are there pending indictments or charges to dismiss?

MS. BELL:  Yes, Your Honor.  The government moves to dismiss Count 1 of the superseding indictment as to this defendant only, and as necessary, the government moves to dismiss the original indictment as to this defendant only.

THE COURT:  This Court grants the government's motion and hereby orders Count 1 of the superseding indictment to be dismissed, in the underlying original indictment to be dismissed as to this defendant only and pursuant to this judgment.

Now, Mr. Apodaca, we will discuss and explain your remaining rights of appeal.

Under your plea agreement, you have waived the right to appeal this sentence or contest same in a collateral proceeding with four exceptions.  Number one, you may directly appeal an arithmetic error at sentencing.  Number two, you may directly appeal a sentence exceeding statutory maximum.  Number three, you may challenge the voluntariness of your guilty plea. And, Number four, you may claim ineffective assistance of counsel.

Now, if you decide to appeal, your notice of appeal must be filed with this court within 14 days of the date judgment is entered in your case or within 14 days of the government entering its notice of appeal.  Also, if you do decide to appeal, you have an absolute right to apply for leave to appeal in forma pauperis or IFP.  If granted, this means that you may be allowed to pursue that appeal at no cost to yourself but instead at a cost to the government.

And, Mr. Walker, did you and your client receive a timely copy of the written notice of right to appeal?

MR. WALKER:  We did, Your Honor.

THE COURT:  Did you have a full and complete opportunity to review that notice with your client?

MR. WALKER:  Yes, sir.

THE COURT:  And does your client have any objections to the appellate rights arising under the plea agreement?

MR. WALKER:  No, sir, no objections.

THE COURT:  Any objections to the appellate rights described in this notice?

MR. WALKER:  No, sir.

THE COURT:  And did you specifically explain the 14-day period that applies to the notice of appeal?

MR. WALKER:  I did, Your Honor.

THE COURT:  Ms. Bell, did the government receive a timely copy of that notice?

MS. BELL:  Yes, Your Honor.

THE COURT:  Does the government have any objections to the remaining appellate rights described in that notice and arising under the plea agreement?

MS. BELL:  No objections.

THE COURT:  This Court did receive and did review a fully-executed copy of the written notice of right to appeal. It is dated June 4, 2024.  It bears the signature of the defendant, defense counsel and this Court.  It is made a part of the record in this case and in any record on appeal.

And, Mr. Apodaca, I will caution you that this notice of right to appeal is a different document than the notice of appeal.  If you have any questions about the notice of appeal, please consult with counsel and he can explain the deadlines and deliverables.

Anything further from the government?

MS. BELL:  No, Your Honor.

THE COURT:  Anything further from the defendant?

MR. WALKER:  No, Your Honor.

THE COURT:  This Court will stay in recess for a brief five minutes to allow defendant to speak across the bar to the family members who have assembled here today.  I'll just instruct the defendant to closely follow the instructions of the United States Marshals and the court security officers. They are here for your protection and your family's protection.

And the same instruction goes for the family and friends in the gallery.  Please remain on that side of the bar and closely follow the instructions of the marshals and CSOs at all times.

With that, the Court stands in recess until eleven o'clock.  Counsel are excused unless they are participating in the sentencing hearing set next.

(The proceedings adjourned at 10:56 a.m.)

----

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

C E R T I F I C A T E

I, Shayna Montgomery, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Amarillo Division, hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above entitled and numbered cause.

WITNESS MY HAND on this 26th day of May, 2025.

/s/Shayna Montgomery
SHAYNA MONTGOMERY, CSR, RMR, CRR
United States Court Reporter
205 SE 5th Ave, Room 133
Amarillo, Texas 79101